# EXHIBIT 2

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**IN THE MATTER OF THE COMPANIES LAW (2020 REVISION)**

**IN THE MATTER OF FANG HOLDINGS LIMITED**

**CAUSE NO: FSD  278 OF 2020 ( ASCJ)**

**BETWEEN:**

**(1) EVENSTAR MASTER FUND SPC**
**for and on behalf of EVENSTAR MASTER**
**SUB-FUND I SEGREGATED PORTFOLIO**

**(2) EVENSTAR SPECIAL SITUATIONS LIMITED**

**PETITIONERS**

**and**

**VINCENT TIANQUAN MO**

**FIRST RESPONDENT**

**FANG HOLDINGS LIMITED**

**SECOND RESPONDENT**

_____

**<span style="color:red">AMENDED</span> WINDING UP PETITION**

_____

**TO THE GRAND COURT**

The humble petition of (i) Evenstar Master Fund SPC for and on behalf of Evenstar Master Sub-Fund I Segregated Portfolio and (ii) Evenstar Special Situations Limited each with a registered office at c/o Maples Corporate Services Limited, PO Box 309, Ugland House, South Church Street, George Town, KY1-1104, Cayman Islands (the *"Petitioners"*), shows that:

**A. INTRODUCTION AND OVERVIEW**

**(I)      The Petitioners**

1.      Evenstar Master Fund SPC is an exempted segregated portfolio company incorporated with limited liability under the laws of the Cayman Islands with registration number 134490 and having its registered office at c/o Maples Corporate Services Limited, PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104.

2.      Evenstar Master Sub-Fund I Segregated Portfolio is the sole portfolio within the Fund and was launched in 2005.

1

3.    Evenstar Special Situations Limited is an exempted company incorporated with limited liability under the laws of the Cayman Islands with registered number 361913 and having its registered office address c/o Maples Corporate Services Limited, P.O. Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104.  Evenstar Special Situations Limited is a wholly-owned subsidiary of Evenstar Master Fund SPC.

4.    The Petitioners each hold fifty (50) Class A Ordinary Shares in the Second Respondent, Fang Holdings Limited (**"Fang"** or the **"Company"**).  The First Respondent to this Petition is Vincent Tianquan Mo (**"Vincent Mo"**), the founder and Executive Chairman of Fang. The Petitioners have been entered on Fang's register of members as the holders of fifty (50) Class A Ordinary Shares respectively (one hundred (100) Class A Ordinary Shares in total) since 7 May 2020.

5.    As Fang is listed on the New York Stock Exchange (**"NYSE"**), its Class A Ordinary Shares are not directly traded.  Instead, a class of securities called American Depositary Shares (**"ADS"**) exist to represent the underlying Class A Ordinary Shares which are held by a third-party custodian known as a depositary.  For the Fang ADS/Class A Ordinary Shares, JPMorgan Chase Bank, N.A. (**"JPM"**) acts as depositary.  ADS represent the underlying Class A Ordinary Shares while American Depositary Receipts (**"ADR"**), if issued, evidence the ADS held by any given party.  One (1) ADS currently represents ten (10) Class A Ordinary Shares.  The First Petitioner holds 1,537,484 Fang ADS which represents 15,374,840 Class A Ordinary Shares.  Prior to the presentation of this Petition, the First Petitioner tendered to JPM its ADR, in respect of ~~1,537,274~~ 1,537,484 Fang ADS, for cancellation together with a stock transfer form, transferring the underlying ~~15,372,740~~ 15,374,840 Class A Ordinary Shares from JPM into the First Petitioner's name.  As of the date of presentation of this petition, the conversion of the First Petitioner's ADS into Class A Ordinary Shares is pending.

6.    As will be outlined in further detail below at paragraphs 209-213, Fang announced its intention to raise up to US$30 million by issuing additional Class A Ordinary Shares to its management at a market price equivalent to US$11.84 per ADS (the **"Proposed Issuance"**). An issuance on those terms, if exercised in full, would result in a fresh allotment of 25,337,837 Class A Ordinary Shares to Fang's management.  This announcement was made on 24 August 2020.   No further public announcements have been made by Fang's management in respect of the proposed share issuance since that date and, as at the date of this Petition, direct enquiries made to Fang's board of directors in this regard have not elicited any substantive response.  It follows that details of the current authorised and issued share capital of Fang is not available at present and any reference below to the percentage interest in Fang held by Evenstar (or any other party), and the voting rights exercisable as a result, is predicated on figures provided by the Company publicly prior to 24 August 2020.

7.    The Petitioners have a legal and/or beneficial interest in 23.5% of the authorised and issued Class A Ordinary Shares in the Company.  When considered in the context of the Company's authorised and issued share capital as a whole (including the Class B Ordinary Shares

referred to below at paragraph 15), the Petitioners have a legal and/or beneficial interest in approximately 17.13% of the Company's share capital.

**(II)** **The Company**

8. Fang, formerly Soufun Holdings Limited, is an exempted company with limited liability incorporated under the laws of the British Virgin Islands which continued in the Cayman Islands with registered number 136949 and having its registered office at Vistra (Cayman) Limited, P.O. Box 31119, Grand Pavilion, Hibiscus Way, 802 West Bay Road, ~~Maples Corporate Services Limited, P.O. Box 309, Ugland House, South Church Street~~, Grand Cayman, KY1-1205~~1104~~, Cayman Islands.

9. As at 31 December 2019, the Company had (and may still have) an authorized and issued share capital of 89,740,177 Ordinary Shares with a par value of HK$1.00 each made up of 65,403,527 Class A Ordinary Shares and 24,336,650 Class B Ordinary Shares.[1]  For the reasons outlined above at paragraph 6 and below at paragraphs 209-213, it is not possible to confirm the details of the Company's authorized and issued share capital as at the date of this Petition.

10. As outlined above, the Company's ADS trade on the NYSE under the Ticker Code: SFUN.  The Company completed an initial public offering on 17 September 2010.  Its initial registration statement was governed by the U.S. Securities Act of 1933, which requires complete, accurate and regular disclosure of relevant information to the market.  Thereafter, the Company has been subject to the reporting requirements laid down by the U.S. Securities Exchange Act of 1934 and rules promulgated by the U.S. Securities and Exchange Commission (**"SEC"**), including that it file an annual report conforming with SEC Form 20-F. As such, the Company has been and continues to be under an affirmative duty to report a range of matters fully and completely with the SEC.[2]

11. The Company's principal place of business is in the People's Republic of China (the "**PRC**") and is located at Tower A, No. 20 Guogongzhuang Middle Street, Fentai District, Beijing.

12. The Company holds itself out as conducting the largest real estate internet listing and search portal in the PRC named Fangtianxia (房天下), which offers marketing services, listing services, leads generation services, financial services and e-commerce services.   The Company apparently conducts its business in the PRC through a series of subsidiaries and variable interest entities.  In Chinese, *"Fang"* means house/home or room and *"Tianxia"*

---

[1] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 2 (filed 27 May 2020).  This figure does not account for share options/employee share option schemes which may be in place.
[2] The U.S. Securities Exchange Act of 1934, sections 13 and 15, mandates annual reporting by entities such as the Company.  The rules of the SEC further require certain further reporting, including current reports as to certain matters (known as Form 6-Ks).  In addition, the holders of equity interests in the Company of 5% or more are required to provide initial and ongoing disclosure of various matters relating to their equity interests in certain prescribed forms (known as Schedules 13D and 13G).  As regards all of these filings, the SEC Rules further provide that, "[i]*n addition to the information expressly required to be included in a statement or report, there shall be added such further material information, if any, as may be necessary to make the required statements, in the light of the circumstances under which they are made not misleading.*"

translates as "*land under heaven*" which is ordinarily translated in this context as meaning *"China"* or *"the world."*

13. The Company's Fifth Amended and Restated Memorandum of Association provides that the objects of the Company are unrestricted.  The principal object for which the Company was established was to act and perform all the functions of a holding company in all its branches and to co-ordinate the policy and administration of any subsidiary company or companies wherever incorporated.[3]

14. As at the date of this petition, the Petitioners believe that significant shareholdings[4] in the Company can be summarized as follows:

| Shareholder | % of Shares/ADS in Issue |
|---|---|
| Vincent Tianquan Mo and his affiliated entities | 30.1% |
| Digital Link Investments Limited | 3.5% |
| General Atlantic Singapore Fund Pte.Ltd. | 12.4% |
| Safari Parent (excluding Vincent Mo) | 2.7% |
| IDG and its affiliated entities (excluding Vincent Mo) | 7.3% |
| FIL Limited | 1.9% |
| Fosun International Limited | 3.7% |
| Petitioners | 17.1% |
| Total | 78.6% |

15. Fang's current memorandum and articles of association (the Fifth Amended and Restated Articles of Association (the *"Articles"*)) state that Fang's share capital is divided into Class A Ordinary Shares and Class B Ordinary Shares. As outlined at article 3(3) of the Articles, "*the Class A Ordinary Shares entitle the holder to one vote per share.  The Class B Ordinary Share shall entitle the holder to ten votes per share*".  The holders of the Class B Ordinary Shares are insiders of the company or related to insiders of the company, including the founder of the Company and Executive Chairman of Fang, Vincent Mo.  Vincent Mo and various companies and trusts controlled by him collectively hold approximately 30.1% of the outstanding share capital in the Company (comprising ordinary shares and ADS) representing approximately 71.7% of the voting power under the dual-class (Class A

---

[3] Object 3(a) of the Fifth Amended and Restated Memorandum and Articles of Association.
[4] The details of significant shareholdings are based on Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended December 2019, page 91 (filed 27 May 2020) and SEC Schedule 13D in respect of Fang (filed 13 July 2020).

Ordinary/Class B Ordinary) share structure.  This figure may, however, be greater if all or a proportion of the Proposed Issuance was granted to Vincent Mo and/or entities subject to his control.

16.   Pursuant to Article 58(2) of the Articles, an extraordinary general meeting shall be convened on the requisition in writing by any member holding at least 20% of the paid-up voting share capital of the Company.

**(III)      The history of the Petitioners' investment in Fang**

17.   The Petitioners are long-term investors in Fang.  The Petitioners began investing in Fang, under its prior name of SouFun Holdings Limited in December 2014.  At that time, the share price of the SouFun Holdings Limited was around US$350 per ADS, adjusted for stock splits.

18.   The Petitioners adopt a bottom-up, fundamentals-driven approach to evaluate investment opportunities in publicly-listed companies, including meaningful exposures in publicly-listed companies in PRC's real estate and internet sector.  In particular, the Petitioners continue to invest in PRC real estate developers and internet companies.  Given that Fang is an internet company in the PRC real estate sector, Fang is one of a few companies which combines two areas of investment focus for the Petitioners.  The Petitioners have largely maintained a shareholding of approximately 1.5 million ADSs, adjusted for stock splits, with minor fluctuations either way.

**(IV)      Summary of the Petitioners' claims**

19.   In summary, the Petitioners claim that the Company's controlling shareholder, the First Respondent, and its board of directors have caused:

    a.   The Company's business to be pursued, and its assets utilised, for the wrongful purpose of benefiting the Company's Executive Chairman, Vincent Mo, and persons associated with him, and the Petitioners rely upon, amongst other things, the following matters (which are pleaded in more detail in section C below):

        i.   The IDG Alternative transaction;

        ii.   The Carlyle transaction;

        iii.   The CIH option transactions;

        iv.   Dealings in relation to Fang's assets and/or entry into arrangements regarding Fang's assets in order to benefit hotel businesses owned and controlled by Vincent Mo and/or which were not for Fang's benefit;

    b.   The Company to wrongfully infringe the rights of its members and ADS holders, and the Petitioners rely upon:

        i.   Unlawful dilution (or proposed dilution) of their interests in the Company;

        ii.   Unlawful infringement of the rights of ADS holders to convert their ADSs into ordinary shares;

    c.   The Company to mislead investors and/or wrongfully fail to comply with applicable disclosure obligations; and

    d.   Fundamental changes in the Company's business and investment status.

20.   Further, by reason of the above, the Company's business and affairs have been and continue to be wrongfully mismanaged to such an extent as to require an urgent and independent investigation.

## B.   OVERVIEW OF COMPANY'S BUSINESS SINCE 2010 AND ITS BOARD OF DIRECTORS

### (I)   PRC's largest real estate internet and search portal

21.   As outlined in the SEC Form F-1 Registration Statement, filed in September 2010 in connection with its initial listing of ADSs on the New York Stock Exchange in 2010, Fang's stated business purpose/its core business comprised the operation of the leading real estate internet search and listing portal in the PRC.  Through this internet portal, Fang has offered and continues to offer marketing, listing, e-commerce services and other value-added services and products related to the PRC's fast-growing real estate, home furnishing and home improvement sectors.  It was established as an internet/online business, not as a traditional *"bricks and mortar"* business.

22.   Fang has stated and continues to state that its user base comprises real estate developers, real estate agents and brokers, property owners, property managers, mortgage brokers, mortgage lenders and suppliers of home furnishings and home improvement products and services.[5]

### (II)   Five-year diversification plan

23.   In 2014, Fang announced a five-year plan to diversify its service offering, increasing its focus on direct real estate transactions and financing.  In 2015, it elaborated on this change of direction, touting its, *"aggressive transformation from a pure Internet Information Platform to a 3-platform structure including the Internet Information Platform, a new O2O Transaction Platform, and a new Internet Financial Service Platform"*.[6]  With the move into O2O (online 2 offline) transactions, Fang provided new products and services directly to the end consumers, thereby cutting out 'middlemen' such as property brokers and mortgage brokers, who historically had formed part of its user base.

---

[5] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2010, page 31 (filed 10 June 2011); Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended December 2019, page 39 (filed 27 May 2020).

[6] See SouFun Holdings 28 October 2015 Press Release "*Soufun Management Comments on Strengthening its New Ecommerce Business*", as exhibited to SouFun Holdings SEC Form 6-K Current Report (filed 29 October 2015).

24.   As outlined further below at paragraphs 106 to 107, this change in business prompted protests by property brokers (a significant contingent of Fang's existing user base) and a boycott by certain property brokers in Hangzhou, Henan, Shenzhen, Chongqing, Shanghai and Guangzhou.

**(III)**   **Return to original business model**

25.   By 2017, Fang conceded that the five-year plan had failed and announced a return to its original business lines.  Vincent Mo, admitted that Fang's, *"two-year long transformation is a failure up to today.  We did not know in depth of the new markets and new business lines. We were too aggressive in transformations at the same time with all of our business lines…We are making adjustments to our transformations. We will return to open-platform strategy in which we will support and facilitate businesses of our partners including developers, brokers and agents…".* [7]

**(IV)**   **Real estate information and analytics service platform 'spun-off' in May 2019**

26.   On 21 January 2019, Fang announced a proposed 'spin-off' of its wholly-owned subsidiary, China Index Holdings Limited (***"CIH"***),[8] with Fang's board of directors approving, in May 2019, the plans to separate CIH and its related business from Fang by dividend distribution of all issued and outstanding shares of CIH held by Fang to Fang's shareholders and the listing of CIH on the NASDAQ.[9]  The 'spin-off' and listing completed on 11 June 2019.

27.   CIH's business comprises the operation of real estate related information and analytics services in China.  In its prospectus, dated 6 June 2019 (the ***"CIH Prospectus"***),[10] the view of Fang's board of directors was expressed to be that it would be in the best interests of Fang and its shareholders for CIH to operate the commercial property-related business independently, with Fang focusing on operating the real estate internet portal in the PRC and its related strategy of enhancing online operations and residential property-related business.  The CIH Prospectus outlined the rationale behind the 'spin-off' and separation of the two business in more detail in the following terms:

- *"Enhanced strategic and business focus. The separation and distribution will allow each company to focus on and more effectively pursue its own distinct operating priorities and strategies, and **will enable the management of each company to concentrate efforts on the unique needs of each business and pursue distinct opportunities for long-term growth and profitability**. Following the separation and distribution, we will strategically focus primarily on the commercial property sector in China to capture the enormous market opportunity from its rapid development, while*

---

[7] See Fang 31 March 2017 Press Release, "*Fang Announces Fourth Quarter and Fiscal Year 2016 Results*", as exhibited to Fang SEC Form 6-K Current Report (filed 31 March 2017).
[8] See Fang 21 January 2019 Press Release, "*Fang Announces Change in Senior Management and Proposed Spin-Off of China Index Holdings*", as exhibited to Fang SEC Form 6-K Current Report (filed 22 January 2019).
[9]  See Fang 13 May 2019 Press Release, "*Fang Updates Proposed Separation of China Index Holdings*", as exhibited to Fang SEC Form 6-K Current Report (filed 13 May 2019).
[10] SEC Form F-1A Registration Statement filed on behalf of CIH (filed 24 May 2019).

*Fang will retain its business operating a real estate Internet portal focusing primarily on serving the residential property sector.*

- *More efficient allocation of capital.  The separation and distribution **will permit each company to concentrate its financial resources solely on its own operations, to provide greater flexibility to invest capital in its business in a timely manner appropriate for its distinct strategy and business needs and to facilitate a more efficient allocation of capital**.*

- *Alignment of incentives with performance objectives.  The separation and distribution **will facilitate incentive compensation arrangements for employees more directly tied to the performance of the relevant company's business**, and may enhance employee hiring and retention by, among other things, improving the alignment of management and employee incentives with performance and growth objectives.*

- *Direct access to capital markets. The separation and distribution will create an independent equity structure that will afford us direct access to capital markets and facilitate our ability to capitalize on our unique growth opportunities and effect future acquisitions utilizing our ordinary shares.*

- *Capital market profile. The separation and distribution **will allow investors to separately value Fang and our company based on their unique investment identities, including the merits, performance and future prospects of their respective businesses. The separation and distribution will also provide investors with two distinct and targeted investment opportunities.** The investment community, including analysts, stockholders and prospective investors in each company, will be better able to realize the value of each company fully and independently and enhance the brand recognition of each company."[11] (Emphasis added).*

28. The 'spin-off' occurred on 11 June 2019 with CIH listing on the NASDAQ.  CIH completed its first full day of trading on 12 June 2020 at which point, based on its closing price of US$2.41 on that day, it had a market capitalization of US$308 million. As at 11 November 2020, CIH's market capitalization was US$135.49 million.

**(V)    Anticipated 'spin-off' of the internet portal business**

29. On 26 April 2019, Fang announced its fourth quarter and fiscal year 2018 results.  In the context of this announcement, Fang also made reference to a plan for a further spin-off of its *"core internet advertising and listing services"* for an independent listing.[12]  On 5 June 2020, Fang announced a change in the ratio of its American depositary shares to Class A

---

[11] SEC Form F-1A Registration Statement filed on behalf of CIH, page 86 (filed 24 May 2019).

[12] See Fang 26 April 2019, Fang, "*today announced its unaudited financial results for the fourth quarter and fiscal year ended December 31, 2018*", as exhibited to Fang SEC Form 6-K Current Report (filed 29 April 2019).

Ordinary Shares which was to be, *"mainly in preparation for the pending spin-off of its internet businesses".[13]*

30.    As of the date of this Petition, the Petitioners are not aware of any further substantive announcements or public comments regarding the status of the 'spin-off' of Fang's core business although research analysts have queried the status of the 'spin-off' of Fang's core business during quarterly earnings calls in respect of Q3 2019 and Q2 2020 without substantive response from Fang's management.[14]  In the premises and based on the public announcements which have been made on behalf of Fang to date, it is to be inferred that Fang's board of directors intends to proceed with this 'spin-off' in the future.

**(VI)    Dividends**

31.    In 2011, the Company declared and paid a dividend of US$154.5 million to shareholders. This was followed in 2012, 2013 and 2014 by the declaration of dividends in the amounts of US$79 million, US$81 million and US$82.4 million respectively.  The 2012-2014 dividends were paid in full to shareholders.  In March 2015, the Company declared a cash dividend of US$82.8 million to shareholders which was also duly paid in full.   In total, dividends in the amount of US$479.7 million were declared and paid to shareholders in respect of the period 2011-2015.

32.    Since 2015, Fang has not declared any cash dividend payable to shareholders.

**(VII)    Board of directors**

Vincent Mo

33.    Vincent Tianquan Mo (莫天全) is (as noted above) the founder and Executive Chairman of Fang and, as outlined above at paragraph 15, through his direct and indirect shareholding in the Company he exercises approximately 71% of the voting rights in the Company.  He has served as Executive Chairman of Fang's board of directors since 1999 and is also the Chairman of CIH, Fang's former subsidiary which was 'spun-off' and listed on NASDAQ in June 2019.   Vincent Mo is a non-executive director of Hopefluent Group Holdings Limited, a company listed on the Stock Exchange of Hong Kong (HKEX:733), Shenzhen Worldunion Group Inc, a company with an A share listing on Shenzhen Stock Exchange (SZ: 2285) and the Chairman and ultimate controller of Chongqing Wanli New Energy Co. Ltd (600847 SHH) (***"Wanli"***), a company listed on the Shanghai Stock Exchange. In addition to the publicly-listed companies outlined above, Vincent Mo also owns, controls and/or is the director of numerous other companies.

---

[13] See Fang 6 June 2020 Press Release, "*Fang Announces ADS Ratio Change*", as exhibited to Fang SEC Form 6-K Current Report (filed 8 June 2020).

[14] Fang Holdings Limited NYSE:SFUN FQ3 2019 Earnings Call Transcript, 18 November 2019 (S&P Global Market Intelligence) and Fang Holdings Limited NYSE:SFUN FQ2 2020 Earnings Call Transcripts, 14 August 2020 (S&P Global Market Intelligence).

34.  Vincent Mo and/or his family (and/or trusts controlled by them) also own and control a group of hotel companies, held primarily via Upsky Enterprises Limited ("**Upsky Enterprises**") a company incorporated in the BVI. According to its website, Upsky Enterprises owns (apparently indirectly) ten portfolio hotels, seven in the PRC and three in the US.  Upsky Enterprises, which was incorporated on 8 December 2005, appears to be a holding company for Vincent Mo's PRC and US hotel assets and business.

35.  Upsky Enterprises previously held a 60.39% interest in Shun Cheong Holdings Limited (now called IDG Energy Investment Limited but referred to herein as "**Shun Cheong/IDG Energy**"), a Hong Kong-listed company with a construction and hotel management business and majority owned by Vincent Mo (via Upsky Enterprises) until August 2016.  In 2016, Shun Cheong/IDG Energy was the subject of a reverse takeover by Xilin Gol League Hongbo Mining Development Co. Ltd (a subsidiary of IDG-Accel China Capital II L.P. and IDG-Accel China Capital II Investors L.P.) with Upsky Enterprises disposing of its direct interest in Shun Cheong/IDG Energy in return for Shun Cheong/IDG Energy's hotel business. As at 31 March 2020, Vincent Mo and/or companies subject to his control held a 5.75% interest in Shun Cheong/IDG Energy.[15]

36.  In addition to his commercial business enterprises, Vincent Mo and/or his family also control two not-for-profit companies within the United States; The Research Center on Natural Conservation, Inc ("**RCNC**") and Wall Street Global Training Center (**"WSGT"**).  As pleaded below, Fang has claimed publicly that WSGT provides training services in the building known as 72 Wall Street, which is owned by a wholly-owned subsidiary of Fang.

37.  A significant proportion of the Fang shares/ADS controlled by Vincent Mo are held by two BVI companies, Media Partner Technology Limited (**"Media Partner"**) and Next Decade Investments Limited (**"Next Decade"**).  The shares in Media Partner and Next Decade are held in irrevocable discretionary trusts (the MC Trust, for which Deutsche Bank International Trust Co. (Cayman) Limited is trustee and the KM & KM Trust, for which Credit Suisse Trust Limited is trustee).  Vincent Mo acts as protector of both trusts.

38.  Between 2011 and 2015, Vincent Mo and his affiliates/related entities held between 28.5% and 32.1% of the authorized and issued share capital in Fang.  As outlined above at paragraph 31, dividends for this period were declared and paid in the amount of US$479.7 million.  It follows, that for the period 2011-2015, Vincent Mo and his affiliates/related entities received approximately US$141 million in dividend payments.  Since 2015, Fang has not declared any cash dividend payments to its shareholders.

39.  Although the self-dealing by Vincent Mo in respect of Fang's assets and the diversion of Fang's property to his personal benefit/the benefit of affiliated entities (as are pleaded below) pre-date, in some instances, the cessation of dividend payments in 2016, since that time the extent of the self-dealing has increased.  In particular, the following matters have occurred since 2016:

---

[15] IDG Energy Investment Annual Report 2020, page 56.

a. The transfer of 42 Fang subsidiaries to Shanghai Yuyue Electronic Technology Development Co Ltd, a company subject to Vincent Mo's control, in June 2019 and September 2019 at an undervalue;

b. The early redemption of the Fifth IDG Note Portion (as defined below) without discount in October 2019 for the benefit of Vincent Mo and/or companies subject to his control;

c. The entry into of the S&P Agreement (as defined below) on 24 December 2019 and exercise of the CIH Share Option (as defined below) for the first time on 27 December 2019. Again, this benefitted Vincent Mo and/or companies subject to his control;

d. The booking of exceptional compensation for Vincent Mo in the amount of US$13.6 million for the fiscal year ended 31 December 2019;

e. The early redemption of the Safari Notes, in part and without discount, on 31 December 2019. This benefitted Vincent Mo and/or companies subject to his control;

f. The exercise of the CIH Share Option for the second time on 23 June 2020.  This benefitted Vincent Mo and/or companies subject to his control;

g. The proposed dilution of non-insider shareholders by approximately 20% on 24 August 2020.

40. It is to be reasonably inferred from the facts rehearsed below that Vincent Mo has used his controlling interest in Fang to compensate himself/entities subject to his control for this lost dividend income stream by extracting cash and property from Fang in other ways.

Other current directors

41. According to the investor relations section of Fang's website, Fang's board of directors currently comprises Vincent Mo, Nina Gong, Shaohua Zhang, Howard Huyue Zhang and Changmin Yan.  Shaohua Zhang, Howard Huyue Zhang and Changmin Yan are denominated independent directors but as Vincent Mo controls approximately 71% of Fang's voting power, he has the power to remove and replace any director in general meeting and it follows that little weight attaches to the denomination of Shaohua Zhang, Howard Huyue Zhang and Changmin Yan as "independent directors".  Fang is contractually obliged to permit a nominee of The Carlyle Group to sit on Fang's board (currently Nina Gong).

Turnover of directors since 2017

42. Since listing in 2010, Fang has experienced a high-turnover in directors (none of the original directors remain on the board save Vincent Mo) with the trend accelerating in recent years:

a. Shan Li, Quan Zhou and Sol Trujillo resigned in 2017;

b. Mingqiang Bi resigned in 2018;

c.  Jingbo Wang (a current partner of IDG and a director of Shun Cheong/IDG Energy since its reverse take-over in August 2016.  Jingbo Wang has been a partner in IDG Capital since 2011), resigned in 2019, as did Sam Sun and Qian Zhao; and

11

   d.  Hong Qin resigned in June 2020.

In contrast, during the first four years, post-listing, no director resigned.  In 2014, one director resigned.  In 2015, two directors resigned and, in 2016, no directors resigned.

43.  The Articles do not prescribe retirement of directors by rotation.  While the directors appointed at the time of the listing in 2010 had, in general, relatively long terms of office (5.4 years on average in office for those appointed at the time of the IPO who have since resigned), the recent trend is for directors to resign their office within a very short timeframe.  Mingqiang Bi's term of office, as independent director, lasted approximately seven months (June 2017-January 2018).  Jingbo Wang's term of office, as director, lasted approximately 19 months (June 2017-January 2019) and Hong Qin's term of office, as independent director, lasted approximately eight months (November 2019 – June 2020).  Taking into account directors currently in office appointed since 2017 who have yet to resign together with the three directors who have resigned in the recent past, the average tenure for a director of Fang since 2017 is a mere 13.8 months.

Relationships between the board of directors and Vincent Mo

44.  Shaohua Zhang is described as an independent director of Fang.  However, from March 2008 to August 2016, he was also the managing director and an executive director of Shun Cheong/IDG Energy, the Hong Kong listed company majority owned by Upsky Enterprises up until its reverse takeover.  Indeed, his resignation as both an executive director and the managing director coincided with the completion of the reverse takeover (on 26 August 2016) at which point Vincent Mo and his wife, Cao Jing, also resigned as non-executive director and executive director/executive chairperson of Shun Cheong/IDG Energy respectively.

Ineffective control by Fang's board of directors

45.  As stated above, all directors serve at the pleasure of Vincent Mo, who wields approximately 71% of shareholder voting power, and so can choose to remove any director at any time.

C.  **COMPLAINTS: USE OF COMPANY'S BUSINESS AND ASSETS TO BENEFIT VINCENT MO**

46.  As pleaded in more detail below, the Petitioners contend that there have been repeated instances of the Company's business and/or assets being used in such a manner as to benefit Vincent Mo or those associated with him rather than being used for the benefit of and for the corporate objectives and purposes of the Company.  The Petitioners rely on the following instances but reserve the right to seek to amend to plead further instances as further information becomes available:

   a.  The IDG Alternative Transaction: the Petitioners contend that this transaction involved Fang repurchasing a convertible note at an overvalue in order to benefit Vincent Mo by enabling him to discharge his own personal indebtedness;

b. The Safari Transaction: the Petitioners contend that this transaction involved Fang repurchasing a convertible note at an overvalue in order to benefit Vincent Mo personally;

c. The CIH Options Transactions: the Petitioners contend that Vincent Mo caused Fang to purchase shares from companies subject to his control at an overvalue on two occasions (27 December 2019 and 23 June 2020).  These transactions caused tens of millions of dollars in losses to Fang, but inured to the benefit of family trusts controlled by Vincent Mo; and

d. Dealings in relation to Fang's assets for the purpose of benefiting Vincent Mo's hotels business or which were not for the benefit of Fang.

**(I)** **The IDG Alternative Transaction**

47. On 4 November 2015, IDG Alternative Global Limited (*"IDG Alternative"*) purchased a US$200 million convertible note from Fang with a maturity date of 3 November 2022 (the *"IDG Note"*).  At the same time, IDG Alternative subscribed for US$156 million of Fang stock (5,359,658 Class A Ordinary Shares).  Accordingly, the combined value of the IDG Alternative share issuance and convertible note was US$356 million (the *"IDG Alternative Transaction"*).

48. SEC filings show that, at that time, the shareholders of IDG Alternative were IDG Maximum Financial Limited ("*IDG Maximum*") and Deanhale Limited (*"Deanhale"*).  In order to partially fund the IDG Alternative Transaction, IDG Maximum subscribed for shares in IDG Alternative in the amount of US$108.77 million and Deanhale subscribed for shares in the amount of US$98 million.  As a result, IDG Maximum held a 72.53% interest in IDG Alternative with the remaining 27.47% interest in IDG Alternative held by Deanhale.  Deanhale was and, as far as the Petitioners are aware, continues to be wholly owned by Vincent Mo.[16]

49. Deanhale's subscription of US$98 million to acquire its shareholding in IDG Alternative was funded as follows:

a. Deanhale provided cash in the amount of US$10 million; and

b. On 29 October 2015, IDG Maximum and Deanhale entered into a note purchase agreement whereby IDG Maximum purchased a senior secured note from Deanhale in the principal amount of US$88 million (the *"Deanhale Note"*).  The proceeds of the Deanhale Note were used by Deanhale to subscribe for shares in IDG Alternative in accordance with the terms of the note purchase agreement.  The Deanhale Note bore an annual interest rate of 2% with a maturity date of 2 November 2019.

---

[16] See SEC Schedule 13D in respect of Fang, as filed by Tianquan Mo and others, Item 2 ("*Deanhale Limited, an exempted company incorporated with limited liability under the laws of the British Virgin Islands, . . . is wholly owned by Mr. Mo*") (filed 4 November 2015).

50.   The transactions outlined above at paragraphs 47-49 capitalized IDG Alternative to the tune of approximately US$206 million.  The cost of the IDG Alternative Transaction, however, was US$356 million. In order to address this funding gap, IDG Alternative entered into a facility agreement with China Merchants Bank Co., Ltd (*"CMB"*) on 28 October 2015 whereby IDG Alternative borrowed US$150 million for a term of 36 months subject to an interest rate of LIBOR plus 3.5% (the *"CMB Loan"*).  The repayment date for the CMB Loan was 28 October 2018.

51.   The maturity dates arising under the IDG Alternative Transaction and the CMB Loan were not aligned:

   a.   The CMB Loan fell due for payment on 28 October 2018;

   b.   The Deanhale Note had a maturity date of 2 November 2019; and

   c.   The IDG Note had (and continues to have, subject to the partial repurchase outlined below at paragraph 56) a maturity date of 3 November 2022.

52.   Had Fang's share price risen in the intervening period, IDG Alternative could have refinanced the CMB Loan, disposed of some of the Fang stock acquired on 4 November 2015 at a profit or converted the note in part and sold those shares, again at a profit, to repay the CMB Loan.  As matters transpired, Fang's share price fell substantially between November 2015 and October 2018 from US$335.00 to US$101.50 (a 69.7% decrease between November 2015 and October 2018):



14

53.   In the lead-up to the CMB loan repayment date, the IDG Note was restructured as follows:

   a.   On 25 October 2018, Fang repurchased US$50 million of the IDG Note from IDG Alternative for US$38.9 million (the **"2018 Note Repurchase"**).[17] As at 25 October 2018, US$38.9 million represented 77.82% of the par value of that portion of the IDG Note;

   b.   By a transaction bearing the same date, Clever Sight Limited (an IDG related-party) purchased 3,407,360 Class A Ordinary shares from IDG Alternative at a price of US$9.60 per share.  The total consideration for this share purchase was US$32.7 million (the **"Clever Sight Share Sale"**);[18] and

   c.   In a further series of transactions disclosed and apparently made at the same time, IDG Alternative retained one portion of the IDG Note (the "**Fifth IDG Note Portion"**) and sold four other portions of the IDG Note to four related parties (IDG Ultimate Global Limited, Stormy August Limited, Velda Power Limited and Quartz Fortune Limited (the **"IDG Purchasers"**)).[19] The par value of the four IDG Note portions in question was US$95,060,000.  However, the IDG Purchasers acquired those IDG Note portions at a discounted price of US$76,048,000 (the **"2018 Note Sale"**).

The proceeds of the 2018 Note Repurchase (US$38.9 million), the Clever Sight Share Sale (US$32.7 million) and the 2018 Note Sale (US$76.048 million) were used to repay the CMB Loan in full.

54.   Fang's SEC Form 20F (Annual Report) for 2018 states that Deanhale is deemed to beneficially own certain shares by virtue of its relationship with IDG Alternative.[20]  However, its Form 20-F, annual report for the fiscal year ended 2018 does not state that the 2018 Note Repurchase was a related-party transaction.  This is despite the fact that the original Form 13D filings by the IDG entities filed on 4 November 2015 did disclose this relationship.

55.   In addition to the restructuring of the IDG Note, as outlined above at paragraph 53, IDG Maximum, Vincent Mo and Deanhale restructured their respective interests in IDG Alternative by entering into an Amendment to Shareholders' Agreement dated 26 October 2018 (the **"Amended SA"**).[21]  As a result of this Amended SA, which amended the 2 December 2015 Shareholders' Agreement among such parties, the beneficial interest in the remaining portion of the IDG Note (the Fifth IDG Note Portion with an approximate value of US$54.9 million) was transferred to Deanhale subject to certain terms.

---

[17]  As disclosed in an exhibit to an SEC Form 13 D filed by IDG in respect of Fang Holdings (filed 1 November 2018).

[18] As disclosed in an SEC Form 13 D filed by IDG in respect of Fang Holdings (filed 1 November 2018).

[19]  As disclosed in an exhibit to an SEC Form 13 D filed by IDG in respect of Fang Holdings (filed 1 November 2018).

[20] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2018, page 112 (filed 14 May 2019).

[21]  As disclosed in an exhibit to an SEC Form 13 D filed by IDG in respect of Fang Holdings (filed 1 November 2018).

56.   It follows that the beneficial interest in the Fifth IDG Note Portion was held by related parties, namely Deanhale and through it, Vincent Mo.  Approximately one year later, on 28 October 2019 (five days before the Deanhale Note's maturity date but more than three years before the IDG Note's maturity date, including the maturity date for the Fifth IDG Note Portion), Fang repurchased the Fifth IDG Note Portion (with a par value US$54.9 million) at a cost of US$55.01 million (***"2019 Note Repurchase"***).  Although Fang's SEC Form 20-F (Annual Report) for 2019 discloses this related-party transaction, it did not even purport to explain how the early repurchase of the IDG Note held beneficially by Deanhale/Vincent Mo was in Fang's interest.

57.   The 2019 Note Repurchase was not in the best interests of the Company:

   a.   The repurchase price was 100.13% of the par value of the IDG Note.  Given that a portion of the IDG Note was being repurchased three years in advance of its maturity date, there was no commercial rationale for the repurchase at 100% of the par value let alone any figure representing a premium in excess of par value;

   b.   The repurchase price should have been discounted and a repurchase price in the range of 78.7%-84.68% of the par value of the IDG Note would have been more appropriate at that time;

   c.   By repurchasing a portion of the IDG Note on non-commercial terms and at substantial overvalue, Fang's management caused it to lose between US$8.86 million and US$12.12 million;

   d.   Given the proximity in timing between the IDG Note repurchase in late October 2019, the Safari NRA in late December 2019 (as outlined below), the maturity date of the Deanhale Note in early November 2019 and the maturity of a separate debt obligation owed by Karistone Limited, another company wholly-owned by Vincent Mo, in the amount of US$27 million on 10 November 2019, it is reasonably to be inferred that Vincent Mo required funds to effect the repayment of the Deanhale Note and/or the Karistone liability and, accordingly, caused Fang to effect the repurchase without the appropriate discount (and therefore at an overvalue); and

   e.   It is further reasonably to be inferred that the repurchase was structured in this manner because it was in Vincent Mo's financial interest that it should occur in this way.  There was no benefit to Fang arising from the 2019 Note Repurchase at a price in excess of par value.

58.   In the premises:

   a.   By failing to make proper disclosure of this a related party transaction (the 2018 Note Repurchase) in its SEC Form 20-F (Annual Report for 2018), Fang breached its obligations under Item 7(B) of Form 20-F, requiring disclosure of related party

transactions, including disclosure of any transaction since the beginning of the registrant's last fiscal year between the registrant and any 5% shareholder where the amount involved exceeds $120,000 and the 5% shareholder has a direct or indirect material interest in the transaction;[22]

b.  By failing to make proper disclosure of the true purpose of the 2019 Note Repurchase (i.e. to enable related parties to discharge their own liabilities) Fang breached its obligations under Item 7(B) of Form 20-F;

c.  Fang's directors have breached their fiduciary duties by failing to act *bona fide* in the best interests of Fang and/or by acting for an improper purpose, by causing Fang to enter into the 2019 Note Repurchase:

   i.   Which caused a loss to Fang; and

   ii.  The true purpose of which was to benefit Vincent Mo by providing him with funds to enable him to discharge his own personal indebtedness.

**(II)    Carlyle Group – The Safari Transaction**

59.  On 24 September 2015: (i) Safari Group Holdings Limited (***"Safari"***) subscribed for 418,803 Class A Ordinary Shares in Fang; and (ii) Safari Group CB Holdings Limited (***"Safari CB"***) purchased two convertible notes with a combined value of US$100 million[23] from Fang (the ***"Safari Notes"***) (together, the ***"Safari Transaction"***).  At the date of the Safari Transaction, each of Safari and Safari CB was owned 72% by Safari Parent Limited (***"Safari Parent")*** and 28% by Ateefa Limited ("***Ateefa***").  The value of Ateefa's (indirect) interest in the Safari Notes was therefore US$28 million.  Safari Parent is affiliated with Carlyle Group and Ateefa is wholly owned by Vincent Mo.

60.  Ateefa's portion of the share subscription and the purchase of the Safari Notes was funded by way of a separate convertible note:

a.  Pacific Voyage Limited ("***Pacific Voyage"***) purchased from Ateefa, a senior, secured note in the principal amount of US$53.56 million (the ***"Ateefa Note"***);

b.  The purchase was made pursuant to a Note Purchase Agreement made between Pacific Voyage, Ateefa and Vincent Mo, dated 17 September 2015 (the ***"NPA"***).  Under the terms of the NPA, Vincent Mo and Ateefa agreed to use the proceeds of sale from the note purchase to subscribe for certain shares in Safari and Safari CB, which Ateefa duly did on 24 September 2015; and

---

[22] Item 7(B) requires companies to disclose transactions "*between the company and (a) enterprises that directly or indirectly through one or more intermediaries, control or are controlled by, or are under common control with, the company.*"

[23] See Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2016, page F-52 (filed 12 May 2017).

c.   The Ateefa Note was due to mature on 24 September 2020.

61.   The maturity date of the Safari Notes is 24 September 2022 and they bear interest at an annual rate of 1.5%.

62.   On 31 December 2019, Fang and Safari entered into a note repurchase agreement (the *"Safari NRA"*), whereby Fang redeemed a portion of the Safari Notes from Safari CB in the principal amount of US$28 million for a consideration of US$28.105 million.  The US$28 million portion of the Safari Notes which was redeemed was beneficially owned by Ateefa and therefore ultimately beneficially owned by Vincent Mo.[24]

63.   Fang's 2019 SEC Form 20-F (Annual Report) does not reveal why that portion of the Safari Notes was repurchased on 31 December 2019 for a figure in excess of 100% of par in circumstances where the term of the Safari Notes had approximately 2 years and 9 months left to run.  There is no commercial rationale for an early repurchase without a discount and it is reasonably to be inferred that the repurchase was structured in this way to benefit Vincent Mo, at Fang's expense.

64.   In the premises Fang's directors acted in breach of their fiduciary duties (to act *bona fide* in the best interests of Fang and to act for the proper corporate or business purposes of Fang) by causing Fang to effect the said repurchase, which was clearly not in the best interests of Fang and the true purpose of which was to benefit Vincent Mo.

**(III)   The CIH Share Option transactions**

65.   Until 11 June 2019, CIH was a wholly-owned subsidiary of Fang.  As pleaded above, on that date CIH was 'spun off'.  Fang did not structure the spin-off so as to retain any CIH shares. On listing, CIH's ADS price was US$3.40 per ADS and remained fairly constant until the end of June 2019.  Between June 2019 and October 2019, CIH's ADS price dropped to US$2.10 per ADS (as at 16 August 2019), before rising to an all-time high of US$5.07 per ADS (as at 17 September 2019).  From 17 September to the end of December 2019, CIH's ADS price generally declined with the closing price on 31 December 2019 of US$3.64 per ADS.

The entry into and initial exercise of the CIH Share Option

66.   Approximately 6 months following completion of the CIH 'spin-off', on 24 December 2019, Fang entered into a sale and purchase agreement (the *"S&P Agreement"*) with two companies controlled by Vincent Mo, Next Decade and Media Partner (referred to above at paragraph 37).  The S&P Agreement gave Fang the right to purchase up to 15 million ordinary shares of CIH held by Next Decade and Media Partner within 12 months of the date of the S&P Agreement.  According to the terms of the S&P Agreement:

---

[24] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page F-59 (filed 27 May 2020).

> *"The Purchaser [Fang] agrees to buy, and the Sellers [Next Decade and Media Partner],*
> *agree to sell, starting from the date hereof and until the elapse of twelve (12) calendar*
> *months thereafter, **at a fixed price of US$5.99 per share**, any amount and at any time,*
> *in the aggregate up to 15,000,000 ordinary shares (mainly Class B shares] ("Shares")*
> *of China Index Holdings Limited (CIH) beneficially owned by each Seller.  **The Purchaser***
> ***shall have the absolute and sole discretion to determine the number of Shares to***
> ***purchase, the timing of the purchase, and the number of transactions to effect such***
> ***purchase(s)…"[25]*** (Emphasis added)

67.   The ratio of CIH shares to CIH ADS is 1:1. On 24 December 2019, CIH's closing price was US$2.97 per ADS.  Accordingly, the fixed price of US$5.99 per share represented a 101.6% premium to the market price as at 24 December 2019.

68.   Three days later, on 27 December 2019, Fang exercised the option to purchase 5,000,000 ordinary shares from Next Decade and Media Partner at the fixed price of US$5.99 per share (*"**First Option Exercise**"*).  The consideration paid by Fang to Next Decade and Media Partners was US$29.95 million in total.  On the date of the First Option Exercise, CIH's ADS traded between a low of US$2.97 and a high of US$3.41.  The closing price for CIH's ADS on 27 December 2019 was US$3.36 per ADS.   Taking the closing price of US$3.36 as a benchmark, the purchase price of US$5.99 per share represented a 78.2% premium to the market price on 27 December 2019.  Accordingly, the transaction caused Fang an immediate but unrealized loss of US$13.15 million, i.e., being the difference between the purchase price (US$29.95 million) and the market value of the CIH shares on that date (US$16.8 million).

69.   As at the date of the First Option Exercise, the CIH shares in question had been Fang's property less than 7 months earlier.

Purported rationale and accounting treatment of First Option Exercise

70.   In SEC filings, made in early 2020, Fang claimed that the transaction was for "*investment purposes*".[26] In its subsequently-filed Form 20-F (Annual Report for 2019), Fang sought to assign the premium to market value for the exercise of the call option, as "*compensation expenses*" for Vincent Mo.  These compensation expenses were calculated as US$13.6 million by Fang, a sum even higher than the difference between the purchase price and the market value on the day the option was exercised (some US$13.15 million).

71.   Although Fang's SEC Form 20-F for 2019 stated that Fang had entered into service contracts with its executive officers,[27] it did not confirm that compensation of this nature was permissible under the terms of the service contract between the Company and Vincent Mo.

[25] Purchase and Sale Agreement dated as of 24 December 2019 among Fang Holdings, Next Decade and Media Partner, exhibited to SEC Form 13D, filed in respect of Fang Holdings (filed 6 January 2020).
[26] SEC Form 13D, filed in respect of Fang Holdings (6 January 2020).
[27] See Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 79 (filed 27 May 2020).

For the financial year ending 31 December 2019, Fang had a compensation committee consisting of Vincent Mo and one of the purportedly independent directors, Hong Qin.[28] Executive compensation was and continues to be purportedly governed by a compensation charter (amended and restated on 2 June 2016) (the "**Compensation Charter"**).   The Compensation Charter provides that the committee, *"shall consist of not less than three members of the Board, a majority of whom satisfy the independence criteria of the applicable rules and regulations of the New York Stock Exchange…"*. The constitution of the compensation committee was materially deficient at the relevant time and may still be so;[29] in that it comprised just two members (not three), one of whom (Vincent Mo) was acknowledged not to be (and plainly was not) independent.[30]  Despite this state of affairs, Fang's SEC Form 20-F (Annual Report for the year 2019) positively asserted that:

> *"**Our compensation committee and our nominating and corporate governance committee are comprised with a majority of independent directors and not only independent directors.**  Our executive chairman, Mr. Mo, who serves on both our compensation committee and nominating and corporate governance committee, **is not independent** under the relevant New York Stock Exchange rules"*. (Emphasis added).

72.   Under the terms of the S&P Agreement, Fang was never obliged to exercise the option on any given date.  Moreover, there was no clear investment rationale to exercise the option, three days after its execution, when the fixed (option) price was 78.2% above the market price at that point in time.

73.   Booking the loss of US$13.6 million as compensation expenses for Vincent Mo is not in line with and, in fact, dwarfs the cumulative cash compensation paid to **all** directors and executive officers of Fang during the past eight years:

| Fang Directors and Executive Officers Compensation | |
|---|---|
| **Year** | **Cash Compensation (USD)** |
| 2010 | 699,000 |
| 2011 | 601,395 |
| 2012 | 711,239 |
| 2013 | 751,441 |

---

[28] See Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 88 (filed 27 May 2020).
[29] Hong Qin has since resigned as a director and he has been replaced by Changming Yan on the compensation committee.
[30] See Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 115 (filed 27 May 2020).

| 2014 | 695,273 |
|------|---------|
| 2015 | 737,395 |
| 2016 | 913,165 |
| 2017 | 869,774 |
| 2018 | 800,000 |
| 2019 | 14,300,000 |

74. By booking the loss of US$13.6 million as compensation expenses attributable to Vincent Mo, Fang's executive compensation for 2019 increased by 1,687.5% compared to the aggregate executive compensation paid for 2018.  Fang's financial performance over the course of 2019 did not merit any such increase in executive compensation, let alone an increase of 1,687.5%:

   a. Fang's SEC Form 20-F (Annual Report for 2019), and accompanying financial statements, reveal that revenue dropped by US$21 million, with the Company incurring a net loss of US$10,250,000 attributable to operational losses and a comprehensive loss of US$32,784,000 (the sum of the net loss over the period together with non-operational losses which have yet to be recognized as the underlying transaction(s) is (are) still open);[31] and

   b. Further, its market capitalization decreased by 7.58% during that period.[32]

75. The accounting treatment of the unrealised loss on the First Option Exercise was therefore neither credible nor appropriate.

76. Publicly available information shows that there was sufficient liquidity in the market for CIH ADS in the lead up to the exercise of the CIH option on 27 December 2019 such that if Fang had genuinely wished to acquire CIH shares as an investment, it could have purchased 5,000,000 CIH ADS at market price or, in the alternative, at a small premium on the market price but, in any event, well below the option price of US$5.99 per ADS/per share.  Fang, in fact, acquired CIH ADS in the period leading up to the exercise of the CIH option on 27 December 2019 and just after it (30 December 2019), and the number of ADS acquired by Fang was a fraction of the shares actually traded on NASDAQ on those days.  Further, there was a period between 4 December and 24 December 2019 where Fang took no steps to acquire any CIH ADS though ADS trading volumes remained significant during this period:

---

[31] See Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, pages F-7 and F-8 (filed 27 May 2020).
[32] This figure of 7.58% takes into account the CIH spin-off in June 2019.

| Date | CIH ADS Purchased by Fang | Total Market Volume | Fang % of Market Volume |
|---|---|---|---|
| 22 November 2019 | 13,900 | 63,321 | 22% |
| 25 November 2019 | 9,500 | 63,121 | 15.1% |
| 26 November 2019 | 17,600 | 429,217 | 4.1% |
| 27 November 2019 | 38,920 | 77,483 | 50.2% |
| 29 November 2019 | 16,900 | 44,965 | 37.6% |
| 2 December 2019 | 13,500 | 162,978 | 8.3% |
| 3 December 2019 | 33,700 | 234,312 | 14.4% |
| 4 December 2019 | | 103,318 | - |
| 5 December 2019 | | 1,002,043 | - |
| 6 December 2019 | | 120,749 | - |
| 9 December 2019 | | 138,416 | - |
| 10 December 2019 | | 132,189 | - |
| 11 December 2019 | | 804,500 | - |
| 12 December 2019 | | 116,703 | - |
| 13 December 2019 | | 714,686 | - |
| 16 December 2019 | | 227,386 | - |
| 17 December 2019 | | 759,195 | - |
| 18 December 2019 | | 99,579 | - |
| 19 December 2019 | | 90,216 | - |
| 20 December 2019 | | 1,806,616 | - |
| 23 December 2019 | | 50,777 | - |
| 24 December 2019 | | 116,673 | - |
| 26 December 2019 | 156,935 | 734,601 | 21.4% |
| 27 December 2019 | 7,100 | 139,532 | 5.1% |
| 30 December 2019 | 45,708 | 156,867 | 29.1% |

| Total | 353,763 | 8,389,443 | |
|---|---|---|---|

77.   For the period in question (22 November 2019 to 30 December 2019), there were 25 trading days in total with the number of ADSs actually traded over that period ranging from 45,000 to 1.8 million per day.  The average trading volume during this period was 335,000 with the median being 138,000.  On the day when trading peaked at 1.8 million ADS traded, Fang's SEC filings disclose that it did not acquire any of the ADSs (1.8 million) actually traded on that date.

78.   Between 22 November 2019 and 30 December 2019, i.e. the period when 8,389,443 CIH ADS were traded on the open market, the closing price for CIH ADS ranged between a low of US$2.96 per ADS and a high of US$3.70 per ADS; well below the option price of US$5.99 per share.  CIH's trading price on 20 December 2019, the date when 1.8 million CIH were traded by parties other than Fang, ranged from US$2.92 per ADS to US$3.10 per ADS, well below the option price of US$5.99 per share/ADS.      It follows that had Fang's directors genuinely wished to acquire 5,000,000 CIH ADS as an investment for Fang's benefit, they could have taken this step on the open market at far less cost to Fang than the exercise of the option.

79.   Moreover, Fang's directors have not articulated any urgency for exercising the option on 27 December 2019.  For the reasons articulated above, there was sufficient liquidity in the market prior to the exercise of the option to obviate any need therefor or, in the alternative, if there was not sufficient liquidity in the market, had Fang's management genuinely wished to acquire CIH ADS as an investment, they could have caused it to build up its position over time.  Indeed, between 29 August 2019 and 23 September 2019, Fang acquired 1,992,113 CIH ADS at a total cost of US$8,441,335.  Taken with the figure of 353,763 above, in the lead up to the First Option Exercise, Fang acquired 2,345,876 CIH ADS (the "*First CIH Trading Tranche*").

Second Exercise of the CIH Share Option and market manipulation

80.   On 23 June 2020, Fang's management caused it to exercise the option, for a second time, to purchase a further 8,549,249 ordinary shares from Next Decade and Media Partner, again, at the fixed price of US$5.99 per share ("*Second Option Exercise*").  The consideration paid by Fang to Next Decade and Media Partner (companies controlled by Vincent Mo) was approximately US$51,210,000 million in total.  When the option was exercised for a second time on 23 June 2020, CIH's ADS were being traded between a low of US$ 2.68 and a high of US$ 3.05.  The closing price for CIH's ADS on 23 June 2020 was US$3.02 per ADS.  Taking the closing price of US$3.02 as a benchmark, the purchase price of US$5.99 per share represented a 98.3% premium to the market price on 23 June 2020 and the transaction caused Fang an immediate but unrealized loss of US$25.39 million, i.e. the difference between the purchase price (of US$51.21 million) and the market value of the CIH shares on that date (of US$25.82 million).

81.   When the option was exercised for a second time on 23 June 2020, Fang was acquiring property which had been held by it approximately one year earlier.

82.     If Fang's financial statements for 2020 are prepared on the same basis as those for 2019, this immediate but unrealized loss in the amount of US$25.39 million will be booked as "*executive compensation*" for Vincent Mo.  In this scenario, executive compensation would increase by 77.6% when compared with 2019 and by 3,073.75% when compared with 2018. Again, Fang's financial performance for 2020 as disclosed to date does not justify exceptional executive compensation, let alone compensation of this magnitude (US$25.39 million):

    a.    For the first half of 2020, there was no material improvement in Fang's total revenues compared with the corresponding period in 2019 (US$103 million in 2020 as compared with US$102.8 million in 2019);

    b.    Further, operating income decreased 62.3% on the corresponding period in 2019 and the Company recorded an increased net loss of US$19.4 million (compared with net income of US$18.5 million for the corresponding period in 2019);[33]and

    c.    Fang's management have admitted that the 177.2% increase in general and administrative expenses for this period (from US$14.9 million in Q2 2019 to US$41.3 million in Q2 2020) was directly attributable to Fang's purchase of CIH's shares.[34]

Market manipulation in lead up to Second Option Exercise

83.     However, the immediate but unrealised loss of US$25.39 million does not represent the true loss suffered by Fang. Based on the facts outlined below it is to be reasonably inferred that Fang's management engaged in market manipulation of CIH's ADS price with a view to artificially inflating the market price prior to the Second Option Exercise in order to disguise the true extent of the immediate but unrealised loss to Fang.  It follows that the closing price of US$3.02 per ADS did not represent CIH's true market price on that date and but for the actions of Fang's management, CIH's true market price would have been significantly lower, most likely in the region of US$1.15 per ADS (the closing price as at 28 May 2020). In the premises, the immediate but unrealised loss to Fang on 23 June 2020 should be recorded as far greater than US$25.39 million.

84.     In the lead up to the Second Option Exercise, Fang acquired 1,955,836 CIH ADS over the course of 18 trading days (the ***"Second CIH Trading Tranche"***).  Between 28 May 2020 and 23 June 2020, the market price of CIH's ADS increased from US$1.15 to US3.02, an increase of 162.6%, though this was still well below the option price.  Following the Second Option Exercise, Fang ceased its acquisition of CIH ADS with immediate effect (or if it continued acquiring CIH ADS thereafter, it has not disclosed this fact in its SEC filings).  CIH's ADS price declined after the 18-trading day period, such that on 14 July 2020 its closing price was US$2.00.

---

[33] Fang 14 August 2020 Press Release, "*Fang announces second quarter and first half year 2020 unaudited financial results*", as filed in Fang Holdings SEC Form 6-K (filed 17 August 2020).
[34] See Fang Holdings Limited NYSE:SFUN Q2 2020 Earnings Call Transcript, 14 August 2020, 12pm GMT (S&P Global Market Intelligence).

85.  Fang's acquisition of CIH ADS relative to the market generally and the impact on the ADS price over this 18-day trading period can be summarised as follows:

**CIH ADS Trading from 29 May – 23 Jun 2020**

| Date | ADS Purchased by Fang | Fang as % of total volume | Total market volume | Price per ADS | Closing price | % change | % change from 28 May 2020 |
|---|---|---|---|---|---|---|---|
| 29 May 2020 | 56,300 | 10.1% | 554,974 | 1.25 | 1.18 | 2.6% | 2.6% |
| 1 Jun 2020 | 10,700 | 13.9% | 76,771 | 1.28 | 1.29 | 9.3% | 12.2% |
| 2 Jun 2020 | 16,792 | 15.5% | 108,162 | 1.39 | 1.44 | 11.6% | 25.2% |
| 3 Jun 2020 | 42,176 | 7.8% | 542,073 | 1.59 | 1.89 | 31.3% | 64.3% |
| 4 Jun 2020 | 121,009 | 33.0% | 366,917 | 1.99 | 2.09 | 10.6% | 81.7% |
| 5 Jun 2020 | 133,089 | 42.4% | 313,881 | 2.10 | 2.24 | 7.2% | 94.8% |
| 8 Jun 2020 | 86,673 | 30.8% | 281,114 | 2.22 | 2.44 | 8.9% | 112.2% |
| 9 Jun 2020 | 56,442 | 39.3% | 143,580 | 2.42 | 2.48 | 1.6% | 115.7% |
| 10 Jun 2020 | 74,200 | 43.7% | 169,709 | 2.41 | 2.40 | (3.2%) | 108.7% |
| 11 Jun 2020 | 134,581 | 46.3% | 290,901 | 2.33 | 2.45 | 2.1% | 113.0% |
| 12 Jun 2020 | 83,000 | 26.3% | 315,492 | 2.34 | 2.41 | (1.6%) | 109.6% |
| 15 Jun 2020 | 75,700 | 46.8% | 161,862 | 2.40 | 2.31 | (4.1%) | 100.9% |
| 16 Jun 2020 | 82,677 | 57.0% | 145,148 | 2.38 | 2.43 | 5.2% | 111.3% |
| 17 Jun 2020 | 142,619 | 51.0% | 279,542 | 2.54 | 2.60 | 7.0% | 126.1% |

25

| 18 Jun 2020 | 207,944 | 67.1% | 309,679 | 2.63 | 2.65 | 1.9% | 130.4% |
|---|---|---|---|---|---|---|---|
| 19 Jun 2020 | 56,633 | 25.4% | 223,389 | 2.77 | 2.79 | 5.3% | 142.6% |
| 22 Jun 2020 | 222,277 | 56.3% | 394,787 | 2.93 | 3.10 | 11.1% | 169.6% |
| 23 Jun 2020 | 353,024 | 53.2% | 663,564 | 2.95 | 3.02 | (2.6%) | 162.6% |
| **Total** | **1,955,836** | | **5,341,545** | | | | |

86.    In comparison, there were 43 trading days between 24 June 2020 and 24 August 2020 with only 4,647,310 CIH ADS traded during this time on the NASDAQ. During this period, 108,076 CIH ADS were traded, on average, on the NASDAQ each day.  In comparison, for the 18-day trading period, there was only one day (1 June 2020) where the trading volume was less than 108,076 CIH ADS, and the average volume per day was 296,786, almost three times the average for the following 43 days.

87.    The impact of Fang's concerted efforts to acquire CIH ADS between 29 May and 23 June 2020 is evident (in orange) in the CIH ADS trading volumes recorded between April and June 2020:



88.    The table above includes a spike in trading immediately after the 18-day trading period (highlighted in orange).  Just after 4pm on 24 June 2020, there was a single trade of approximately 600,000 ADSs.  The Petitioners are not aware of the identities of the parties who engaged in that trade on 24 June 2020.  If Fang was a party to this trade, it has not revealed this in any SEC filings to date.

89.    While the size of trades between 29 May and 23 June 2020 was broadly similar with the size of the trades in April and May 2020 (prior to Fang's 18-day trading period), the number of trades executed between 29 May and 23 June 2020 was much higher which coincided with a significant increase in the CIH ADS price:



90.    Intraday trading information shows anomalous trading patterns, whereby a very high number of ADS were traded within a short period of time with a consequent sharp price increase. This price increase was followed by a decline in the ADS price, at which point the cycle was repeated (i.e. a very high number of ADS were again traded within a short period of time with the price climbing steeply again). This intraday trading pattern shows that the majority of purchases were made in very short intervals, rather than consistently throughout the day, and had the effect of increasing the price of CIH's ADS. Intraday trading information for 18 June 2020, a day where 67.1% of trading volume was attributable to Fang, illustrates this anomalous trading pattern:



Contradicting representations in the CIH Prospectus

91.   The acquisition of CIH ADS and shares by Fang, first six months after the 'spin off' and then
      again, a year following the 'spin-off', directly contradicts the rationale for the 'spin-off' as
      set out in the CIH Prospectus (which was approved by Fang's directors), including:

      a.   permitting CIH and Fang to concentrate their respective financial resources solely on
           their own operations and provide greater flexibility to invest capital in their respective
           businesses in a timely manner appropriate to their distinct strategy and business
           needs; and

      b.   allowing investors to separately value Fang and CIH based on their unique investment
           identities (see paragraph 27 above).

92.   At the time of the First Option Exercise and the Second Option Exercise, CIH's authorised
      and issued share capital was 96,112,336 Class A Ordinary Shares comprising 72,475,630
      Class A Ordinary Shares and 23,636,706 Class B Ordinary Shares.  Acquiring 13,549,249
      shares and 4,301,712 CIH ADS on the open market (representing 18.57% of the equity in
      CIH) does not conform with the avowed purpose of allowing investors to separately value
      Fang and CIH.

93.   Moreover, Fang has expended approximately US$95,662,408 in acquiring 17,850,961 CIH
      ADS/CIH shares, which can be broken down as follows:

      a.   2,345,876 CIH ADS between 29 August 2019 and 30 December 2019 (US$9,616,552),
           i.e. the First CIH Trading Tranche;

      b.   5,000,000 ordinary shares on the First Option Exercise (US$29,950,000);

      c.   1,955,836 CIH ADS between 29 May 2020 and 23 June 2020 (US$4,845,855), i.e. the
           Second CIH Trading Tranche; and

      d.   8,549,249 ordinary shares on the Second Option Exercise (US$51,210,001).

The SEC filings made by Fang disclose that its working capital (US$95,662,408) was used to
acquire these CIH ADSs/shares.  CIH's current market capitalization is approximately
US$135.49 million.  In other words, Fang has expended the equivalent of 70.6% of the
current market capitalization of CIH to acquire an 18.57% equity interest therein.   As
outlined above, one of the avowed purposes of the 'spin-off' was to concentrate CIH and
Fang's respective financial resources solely on their own operations and provide greater
flexibility to invest capital in their respective businesses in a timely manner appropriate to
their distinct strategy and business needs.  It is not possible to reconcile this avowed
purpose with the course of conduct which Fang's management caused it to embark upon,
beginning in August 2019 (a mere 2.5 months following the completion of the CIH 'spin-off').
Instead of concentrating Fang's resources in a manner appropriate to Fang's distinct
strategy and business needs and solely on its own operation, Fang's directors have caused

it to embark upon a course of conduct (investing its capital extensively in CIH) which is inconsistent with the rationale for the CIH 'spin-off'.

Breaches of fiduciary duties

94.    Having regard to: (i) the fact that the option price was at a significant premium to the market price; (ii) the lack of rationale for the First Option Exercise (given that Fang could have purchased 5 million ADS on the open market at a significant discount to the option price and indeed had been purchasing ADS on the open market prior to the Second Option Exercise at a significant discount to the option price); (iii) the lack of urgency or necessity in acquiring an equity interest in CIH (Fang's wholly-owned subsidiary less than six months prior to the First Option Exercise); (iv) the inappropriate accounting treatment of the unrealised loss arising from the First Option Exercise; (v) the significant loss occurring on both the First Option Exercise and the Second Option Exercise; and (vi) the lack of rationale for the Second Option Exercise (given that Fang could have purchased 8,549,249 ADS on the open market and indeed had been purchasing ADS on the open market prior to the Second Option Exercise at a significant discount to the option price), it is reasonably to be inferred that:

   a.   The entry into the CIH Share Option and/or the First Option Exercise was not for genuine "*investment purposes*" but instead were in order to benefit Next Decade and Media Partner, and through them, Vincent Mo and/or family trusts subject to his control;

   b.   The Second Option Exercise was also for the purpose of benefiting Next Decade and Media Partner, and through them, Vincent Mo and/or family trusts subject to his control; and

   c.   The entry into the CIH Share option and/or the First Option Exercise and/or the Second Option Exercise were not in the best interests of the Company or for the proper corporate or business purposes of the Company.

95.    The entry into the CIH Share Option, the First and Second Option Exercises were all either approved or acquiesced in by Fang's board.  Further, it is also to be reasonably inferred that the treatment of the immediate but unrealised loss to Fang occasioned by the First Option Exercise was also approved by Fang's audit committee and/or compensation committees.

96.    In the premises, Vincent Mo and Fang's directors thereby acted in breach of their fiduciary duties by not acting *bona fide* in the best interests of Fang and by not acting for the proper corporate or business purposes of Fang.

97.    Further, it is to be reasonably inferred that:

   a.   Having regard to the timing of the acquisition of 1,955,836 CIH ADS by Fang prior to the second exercise of the CIH option, the limited 18-day trading window within which Fang sought to acquire the CIH ADS, the anomalous intraday trading patterns over that period of time and the disproportionate impact this had on CIH's market price (an increase of 162% in less than a month), that Vincent Mo and Fang's directors have manipulated CIH's ADS price with the aim of purporting to justify the second exercise

of the CIH share option by Fang and/or to disguise the true extent of the immediate but unrealised loss to Fang; and

b. Had Vincent Mo and Fang's directors refrained from manipulating CIH's ADS price it would have likely remained in the region of US$1.15 (the closing price as at 28 May 2020) in which case the immediate but unrealized loss to Fang on the exercise of the option on 23 June 2020 would have been US$41,378,364 i.e. Fang would have expended approximately US$51.2 million to acquire shares with an approximate market value of US$9.8 million. Had the option been exercised for a second time (without any market manipulation) and taking the said price of US$1.15 per CIH ADS as a benchmark, the option price of US$5.99 per share would have represented a 420.87% premium to the market price.

98.   The manipulation of CIH's ADS price in that manner was not a proper purpose for the acquisition by Fang of CIH ADS, and was not in the best interests of Fang, since Fang's own funds were used to manipulate CIH's market price. Over the 18-day trading period, Vincent Mo and Fang's directors caused the Company to expend approximately US$4,845,855 in acquiring the 1,955,836 CIH ADS and it is to be reasonably inferred that those funds were expended for the purpose of artificially inflating CIH's market price with the aims pleaded above. SEC filings disclose that funding for the exercise of the option in December 2019 and June 2020 came from Fang's working capital.

99.   Accordingly causing Fang to manipulate CIH's market price constituted a further breach by Vincent Mo and Fang's directors of their fiduciary duties by not being bona fide in the best interest of the Company and by not being for the proper corporate or business purposes of the Company.

100.  The said breaches of fiduciary duty have caused substantial loss to Fang. Since 27 December 2019, CIH's share price has fallen significantly. As at market close on 11 November 2020, CIH's share price was US$1.51.



101. The 13,549,249 CIH shares purchased by Fang by the two exercises of the option are currently worth US$20,459,366 representing an unrealized loss of US$60,700,635 on the cumulative purchase price. Accordingly, companies controlled by Vincent Mo have profited by offloading underperforming assets (in the form of the 13,549,249 CIH shares) to Fang at a significant premium to the market price.

102. The said breaches of fiduciary duties have been compounded by Fang's failure to make proper disclosures and by misleading investors by attempting to disguise the unrealised loss as executive compensation.

**(IV)**    **Dealings in relation to the Company's assets and business for the benefit of Vincent Mo and/or his other business interests and/or which were not for the benefit of the Company**

103. As set out in paragraphs 12, 15 and 21 above, Fang:

   a. Was founded by Vincent Mo in 1999 as an advertising platform for PRC's real estate companies;

   b. Now operates PRC's largest real estate and listing and search portal named Fangtianxia（房天下）. In other words, it is an internet/online business, not a traditional "bricks and mortar" business;

   c. Also operates a short-term rental website similar to "AirBnB" in China, under the brand name Youtx (游天下); and

   d. Does not hold itself out as a real estate company or property company in the traditional meaning of word; that is, it is not a company that buys, sells and rent properties.

104. By contrast, publicly available information indicates that Vincent Mo owns, via a separate corporate group, a hotel business, in particular the Upsky brand of hotels held by Upsky Enterprises and/or affiliated companies.  The "Upsky" hotel portfolio in the PRC, as described by its website, includes the following 7 hotels:

   a. Shanghai Baoan Hotel in Shanghai ("***Shanghai Baoan"***);

   b. Beijing Baoyi Hotel in Beijing ("***Beijing Baoyi Hotel"***);

   c. Youtx Sky Yiqing in Lichuan (***"Youtx Sky"***);

   d. Youtx Sky Huizhou Condo Hotel in Huizhou (***"Youtx Huizhou"***);

   e. Skye The Resort Apartments ("***Skye Resort"***);

   f. Silver Beach No.1 International Conference Center Hotel in Beihai ("***Silver Beach"***); and

   g. Wharton International Hotel in Nanning (the ***"Wharton Hotel"***).

105. The "Upsky" hotel portfolio in the US, as described by its website, includes the following 3 hotels:

    a.   Best Western Plus Lighthouse, Pacifica, California;

    b.   Crowne Plaza San Francisco Airport Hotel, California; and

    c.   Radisson Hotel Hauppauge-Long Island.

106.   An attempt by Fang in 2014 and 2015 to enter the property transaction sector in the PRC (as a real estate/property company) was vigorously resisted by property brokers in different cities:

    a.   Protests started in May 2014 in Hangzhou, when nine local brokers stopped posting their listings on the Company's platform, and continued with other brokers in Henan, Shenzhen, and Chongqing;

    b.   In August 2014, 13 property brokers in Shanghai, accounting for around 30% to 40% of the Company's business, launched a similar boycott;

    c.   In November 2014, leading real estate Lianjia and 5i5j announced they were cutting ties with Fang; and

    d.   In April 2015, 34 brokers in Guangzhou were still boycotting Fang.

107.   As a result of the difficulties it had faced in attempting to enter the real estate market, in 2017, Fang announced that its strategic attempt to change its business model from an internet portal business to a real estate/property company had failed.  It stated that it was returning to its original business model of an internet portal business.  As a result, it estimated that it would return to profitability in 2018, and estimated profits to be around US$100 million to $120 million.[35] These estimates proved to be unrealistic and Fang incurred a net loss of US$114.9 million in 2018, *"primarily due to the combined effect of the decrease in [Fang's] revenues and the decrease in the fair value of [Fang's] equity investments".*[36]

108.   Nevertheless, as set out below, for reasons that have not been explained, Fang has engaged in a pattern of purchasing properties in China and the US, even though this activity bore no relation to its traditional core business.  The pattern is pronounced from 2017 onwards, but has its antecedents in earlier purchases.

109.   Further, there have been opaque dealings between Fang entities and entities owned and/or controlled by Vincent Mo (including payment of management fees to entities controlled by him) and a failure to make appropriate disclosure in relation to properties owned by Fang entities.

110.   In the premises, it is to be reasonably inferred that the purchase of real estate/hotels by Fang has been for the purpose of benefitting Vincent Mo and/or businesses owned and/or controlled by him and not for the benefit of Fang.

---

[35] Fang Holdings Limited NYSE:SFUN FQ4 2017 Earnings Call Transcript, 29 March 2018 (S&P Global Market Intelligence).

[36] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2018, page 7 (filed 14 May 2019).

*Section 1: PRC assets*

Sanya Bay Hotel

111.  In 2012 Fang purchased 47 rooms in a Sanya Bay La Costa Seaside Hotel ("***the Sanya Bay Property***").  The transaction was described by Fang as follows:

a.  In its SEC Form 20-F (Annual Report) for 2011 (filed in April 2012), Fang disclosed that it owned, "*certain properties of approximately 2,913 sq.m. in Sanya, Hainan Province, China*".  It stated that, *"[w]e acquired these properties for RMB82.5 million (approximately US$13.1 million) pursuant to a purchase agreement which we entered into with the previous owner of these properties, Beijing Hengxinjiahua Investment Consultancy Limited, on March 15, 2012.  We plan to use these properties as our local office in Hainan as well as for internal training purposes*";[37]

b.  In the same SEC Form 20-F disclosure, Fang asserted that Beijing Hengxinjiahua was an independent third-party;[38]

c.  The purchase agreement filed as an exhibit to the SEC Form 20-F for 2011 revealed that Fang had actually acquired 44 hotel rooms in the Sanya Bay La Costa Seaside Hotel.[39]

d.  In its SEC Form 20-F (Annual Report) for 2012, Fang revealed that in June 2012, it had acquired a further 198 sq.m. of property from Beijing Hengxinjiahua for RMB5.6 million (approximately US$0.9 million) bringing the total number of hotel rooms to 47;

e.  On 25 October 2012, the SEC staff wrote to Fang and questioned the Beijing Hengxinjiahua transaction, requesting details of the business purpose and nature of the transaction;[40]

f.  In a response dated 8 November 2012, Fang:  (i) admitted that Beijing Hengxinjiahua had been previously owned by Vincent Mo and Mr. Dai (i.e. the Company's president, chief executive officer who is also Vincent Mo's nephew) but claimed that, "*Mo and Mr. Dai sold their respective interests in Dong Fang Xi Mei [the former name of Beijing Hengxinjiahua]*" on 20 December 2011 to Dandong Yuanlong Villa Management Company ("***Dandong Yuanlong***"), which it claimed was, "*an independent third party*" (four months before the purchase by Fang of Dong Fang Xi Mei); (ii) reported further that the Company had lent $14.8 million in 2011 for the purpose of purchasing Dong Fang Xi Mei (even though Dandong Yuanlong eventually purchased Dong Fang Xi Mei (and underlying Sanya Bay Property) for US$150,276.50); (iii) stated that after "*Dandong Yuanlong experienced liquidity issues*" it had been agreed that the company would purchase the subject properties;[41]

---

[37] SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2011, page 43 (filed 26 April 2012).

[38] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2011, Note 21 to the Financial Statement (filed 26 April 2012).

[39] See SouFun Holdings SEC Form 20-F, Annual Report for the year ending 31 December 2011 exhibit 4.22 (filed 26 April 2012).

[40] 25 October 2012 letter from SEC Staff to SouFun Holdings.

[41] SouFun Holdings counsel letter of 8 November 2012 to SEC Staff.

g. In the same letter to the SEC, Fang further stated that it entered this transaction to purchase the properties because, *"[it] would be able to use the subject properties as its local office and for internal training purposes"*;[42] and

h. The letter to the SEC was referred to again by Fang in 2013 when it attempted to refute claims that the transaction was a related party transaction.[43]

112. Neither Fang's 2013 press release nor the 2012 letter to the SEC mentioned that Dandong Yuanlong was a company owned by a former classmate of Vincent Mo, Deng Wei.

113. There was no proper commercial rationale or benefit for Fang to make the loan to Dandong Yuanlong, or for it to purchase the Sanya Bay Hotel properties from Dandong Yuanlong. The purchase of the Sanya Bay Hotel properties predates Fang's stated venture into real property (which was in 2014). Further, as pleaded below, Fang does not appear to be using the properties for office purposes and has not disclosed any income received in respect of the properties, indicating that Fang has received no commercial benefit from the acquisition of the properties.

114. In SEC Form 20-F annual filings from 2012 to date, Fang has continued to describe the properties as either being planned for use as, *"our local office in Hainan as well as for internal training purposes",*[44] or as being in actual use, *"as our local office"*.[45]

115. In fact, the Sanya Bay Hotel properties are not used as offices.

116. The Sanya Bay La Costa Seaside Hotel is a resort hotel in Sanya, Hainan with approximately 350 rooms in total. The hotel was developed by a company called Hainan Honghai Tourism Co. Ltd (***"Honghai Tourism"***) and is managed by Sanya Bay La Costa Hotel Co. Ltd (***"Sanya Bay Co"***).

117. The Petitioners understand that the Sanya Bay Hotel is managed on the basis of a property rights model whereby:

a. The developer of the hotel (in this instance, Honghai Tourism) sells all or a part of the hotel rooms to private investors; and

---

[42] SouFun Holdings counsel letter of 8 November 2012 to SEC Staff.

[43] SouFun Holdings 16 April 2013 Press Release, "*Soufun Management Commented on a Short Seller's Updated Report*", exhibited to SouFun Holdings Current Report Form 6-K (filed 18 April 2013).

[44] SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2012, Page 39 (filed 3 April 2013).

[45] SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2013, page 58 (filed 30 April 2014); see also SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2014, page 46 (filed 28 April 2015) (same); SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2015, page 67 (filed 17 May 2016) (same); Fang SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2016, page 48 (filed 12 May 2017) (same); Fang SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2017, page 47 (filed 15 May 2018) (same); Fang SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2018, page 64 (filed 14 May 2019); Fang SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 46 (filed 27 May 2020) (same).

      b.  Regardless of the identity of the investor owners, all rooms in the hotel are managed by the same company (i.e. Sanya Bay Co) and are available to be booked by guests. The investor who owns the rooms does not actively manage or use the property.

118.  As at 19 October 2020, no Fang company signage was identified outside or in the public areas of the hotel and members of staff at the Sanya Bay Hotel had no knowledge of Fang using any part of the premises as its Hainan local office.

119.  The purchase agreement filed as an exhibit to that 2011 Annual Report also disclosed details of the property acquired by Fang, including the individual room numbers of the 44 hotel rooms.  These rooms are spread out over seven floors (2nd floor, 3rd floor, 7th-11th floors). An invoice, dated 19 October 2020, evidences that at least one of the rooms, Room 1038, is available to paying guests for overnight stays and is fitted out as an ordinary hotel room, not an office.

120.  In addition:

    a.  Fang already has a local office in Sanya which is listed on its website, as being at 302, Building 3, Central Building, Yingbin Road, Jiyang District, Sanya City, Hainan Province (海南省三亚市吉阳区迎宾路中环广场 3 栋 302);

    b.  Sanya Bay La Costa Seaside Hotel is not listed on Fang's website as an office of Fang's in Sanya; and

    c.  Use of the Sanya Bay La Costa Seaside Hotel as an office (if such were, in fact, occurring) may be a breach of:

        i.  Article 81 of the People's Republic of China's *Law on Land Administration* 《中华人民共和国土地管理法》);

        ii.  Article 28 of the People's Republic of China's Fire Protection Regulations for the Hainan Free Trade Port (《海南自由贸易港消防条例》).

121.  Based on the foregoing, it is reasonably inferred that the 47 hotel rooms (the 44 hotel rooms acquired in March 2012 and the 3 hotel rooms acquired in June 2012) do form part of the property rights model in effect at the Sanya Bay Hotel and that they comprise part of the pool of hotel rooms, 350 hotel rooms in total, available to paying guests who wish to stay at the hotel.  The 47 hotel room owned by Fang is not insignificant representing 13.4% of the total pool of hotel rooms at the Sanya Bay Hotel.

122.  In its SEC Form 20-F (Annual Report) for fiscal year 2012, the financial statements cover revenues in respect of marketing services, listing services, e-commerce services and other value-added services and products.[46]  Ancillary activities are recognized under the heading, "*operating income*" for the same period which covers foreign exchange income, interest income, realized gains – trading securities and government grants.  The income stream from

[46] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2011, page 55 (filed 26 April 2012).

the 47 hotel rooms was not recognized as revenue or operating income for this period or if it was, it was not correctly disclosed.

123. In its SEC Form 20-F (Annual Report) for fiscal year 2013, the accompanying financial statements once again do not recognize any revenue or operating income from the 47 hotel rooms for this period.[47]  Other income was recognized for the first time in that year and is described as, *"other revenue of US$8.9 million and other expenses of US$8.1 million of the three subsidiaries [Fang] acquired in the BaoAn acquisition since March 2013"*.[48]  It is highly unlikely to be the case that the revenue/income in respect of the 47 hotel rooms failed to meet Fang's *de minimis* accounting threshold – in 2011 and 2013, Fang recognized foreign exchange gains in the amount of US$1,000 and US$3,000 respectively.[49]

124. The position was the same for the fiscal year 2014 with Fang's management neglecting and/or omitting to account for revenue or operating income in respect of the 47 hotel rooms.  Other income in 2014 consisted of, *"other revenue of US$13.7 million and other expenses of US$12.9 million of the three subsidiaries [Fang] acquired in March 2013 that owned and managed the Baoan Building."*[50]

125. For the fiscal year ended 2015, revenue and/or operating income from the 47 hotel rooms was not recorded in Fang's financial statements.[51]  Other losses (not income) are recorded in the form of losses of US$625,000 which are ascribed to, *"other revenue of US$0.7 million and other expenses of US$.1.3 million of our subsidiaries that operate the hotel and office leasing businesses."*[52]  The, "*hotel and office leasing businesses*" appears to be a reference to the operations owned by the Baoan entities.[53]  Other income, again derived from the Baoan hotel and office leasing business, was US$415,000 in 2016[54] and a loss of US$567,000 in 2017.[55]

126. For the fiscal years 2017-2019, there was a significant jump in the revenue and expenses which contributed to the line item, "*other income*".  In 2017, other revenue was US$12.2 million and other expenses were US$12.8 million in respect of the operation of the hotel

---

[47] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2013, page 52 (filed 30 April 2014).

[48] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2013, page 86 (filed 30 April 2014).

[49] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2013, page 8 (filed 30 April 2014).

[50] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2014, pages and 73 (filed 28 April 2015).

[51] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2015 (filed 17 May 2016).

[52] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2015, page 107 (filed 17 May 2016).

[53] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2015, page 137 (filed 17 May 2016).

[54] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2016, page 78 (filed 2017).

[55] See Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2017, pages 77 and 80 (filed 15 May 2018).

and office leasing businesses of Fang's subsidiaries.  In 2018, "*other income*" consisted of rental income of US$2.6 million, income from litigation of US$1.4 million and loss from hotel operations of US$0.7 million.[56]  In 2019, "*other income*" consisted of rental income of US$5.2 million, income from litigation of US$0.4 million and loss from hotel operations of US$1.7 million.  Despite the significant jump in other revenues from 2017-2019 (and the jump in expenses in 2017), neither the annual reports nor the accompanying financial statements provide any clarity regarding the precise source of the income.  In circumstances where Fang's management neglected, omitted and/or failed to make the required disclosures regarding this revenue stream from 2011-2016 and, "*other income*" for the Fiscal Years 2017-2019 is framed in opaque terms, it is to be reasonably inferred that, "*other income*" in the Forms 20-F, Annual Reports for the Fiscal Years 2017-2019 and accompanying financial statements does not include income for those periods derived from the 47 hotel rooms.

127.  In the premises, having regard to the misleading description of the use of the property, the lack of any obvious rationale for Fang to be acquiring hotel property in 2012, the opaque circumstances in which it was acquired and the failure to disclose the related party elements of the transactions, it is averred that the true purpose of Fang acquiring the Sanya Bay Hotel properties was to enable Vincent Mo and Richard Jiangong Dai (代建功) to offload property they owned onto Fang, via Dandong Yuanlong, which at the very least constitutes self-dealing, and/or represents the transfer of the cost of acquiring such property from themselves to Fang.

128.  Further, the failure to disclose any income from the properties, and the false description of the use of the properties as offices, when in fact they are used as hotel rooms, raises the reasonable inference that the income derived from the properties is being diverted away from Fang and to or for the benefit of Vincent Mo and/or his affiliated hotel businesses.

129.  The breaches of duty outlined above are compounded in that when the SEC queried the nature of the transactions in October 2012, the response provided by Fang's directors to the SEC (as to which see paragraph 111 above), was incomplete, misleading and/or untrue.

***Youtx Hotels***

130.  According to its website, "Youtx" is real estate internet portal owned by Fang, specializing in daily rentals and short rentals.  Youtx's website states:

> "*As a branch of Fang.com (NYSE:SFUN), Youtx.com is a solution for short-term rentals founded in September of 2011. Whether a vacation villa, a Chinese traditional house, or a common apartment, people can list their extra property on our website to rent, to get more from short-term rentals than long-term ones. And travelers can get unique travel experience and save considerable amount of money by choosing to stay at short-term rentals than hotels.*"

---

[56] See Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2018, page 99 (filed 14 May 2019).

131.  Based on this description, Youtx's business is similar to that of AirBnB though, as outlined below, it would appear to include traditional hotel accommodation.  However, there is no mention of Youtx (or any type of AirBnB-type business which could be a reference to Youtx) in Fang's SEC filings.

132.  Youtx Huizhou and Youtx Sky are held out as affiliated with Upsky Enterprises, the hotel business owned by Vincent Mo, not Fang.  Specifically:

(a)  According to the Upsky brand's website (Vincent Mo's personal hotel business), Youtx Huizhou and Youtx Sky are all listed as "Upsky" hotels, though the description of Youtx Huizhou states that this "*hotel apartment belongs to Soufun and is invested by the Century investment company*"; and

(b)  Youtx Huizhou prominently displays Upsky brand signage in the hotel.

133.  In view of the apparent operation of the hotels as Upsky branded hotels, despite Youtx's description of itself as part of Fang and Upsky's statement that Youtx Huizhou is owned by Soufun (the former name of Fang), it is reasonably to be inferred that there are management arrangements between Fang (or a Fang subsidiary) and Upsky (a related party) in relation to the management of Youtx Huizhou and/or Youtx Sky, in which case there has again been a failure by Fang to disclose a related party transaction and any and all amounts earned or received under such arrangements.

*Shanghai Baoan Hotel*

134.  In December 2012, Fang entered into an agreement with China BaoAn Group Co., Ltd., a Chinese company, to acquire a large property in Shanghai, known as the "*BaoAn Building*", for US$127 million in cash.[57]  The acquisition was completed in the first quarter of 2013, according to Fang's management:

> "*In December 2012, we entered into an agreement to acquire a portion of the BaoAn Building in Shanghai for our Shanghai headquarters through the acquisition of the entire equity interests in three companies that owned and operated the property from China BaoAn Group Co., Ltd., a Chinese company, and its affiliated companies, for RMB800 million (US$127.3 million) in cash. The property, located at 800 Dongfang Road, Pudong, Shanghai, has usable space of approximately 42,000 square meters and is currently used for offices, retail space and a hotel. We plan to gradually convert it into office and training space to support our business expansion in Shanghai and East China area. The relevant regulatory approvals were obtained and the acquisition was completed in the first quarter of 2013*".[58]

135.  The companies that were acquired in this transaction and which collectively own and operate the BaoAn Building (including Shanghai Baoan Hotel Co Ltd and Shanghai Baoan

---

[57] SouFun Holdings 2 January 2013 Press Release, "*SOUFUN ESTABLISHED HEADQUARTERS IN SHANGHAI AND SIGNED AN AGREEMENT TO ACQUIRE A COMMERCIAL PROPERTY FOR ITS SHANGHAI HEADQUARTERS*", exhibited to SouFun Holdings SEC Form 6-K, Current Report (filed 4 January 2013).
[58] "*Management's Discussion and Analysis of Financial Condition and Results of Operations*", exhibited to SouFun Holdings Form 6-K Current Report (filed 3 December 2013).

Enterprise Co Ltd) appear to have been referred to in subsequent SEC Filings by Fang as the "*Baoan Entities*".[59]

136.   After the acquisition of the BaoAn Building, the Baoan Entities entered into an agreement with Beihai Silver Beach No 1 Hotel Company Limited ("*Beihai Silver Beach*"), a company under the control of Vincent Mo[60], for Beihai Silver Beach to manage the building. Specifically, according to Fang's SEC Form 20-F (Annual Report) for 2013, "*on April 1, 2013, we and Beihai Silver Beach entered into a contract, pursuant to which Beihai Silver Beach was engaged to manage the hotel and office leasing operations owned by the Baoan Entities for ten years*".[61]   As disclosed on the Upsky website, one of its PRC portfolio companies is Silver Beach No. 1 International Conference Center Hotel located in Beihai.  According to the "History" section of the website, the Upsky group *"[i]ndependently designed and built the Beihai Silver Beach No.1 Conference Center Hotel (four-star hotel)Opened (sic) successfully **and began comprehensive management company**."* (emphasis added). In the premises, it is reasonable to infer that the management company identified by the Upsky group on the website and Beihai Silver Beach are one and the same.

137.   In the same SEC Form 20-F filed for 2013, Fang stated that, "*the property has usable space of approximately 42,000 sqm and is currently used for offices, retail space and a hotel*".[62]   A similar statement was contained in further SEC Form 20-F filings for 2014 and subsequent years.

138.   Fang reported that in 2013, the sum of $537,000 was paid in fees by Fang (through the Baoan Entities) to Beihai Silver Beach.[63]  In total, between 2013-2019, Fang paid US$3.8 million in fees to Beihai Silver Beach, Vincent Mo's company.

139.   SAIC records have not revealed any operations of Beihai Silver Beach based in Shanghai. The Petitioners believe that Beihai Silver Beach manages Silver Beach, a hotel based in Beihai, in the extreme south of the PRC and at a considerable distance from Shanghai (the hotel identified above at paragraph 136).  In addition, an invoice in respect of a stay at the Shanghai Baoan Hotel identifies the management entity as Shanghai Baoan Hotel Co Ltd (i.e. one of the Baoan Entities), and not Beihai Silver Beach.  Shanghai Baoan Hotel Co Ltd is a wholly-owned subsidiary of Fang and is listed as one of its principal subsidiaries in its SEC Form 20-F for the fiscal year ended 31 December 2019.[64] The relationship between Fang and Shanghai Baoan Hotel Co Ltd renders it unlikely that there is any sub-contracting arrangement between Beihai Silver Beach and Shanghai Baoan Hotel Co Ltd. It would make no commercial sense for Fang to enter into a management agreement with a related party (Beihai Silver Beach) only for that related party, in turn, to subcontract the work in full back to Fang's wholly-owned subsidiary, Shanghai Baoan Hotel Co Ltd.  In the premises, it is

---

[59] SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2013, page F-40 (filed 30 April 2014).

[60] Behai Silver Beach is disclosed as a related party ("*a company under the control of Vincent Tianquan Mo*") in SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2013, page F-63.  Similar disclosures are made in SouFun/Fang's Form 20-Fs for subsequent years.

[61] SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2013, page F-40 (filed 30 April 2014).

[62] SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2013, page 59 (filed 30 April 2014).

[63] SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2013, page 113 (filed 30 April 2014).

[64] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page F-15 (filed 27 May 2020).

reasonably to be inferred that Beihai Silver Beach may not have in fact provided management services in respect of the Shanghai Baoan Hotel.

140.  Further:

    a.  The Upsky website lists the Shanghai Baoan Hotel as its PRC headquarters and states that, *"In December 31th 2013 (sic.), the hotel officially belonged to the Upsky Hotel & Resorts group, and became the headquarters of Upsky China"*.  The Shanghai Baoan Hotel asset is therefore being used (at least in part) for the benefit of Upksy Enterprises.

    b.  Fang's SEC filings have not disclosed any transaction between Fang and the Upsky group of companies in relation to the Shanghai Baoan Hotel.  It is reasonably to be inferred that:

        i.  Either the Shanghai Baoan Hotel has, in fact, been transferred to an Upsky entity, in which case this has not been disclosed in SEC filings nor the terms upon which the hotel was transferred by Fang to Upsky, which is a related party.

        ii.  Or, if the Shanghai Baoan Hotel is merely occupied by Upsky Enterprises (or another Upsky entity) as its PRC headquarters, details of the terms or consideration upon which this right has been granted to the Upsky group have not been disclosed in Fang's SEC filings to date, and ought to have been as a related party transaction.

141.  In the premises:

    a.  There appears to be no justification for the payment of US$3.8 million to Beihai Silver Beach by Fang between 2013-2019;

    b.  Fang's directors breached their fiduciary duty to act *bona fide* in the best interests of Fang by causing it to pay US$3.8 million to Beihai Silver Beach without any justification; and

    c.  The Upsky Group's apparent use of the property raises a reasonable inference that a transaction has been entered into between Fang and an Upsky entity and/or there has been an intermingling of Fang's and Vincent Mo's hotel business (including the Upsky business) for the purpose of benefiting Upsky Enterprises and/or Vincent Mo and not for the benefit of Fang or for the corporate or business purposes of Fang.

*Baoyi Property*

142.  Fang has purchased a property known as "*Beijing Baoyi*" (the "**Baoyi Property**") in circumstances suggesting it is a disguised hotel purchase made for the benefit of Vincent Mo.

143.  In its SEC Form 20-F (Annual Report) for 2015, Fang stated that it had:

*"entered into a commercial properties purchase agreement with a real estate developer to purchase an office building in Beijing to be used as our new headquarters establishment with a total price [of] approximately $243 million.  This property has a total usable office space of approximately 70,000 sq.m. and is located at*

*Guogongzhuang Middle Road, Fengtai District, Beijing, which we believe will provide strong support to our fast expanding headcounts and Beijing operations…*"[65]

144. It is reasonably to be inferred that the liability for the purchase price of the Baoyi Property was incurred by Fang (and Fang's SEC Form 20-F referred to above did not state that any third party had assumed such liability).

145. Despite this statement describing the Baoyi Property as comprising "*office space*", it in fact includes a hotel, namely, the Beijing Baoyi Hotel.  This fact is not mentioned, however, in this or any of Fang's subsequent SEC Form 20-F annual filings.  As pleaded above at paragraph 104, the Beijing Baoyi Hotel is described on Upsky's website as one of its seven PRC hotels.

146. Because of this lack of any reference in Fang's SEC filings, Fang has given no information regarding the performance of the Beijing Baoyi Hotel, including as to revenue and any profits, over the years or if such has been included in annual reports, it has not been disclosed on an identifiable basis.  Similarly, the SEC filings do not disclose the basis upon which the Beijing Baoyi Hotel has been and continues to be managed.

147. SAIC records reveal, however, that the registered address οf Beijing Baoyi Hotel Management Co Limited (**"*Baoyi Co*"**) is virtually identical to the physical address of the Beijing Baoyi Hotel.  In the premises, it is to be reasonably inferred that the Beijing Baoyi Hotel is managed by Baoyi Co.

148. Until 26 June 2019, Baoyi Co was a subsidiary of Shanghai Baoan Hotel Co Limited (which, as pleaded above, is a Fang subsidiary).  On this date, the ownership of Baoyi Co was transferred to Shanghai Yuyue Electronic Technology Development Co Ltd ("***Shanghai Yuyue***") a company which (as pleaded below) is under the control of Vincent Mo.

149. Despite Fang's 2015 SEC Form 20-F stating that it had acquired the Baoyi Property, the PRC Real Estate Register states that the following are registered owners ("***Baoyi Registered Owners***") of parts of the Baoyi Property with such interests being entered on the register between March and May 2017:

a. Beijing China Index Information Co., Ltd (北京中指数资讯有限公司);

b. Beijing Sou Fun Internet Information Service Co., Ltd (北京搜房互联网信息服务有限公司);

c. Beijing Sou Fun Science and Technology Development Co., Ltd (北京搜房科技发展有限公司);

d. Beijing Century Jia Tian Xia Science and Technology Development Co., Ltd (北京世纪家天下科技发展有限公司);

e. Beijing Li Tian Rong Ze Yi Jia Science and Technology Development Co., Ltd (北京立天荣泽亿家科技发展有限公司); and

---

[65] SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2015, page 67 (filed 17 May 2016).

f.   Beijing Jia Tian Xia Advertisement Limited (北京家天下广告有限公司).

The PRC Real Estate Register does not reveal who was registered as the legal owner(s) the various parts of the Baoyi Property prior to the period at issue in 2017.

150.  The Baoyi Registered Owners are all companies that are majority owned by Vincent Mo (as pleaded further below).   Fang has failed to disclose any transaction between Fang and the Baoyi Registered Owners by which any ownership interest was transferred to the latter, which ought to have been disclosed as a related party transaction.  Further, Fang has failed to disclose any income arising from the sale or operation of either the Baoyi Building or the Beijing Baoyi Hotel or any parts thereof.

151.  Alternatively, if Fang purchased the Baoyi Property in order for it to be held from the outset wholly or partially by the Baoyi Registered Owners then Fang has failed to disclose that fact, and there was no need for such an arrangement and as such it involves unnecessary risks for Fang and was not for the benefit of Fang.

152.  In the further alternative, if any of the Baoyi Registered Owners were formerly owned by any Fang group company, and were transferred into the majority ownership of Vincent Mo, no such transfer transaction has been disclosed by Fang (and ought to have been, as a related party transaction under Item 7(B) of Form 20-F) and nor has any price for any such transfer been disclosed as income by Fang.

153.  SAIC records further reveal that:

a.   Beijing China Index Information Co., Ltd (北京中指数资讯有限公司) is 80% owned by Vincent Mo via two intermediate companies; Beijing Sou Fun Internet Information Service Co., Ltd and Beijing Jia Tian Xia Advertisement Limited;

b.   Beijing Sou Fun Internet Information Service Co., Ltd (北京搜房互联网信息服务有限公司) has a registration number of 110101006348693, was incorporated on 17 December 2003 with a registered capital of RMB 10 million, and is 80% owned by Vincent Mo.  Vincent Mo is listed as Executive Director and Manager of this company;

c.   Beijing Sou Fun Science and Technology Development Co., Ltd (北京搜房科技发展有限公司) has a registration number of 110108009395808, was incorporated on 14 March 2006 with a registered capital of RMB 11 million, and is 80% owned by Vincent Mo.  Vincent Mo is listed as Executive Director and Manager of this company.

d.   Beijing Century Jia Tian Xia Science and Technology Development Co., Ltd (北京世纪家天下科技发展有限公司) is 80% owned by Vincent Mo;

e.   Beijing Li Tian Rong Ze Yi Jia Science and Technology Development Co., Ltd (北京立天荣泽亿家科技发展有限公司) has a registration number of 110107019871501, was incorporated on 16 September 2015 with a registered capital of RMB 2 million, and is 80% owned by Vincent Mo; and

f.   Beijing Jia Tian Xia Advertisement Limited (北京家天下广告有限公司) has a registration number of 110101001652970, was incorporated on 1 September 2000 with a registered capital of RMB 1.5 million, and is 80% owned by Vincent Mo.

154.    Five out of the six entities listed in paragraph 153 above are listed in Fang's SEC Form 20-F filings as being major subsidiaries of Fang (and not entities owned directly by Vincent Mo).[66] The exception is Beijing China Index Information Co. (as to which see below).   The Petitioners understand that an accounting decision has been made to consolidate these entities directly owned by Mo as being Fang subsidiaries (even though no Fang entity is in fact recorded as being an owner of them) on the basis of Structure Contracts.[67] Fang states in its SEC Form 20-F annual filings that the reason for Structure Contracts is to comply with PRC laws on foreign investment in the Internet business.[68]

155.    Fang has disclosed in its annual reports (i.e. its SEC Form 20-F annual filings) that the Structure Contracts suffer from the following risks (among others):

    a.    "*[Fang] may lose the ability to utilize assets held by our consolidated controlled entities that are important to the operation of our business if any of these entities goes bankrupt or becomes subject to a dissolution or liquidation proceeding*"; and

    b.    "*Contractual arrangements, including voting proxies, with our consolidated controlled entities for our Internet content distribution and marketing businesses may not be as effective in providing operational control as direct or indirect ownership*".

156.    Beijing China Index Information Co., Ltd was also previously listed as a, "consolidated controlled entity" of Fang.  After the 'spin-off' of CIH, it ceased to be a "consolidated controlled entity" of Fang, and it has not become listed as a "consolidated controlled entity" of CIH.  Accordingly, it would appear that any Structure Contracts that were in place and enabled it to be treated as a "consolidated controlled entity" of Fang have been terminated or expired.

157.    In fact, there is no commercial purpose or rationale for the Baoyi Property being owned by the Vincent Mo entities (rather than via wholly-owned subsidiaries of Fang), because there

---

[66] For example, Sou Fun Internet Information Service Co., Ltd referred to in paragraph 153 above, is described on page F-14 of Fang's SEC Form 20-F Annual Report for 2019 as a major subsidiary of Fang.  Beijing Sou Fun Science and Technology Development Co., Ltd referred to in paragraph 152c above, is described on page 57 of Fang's SEC Form 20-F Annual Report for 2019 as a principal subsidiary of Fang, and a, "*consolidated controlled subsidiary*".  Beijing Century Jia Tian Xia Science and Technology Development Co., Ltd is described on page F-14 of Fang's SEC Form 20-F Annual Report for 2019 as a, "*consolidated controlled entity*". Beijing Li Tian Rong Ze Yi Jia Science and Technology Development Co., Ltd is described on page F-14 of Fang's SEC Form 20-F Annual Report for 2019 as a, "*consolidated controlled subsidiary*", Beijing Jia Tian Xia Advertisement Limited is described on page 58 of Fang's SEC Form 20-F Annual Report for 2019 as a, "*consolidated controlled subsidiary*".

[67] In terms of accounting treatment, page 62 of Fang's Form 20-F Annual Report for 2019 states that "*[b]ased on these Structure Contracts, we believe that, notwithstanding our lack of equity ownership, the arrangements provide us with effective control over our consolidated controlled entities.  Accordingly, the financial results of these entities are included in our consolidated financial statements.*"

[68] The rationale for structure contracts is set out at page 20 of Fang's SEC Form 20-F Annual Report for 2019 as follows:"*[t]o comply with applicable PRC laws, rules and regulations, we conduct our operations in China primarily through our wholly-owned PRC subsidiaries and our consolidated controlled entities.  Our wholly-owned PRC subsidiaries, our consolidated controlled entities (excluding their subsidiaries) and their respective shareholders have entered into a series of contractual arrangements, which consist of exclusive technical consultancy and service agreements, equity pledge agreements, operating agreements, shareholders' proxy agreements, loan agreements and exclusive call option agreements (collectively, the "Structure Contracts").*

are no restrictions preventing wholly foreign-owned enterprises owning real estate in the PRC.

158.   In the premises, registering the Baoyi Property in the names of third parties majority owned by Vincent Mo, without commercial justification was not in the best interests of Fang and has unnecessarily put that asset at risk, in a manner that potentially benefits Vincent Mo.

159.   Further, if Fang has transferred any ownership interest in the Baoyi Property and/or in the Baoyi Registered Owners (and no income arising from any such transfer has been reported in Fang's SEC Filings), Fang's directors will have breached their fiduciary duties to act *bona fide* in the best interests of Fang, to promote the success of the company, to act for the proper corporate and business purposes of Fang, to exercise reasonable care, skill and diligence and (in the case of Vincent Mo) to avoid conflicts of interests by transferring or permitting the alienation of Beijing Baoyi Hotel for no value.

Intermingling of Fang's business/assets with Vincent Mo's hotel businesses

160.   In the premises, each of the following represents an intermingling of Fang's business/assets with that of Vincent Mo's hotel businesses which cannot have been and is not in the best interests of Fang:

   a.   Sanya Bay Hotel: apparent diversion of hotel room income to Vincent Mo's hotel businesses;

   b.   The apparent use by Upsky, without any disclosed benefit to Fang, of Youtx-branded assets (i.e. Youtx Huizhou and Youtx Sky), where Youtx describes itself as a branch of Fang and where at least one of the hotels (Youtx Huizhou) is stated by Upsky itself to belong to "Soufun" (Fang's former name);

   c.   Shanghai Baoan Hotel: payment of fees to Beihai Silver Beach and apparent use of Fang's asset by Upsky without any disclosed benefit to Fang;

   d.   Baoyi Property: transferring or registering the property in the names of companies that are majority owned by Vincent Mo and diversion of management income through the transfer of Baoyi Co.

***Section 2: The transfer of 42 subsidiaries at undervalue to Shanghai Yuyue***

161.   Baoyi Co was not the only entity transferred to Shanghai Yuyue between June and September 2019 (as referred to in paragraph 148 above).  Fang's SEC Form 20-F (Annual Report) for 2019 states that:

   *"In June 2019 and September 2019, we entered into a series of disposal agreement (sic.) with Shanghai Yuyue to transfer our shareholding in 42 subsidiaries which used to provide marketing, listing, leads generating services and ecommerce business to Shanghai Yuyue.  Revenues generated by these entities were US$8.7 million for the year ended December 31, 2018 and US$1.5 million before the disposal in 2019.  Upon the disposal, Shanghai Yuyue assumes net liabilities for these entities at carrying amount.  Accordingly, there was no disposal gain or loss as a result of the transaction.*

*For the year ended December 31, 2019, noncash net liability distributed to Shanghai Yuyue in connection with the disposal was US$8.8 million".*  (Emphasis added)[69]

162.   Although the 42 subsidiaries are not named in the disclosure contained in Fang's SEC Form 20-F Annual Report for 2019, it appears Baoyi Co was among the entities transferred to Shanghai Yuyue or, in the alternative, it was an additional transfer which was not disclosed.

163.   SAIC records disclose that Shanghai Yuyue is owned by two PRC nationals, Jiang Yan and Fan Wenying.   However, Fang's SEC Form 20-F Annual Report for 2019 states that Shanghai Yuyue is under the control of Vincent Mo.[70]

164.   Fang's 2019 Form 20-F Annual Report does not indicate why the 42 subsidiaries were transferred to Shanghai Yuyue, a company controlled by Vincent Mo, on an investment cost/net liabilities basis.   These 42 subsidiaries were revenue-making subsidiaries and any fair value assessment of their worth should have been based on their future estimated earnings.   It is to be reasonably inferred that this transaction did not occur on a commercial basis, concluded at arm's length.

165.   In the premises, Fang's directors breached their fiduciary duties to act *bona fide* in the best interests of Fang, to act for the proper corporate and business purposes of Fang, to exercise reasonable care, skill and diligence, to avoid conflicts of interests by entering into the transaction.

### Section 3: US properties

#### *72 Wall Street*

166.   In 2011, a Fang subsidiary acquired a former AIG building located at 72 Wall Street, New York for an aggregate of approximately US$60.7 million.   The building was acquired by Best Work Holdings (New York) LLC (***"Best Work"***) (a company 100% owned by Fang) from Sahn Eagle LLC in two separate transactions, each completed during the course of 2011.[71]

167.   In its December 2010 press release announcing the first of the two transactions, which was publicly filed with the SEC, Fang stated that it planned, *"to use the former AIG Training Center as its own global training center to train its expanding management staff and clients, in conjunction with selected universities and colleges in the United States.   As Chinese economy continues to expand, developing capable Chinese management talent is a strategic priority for the company to ensure its continued competitive advantage and market leadership".*[72]

---

[69] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 98 (filed 27 May 2020) (same).

[70] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 98 (filed 27 May 2020).

[71] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2011, page 43 (filed 26 April 2012).

[72] See SouFun Holdings SEC Form 6-K, Current Report (filed 23 December 2010), attaching SouFun Holdings Press Release dated 23 December 2010, *"SouFun Announces the Signing of an Agreement to Acquire Former AIG Training Center".*

168. The description of 72 Wall Street as a "*training center*" does not reflect the true nature, scale and scope of the property.  The 72 Wall Street property is a commercial building comprising 325,000 square feet, standing at 124 feet (37.8 metres) and consisting of 18 stories in total.

169. In March 2011, around the same time as Best Work was formed as a Fang subsidiary, Vincent Mo also formed WSGT as a New York non-profit company.  Initially, Vincent Mo caused WSGT to be the named purchaser in the 4 October 2011 contract with Sahn Eagle which covered the purchase of the second parcel of the "*72 Wall Street*" property.  On 14 October 2011, however, Vincent Mo caused WSGT to assign the contract to Best Work.

170. After Best Work completed the purchase of 72 Wall Street, Fang claimed, in its SEC Form 20-F (Annual Report) for fiscal year 2011 that, "*[w]e plan to use the building as our global training center*"[73] and that WSGT had provided, *"training services"* in that year to Fang.[74] When pressed by the SEC for specifics of this, it further reported that WSGT had furnished, *"training programs to employees and customers in the following areas: management skills and leadership, finance and accounting, product development, marketing and customer base analysis, and business strategies."*[75]  It asserted that the training had been "*primarily*" provided at 72 Wall Street itself and produced an English translation of a purported contract with WSGT.

171. In its SEC Form 20-F (Annual Report) for the year 2012, Fang likewise reported that WSGT had furnished, *"training programs to employees and customers in management skills and leadership, finance and accounting, product development, marketing and customer base analysis, and business strategies"*[76] and that the training was primarily provided at 72 Wall Street.[77]  It also repeated its prior statement that, "*[w]e plan to use the building as our global training center".*[78]

172. The statement that the training was primarily provided at 72 Wall Street (and that the planned use of the property was for, "*our global training center*") was repeated in Fang's SEC Form 20-F (Annual report) for the year ending 31 December 2013.[79]

---

[73] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2011, page 43 (filed 26 April 2012).

[74] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2011 (filed 26 April 2012).

[75] Letter SouFun Holdings counsel to SEC Staff dated 8 November 2012.

[76] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2012, page 77 (filed 3 April 2013).

[77] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2012, page 30 (filed 3 April 2013).

[78] See SouFun Holdings SEC Form 20-F, Annual report for the Fiscal Year Ended 31 December 2013, page 30 (filed 30 April 2014).

[79] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2013, pages 30, 114 (filed 30 April 2014).

173. Also, in its Form 20-F disclosures, Fang stated it paid approximately US$500,000 to WSGT for training service fees in 2011,[80] approximately US$1.6 million in 2012[81] and approximately US$250,000 to WSGT in training fees in 2013.[82]  From 2011 to 2013, the fees reportedly paid by Fang to WSGT came to approximately US$2.4 million in total.

174. However, concurrently-filed public disclosures by Shun Cheong/IDG Energy[83], (which, as noted above was majority-owned by Vincent Mo) at that time shows that from the outset, Vincent Mo's plan was to use 72 Wall Street as a hotel.  The Shun Cheong disclosure dated 15 December 2011 states that Beijing Pukai Shiji Investment Consultancy Company (**"Beijing Pukai"**) (a hotel investments and consulting services company ultimately controlled by Vincent Mo) was involved in a hotel project at 72 Wall Street:

> *"The projects participated by the JV Partner [Beijing Pukai] include Hebei Hengshui "Park Number One" High-end Residential Project ( 河北衡水「公园一号」高档住宅 项目 )), Asia Pacific Garden Hotel-Beijing ( 北京亚太花园酒店 ) ("Garden Hotel") and Tianjin Yilan International Hotel ( 天津依兰国际酒店 ) ("Yilan Hotel") in the PRC, **and 72 Wall Street Mansion in the U.S**". (emphasis added).*

175. When questions were raised publicly in April 2013 regarding the 72 Wall Street property, a Fang press release, which was shortly thereafter reported to the SEC,[84] asserted that:

> *"[Fang] purchased 72 Wall Street for its long term strategy of [Fang]'s internal global training programs collectively called **[Fang] Business School**.  The facility needs renovation and is now not in a condition for full operations.  The company has been using it as a temporary office and occasionally for visiting [Fang] employees and clients (62 visitors in 2011, 241 visitors in 2012, and planning for 350 visitors in 2013). **It is preliminarily planned to open in full in two years from today**. [Fang]'s visiting employees and clients for training purposes are mostly arranged by a related party called Wall Street Global Training Center (a not for profit organization in application), of Which (sic) our Chairman is a director. In the past two plus years, [Fang] paid roughly $2 million (which has been disclosed with SEC) to Wall Street Global Training Center for the 300 plus visitors"*. (Emphasis added)

176. This 2013 press release, which admits that 72 Wall Street was unsuitable for training and was used merely as a, "*temporary office*" and for visitors, appears to contradict Fang's prior

---

[80] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2011, page 83 (filed 26 April 2012).

[81] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2012, page 77 (filed 3 April 2013).

[82] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2013, page F-64, Note 18 to the Financial Statements. (filed 30 April 2014).

[83] Circular published by Shun Cheong/IDG entitled *"Major and Connected Transaction – Formation of a Joint Venture Company and Notice of SGM"* dated 15 December 2011.

[84] SouFun Holdings SEC Form 6-K, Current Report (filed 11 April 2013), attaching Soufun Holdings 5 April 2013 Press Release, "*Soufun Management commented on a Short Seller's Third Report*".

statement to the SEC that, in 2011 and the first three quarters of 2012, that WSGT conducted "*training programs*" for "*62 and 143 employees and customers*", "*primarily*" at 72 Wall Street.[85]  Indeed, the number of "*visitors*" to the "*temporary office*" claimed for the year 2011 (62) is the same number that Fang previously claimed (in its statement to the SEC) had received "*training"*.

177.  Notwithstanding these apparent contradictions, Fang continued to state, in its SEC filings, that the primary use of 72 Wall Street was as a global training centre.[86]

178.  Despite its 22 April 2013 press release describing its plans for a "*Fang Business School*" to open in 2015, no such school materialised that year, or ever.  Instead, in its SEC Form 20-F (Annual Report) for 2016, and in public disclosures form that point onwards, Fang simply stated that 72 Wall Street is, "*currently under major refurnishment (sic) work"*.  However, this *"major refurnishment"* is for the use of the property as a hotel, not a global training centre.  NYC Department of Buildings ("***NYC DOB"***) records filed on 27 October 2016 indicate that the 72 Wall Street property was to undergo construction work to convert it into a hotel with adjoining office and retail space and this work is ongoing.  NYC DOB records further state that the registered architect for the property is Marc Stumer of Mojo Stumer Associates and that firm's website displays concept photos for this project under the name "*72 Wall Street Hotel*".  The NYC DOB records further disclose that the estimated total cost of renovation is US$19.5 million.

179.  The history section of Upsky's website records that it *"purchased an office building in New York"* in 2011.  No further details of this "office building" is disclosed nor the use that it has purportedly been put to in the context of Upsky's business since then.  As outlined above at paragraph 34, Upsky Enterprises is a private company through which Vincent Mo operates hotels in the PRC and US.  In the circumstances, it is to be reasonably inferred that Upsky's reference to an "office building" in New York is a reference to 72 Wall Street which Fang (not Upsky) acquired in 2011.

180.  It is to be reasonably inferred that it was always the intention of Vincent Mo and Fang's management to use 72 Wall Street as a hotel and the avowed use of the property as a "*global training centre*" was a fiction which Fang's management repeatedly used to mislead the public on this point from 2011-2015.  Despite filing the renovation permit application in October 2016 and receiving approval in April 2018, Fang has since failed to make appropriate disclosures to investors and/or failed to describe the true use to which 72 Wall Street is to be put, even as Vincent Mo has publicly foreshadowed its inclusion in his/Upsky's US hotel portfolio on Upsky's website.

181.  Further, having regard to the misleading statements relating to its use, and the involvement of entities owned and/or controlled by Vincent Mo (such as Beijing Pukai), it is to be

---

[85]  Letter Soufun Holdings counsel to SEC Staff dated 8 November 2012.

[86]  See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2014, page 46 (*"We have primarily used this building as our global training center"*) (filed 28 April 2015)*;* SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2015, page 67 (same) (filed May 17 2016).

reasonably inferred that the true purpose of acquiring 72 Wall Street was to benefit Vincent Mo's hotel business and not to benefit Fang, and that this was hidden from shareholders.

182.  In October 2018, Best Work entered into a mortgage with Far Eastern International Bank, to secure a concurrently-executed US$60 million Facility Agreement between Fang and Far Eastern International Bank. Under the agreements, Best Work serves as guarantor for Fang's debt, and has pledged 72 Wall Street as collateral.  The use of funds under the Facility Agreement is not apparent from the mortgage but, having regard to the intermingling of Fang's business/assets with that of Vincent Mo's hotel businesses pleaded at paragraph 160 above, it may be reasonably inferred that the loan is to finance the refurbishment of 72 Wall Street as a hotel for the benefit of Vincent Mo and his hotels business and not for the benefit of Fang.

**RCNC – Arden House, New York Military Academy and Briarcliff Campus**

183.  On 21 October 2011, RCNC was formed as a non-profit New York corporation.

184.  A non-profit company in the United States is required to file annual IRS "Form 990" disclosures with the Internal Revenue Service ("**IRS**"), indicating both its management and any, "*related party transactions*" with persons involved in its management.  At all material times, according to such disclosures, Vincent Mo has been the Chairman of RCNC.  In addition,  Vincent Mo's wife, Jing Cao, and daughter, Katharine Mo, have been identified as officers of RCNC.

185.  The initial stated purpose of RCNC was to, "*encourage interest for environmental protection and preserve natural collection*".[87]  Three days after its creation, on October 24, 2011, RCNC closed on the purchase of Arden House, a large historic mansion property in Harriman, in the state of New York.  RCNC was publicly identified at the time as being affiliated with Vincent Mo and Fang, and gave 72 Wall Street as its address.

186.  Arden House's prior owner was another New York non-profit, Open Space Initiative ("**OSI**").  A contemporaneous press release by the OSI's realtor stated that RCNC had purchased the property for US $6.5 million.  The press release further quoted the seller as stating that, "*[t]he property had a deed restriction limiting sales to like-kind not-for-profit groups and a conservation easement covering 450 acres*".  The same press release stated that RCNC's "*mission*" involved, "*discovering innovative natural conservation methods, organizing forums to discuss contemporary environmental preservation issues and studying the effects of global warning*".

187.  Although RCNC's non-profit status allowed the parties to overcome the deed restrictions limiting the sale of Arden House to non-profit corporations, it is unclear whether RCNC has engaged in significant philanthropic activities connected with this stated "*mission*".  Its website claims that it has been involved in such activities.  In 2017, apparently in connection

---

[87]  RCNC IRS Form 990 for fiscal year 2014, page 1 (filed November 15, 2015).

with the purchase of the New York Military Academy, RCNC's certificate was amended to include "*education*" among its purported "*missions*".

188.   It is clear, however, that Arden House has been used by Vincent Mo's family, or those connected with him, for other purposes.   In 2018, Vincent Mo's *alma mater*, Tsinghua University, organized a fintech seminar at Arden House.   More recently Vincent Mo's daughter has announced that her wedding will take place at Arden House in 2021.

189.   When RCNC was established in 2011, contemporary news reports stated that RCNC had been, "*created by [Fang]*".[88]   In a letter, dated 8 November 2012, to the SEC Fang denied any such connection".[89]   As noted in paragraphs 166 to 179 above, however, this letter also appears to have contained inaccurate statements about WSGT (another non-profit in New York controlled by Mr. Mo).

190.   In April 2013, Glaucus Research Group California, LLC (*"Glaucus"*) raised further questions about RCNC's connections with Fang, pointing to the fact that Arden House's administrator was a Fang employee utilizing a Fang email address.   In its public statements attempting to refute to these reports, Fang stated that, *"Our Chairman's family formed a not-for-profit corporation called Research Center on Natural Conservation …to purchase the Arden House… Our Chairman's family (not SouFun) paid full for the purchase…"* (sic).   However, the actual source of those funds was not disclosed (and, as noted below, it appears that Vincent Mo's companies, Upsky Enterprises and Next Decade, supplied at least some finance to RCNC).   The fact that the estate was being administered by a Fang employee using a Fang email address was attributed to the fact that Vincent Mo, "*occasionally invites [Fang's] visiting employees and clients to use the Arden House for free.*"

191.   Shortly thereafter, the email contact address on the Arden House website was changed from houyukui@soufun.com to admin@theardenhouse.com.   However, the domain name theardenhouse.com still shares the same Secure Sockets Layer (**"SSL"**) certificate with Fang and, in fact, domain names used by Fang and several other companies associated with Fang, Vincent Mo and the "Upsky" brand use the same SSL certificate, which indicates that the websites are run by the same organisation.   These domains include: fang.com; fang.com.cn; youtx.com; upskywharton.com; upskyshanghai.com; upskynanning.com; upskybeihai.com; upskybaoan.com; upskyardenhouse.com; soufun.com; chinaindexacademy.com.

192.   In October 2015, RCNC acquired New York Military Academy ("**NYMA**"), a New York non-profit corporation that owns and runs a 126 year-old international boarding school of the same name, located in Cornwall-on-Hudson, New York.

193.   NYMA was acquired by RCNC at an auction conducted by NYMA's then court-appointed bankruptcy trustee.   The stated purchase price of the auction was US$15.83 million.   The

---

[88] SEC October 25, 2012 letter to SouFun Holdings.
[89] SouFun Holdings counsel 8 November 2012 letter to SEC.

purchase arrangements also apparently involved discharging NYMA from the bankruptcy regime.

194. Since October 2015, Vincent Mo and his wife, Jing Cao, have been members of NYMA's Board of Trustees.

195. On 10 February 10, 2017, RCNC acquired a further property, the campus of the former "Briarcliff College", located in Briarcliff Manor, in the State of New York.  Public reports indicate that the Briarcliff College campus was acquired from Pace University for approximately USD 17.35 million.  These three purchases by RCNC (Arden House, NYMA and Briarcliff campus -collectively the *"NY Properties"*) required a considerable outlay of cash from a company (RCNC) that was not a functioning business itself, and was only newly created.

196. Although the precise source of RCNC's capital is unclear, its IRS filings (in particular disclosure of "*related party transactions*") indicated not only that it has borrowed considerable funds from Vincent Mo and/or his private entities, but that Vincent Mo's companies have received significant real property rights over the NY Properties in return.

197. Specifically, the IRS Form 990 filed by RCNC for the year 2018 discloses the following, "*Business Transactions Involving Interested Persons*" as identifying its President, Vincent Mo as the, "*Interested Person*" in each case:

   a. A "*mortgage and loan*" of aggregate value "*13,403,186*" from "*Upsky International Holdings – San Francisco*" (Vincent Mo is described as "*President*" of that entity);

   b. A "*mortgage loan from Upsky Enterprises*" in the sum of US$26,948,751 (Vincent Mo is also described as "*Presiden*t" of that entity);

   c. A "*mortgage loan*" in the sum of US$6,654,225 from "*Next Decade*" (which it acknowledges as being owned by the "*KM & KM Trust*" an irrevocable discretionary family trust established by Vincent Mo under the laws of Singapore); and

   d. A US$170,000 loan from Upsky Lighthouse Hotel LLC, an apparent subsidiary of Upsky Enterprises (and disclosed as being affiliated with Tianquan Mo, AKA Vincent Mo). The interest for the loan from Upsky Lighthouse Hotel is US $2,633.  It is not stated in the Form 990 whether the interest of US$2,633 accrues per calendar month or per annum.

198. In addition, the NYMA Form 990 filed for the year 2017 indicates that RCNC has received a loan from "*Upsky*" in the aggregate sum of US$3,318,779.

199. The description of the Vincent Mo-related entities in these filings is cursory, and the actual nature of the loan and mortgage transactions (and properties secured thereunder) remains unclear.  Moreover, RCNC and NYMA have not yet completed their IRS Form 990 filings for the years subsequent to 2018 and 2019, respectively.

200. It is reasonably to be inferred, however, that Upsky and Next Decade have obtained mortgage security over at least some of the New York Properties. This indicates that Vincent Mo has a potential means of foreclosing over such properties (and thus securing direct title over them) should there be a default in respect of the mortgage loans.

201. That Upsky is involved with the NY Properties is further shown by the history section of Upsky's website, listing Upsky's inheritance of the *"rich history of Arden House, Upsky Hotels & resorts is to extend the merits of Arden House and Establish a new round of success in the Arden House tradition"*.

202. It further remains the case that in the conduct of Vincent Mo's hotel business (including Upsky Enterprises and other entities owned and/or controlled by Vincent Mo) has utilized and benefited from Fang's assets, on several occasions without adequately disclosing such use and benefits (*see* paragraphs 130 to 159).

203. At a minimum, the apparent co-mingling of Company and Upsky business/assets in the PRC creates a strong need to ascertain the true source of the capital lent by Upsky / Next Decade to RCNC and NYMA and whether it is derived from Fang, and if so, in what amounts.

**Upsky US hotels**

204. As outlined above at paragraph 105, Vincent Mo's Upsky hotel business also holds US hotel assets, namely:

   a. Best Western Plus Lighthouse Pacifica in California (***"Upsky Best Western"***);

   b. Crowne Plaza San Francisco Airport Hotel in California (***"Upsky Crowne Plaza"***); and

   c. Radisson Hotel Hauppauge-Long Island in New York (**"Upsky Radisson Hotel"**).

   (Collectively the "***US Upsky Properties"***).

205. The Upsky Best Western is held in the name of Upsky Lighthouse Hotel LLC (***"Upsky Lighthouse"***), a company incorporated in California on 18 October 2013. Vincent Mo is registered as the sole manager of Upsky Lighthouse.

206. The registered owner of Upsky Crowne Plaza is Upsky San Francisco Airport Hotel LLC, a company incorporated in California and in respect of which Vincent Mo is registered as the sole manager.

207. The registered owner of Upsky Radisson Hotel is Upsky Long Island Hotel LLC, a company incorporated in New York and again, in respect of which Vincent Mo is registered as the sole manager.

208. Given the evident co-mingling of Upsky and Company business/assets within the PRC, as described at paragraphs 130 to 159 above, at minimum, disclosure and / or further investigation is warranted in respect of the sources of funding for the purchase and maintenance of these three US hotels in order to ascertain whether the source of the relevant funding was Fang and if so in what amounts.

**D**     **COMPLAINTS: INFRINGEMENT OF RIGHTS OF MEMBERS AND ADS HOLDERS**

**(I)**     <u>**Dilution**</u>

209. On 24 August 2020, Fang announced that it planned to raise US$30 million by issuing Class A Ordinary Shares to Fang's management at a price equivalent to the weighted average closing price of Fang's ADS over the course of ten trading days as at Friday, 21 August 2020. According to the announcement, the stated purpose of the share issuance was, *"to increase cash reserves for debt payback as well as to demonstrate the management's confidence in the company".*[90]

210. On 25 August 2020, the Petitioners wrote to Fang querying the commercial rationale of the Proposed Issuance, particularly in light of the Company's requirement for cash to service its debt obligations.  Fang had expended more than US$50 million in June 2020 acquiring CIH shares at a significant premium to the then recent market price.  According to its own filings at the time, it had funded the CIH share acquisition for investment purposes from its own working capital.

211. In their letter, the Petitioners also requested further details relevant to the transaction, including, *inter alia,* the following:

    a. Details of the insiders who were taking up the shares;

    b. How the acquisition was being funded and whether Fang was providing financial assistance to management to acquire its own shares;

    c. The nature of the debt and when it fell due for payment;

    d. Whether Fang's management had considered the dilutive effect of the issuance; and

    e. Why the offer had been made to connected parties only.

No substantive response was received to this letter.

212. The Petitioners' Cayman attorneys wrote to Fang on 27 August, 31 August, 15 September and 28 September 2020 seeking a substantive response to the queries raised by the Petitioners in their letter of 25 August 2020.  In their letter dated 27 August 2020, the Petitioners' attorneys reiterated the concerns outlined above and asserted that the share issuance would dilute significant existing shareholders by approximately 20% while the Company received relatively modest cash proceeds due to the placement price being significantly lower than the historical average.  As of the date of this Petition, Fang has provided no substantive response to this correspondence.

---

[90] Fang 25 August 2020 Press Release, "*Fang Announces Appointment of New Acting CFO and Plan of Issuance of Shares to Management*", exhibited to Fang SEC Form 6-K Current Report (filed 26 August 2020).

213. In the premises, it is to be reasonably inferred that there is no commercial rationale for the share issuance, and that the true purpose is to dilute existing shareholders in order to alter the voting power/shareholders' entitlements in any subsequent 'spin-off' transaction, and accordingly Fang's directors have acted for an improper purpose in causing Fang to proceed with the said share issuance assuming such has, in fact, occurred.  Fang's directors have failed and/or neglected to provide, and/or have caused or procured Fang not to provide, a substantive response in respect of the proposed dilution despite the multiple requests, in writing, by the Petitioners/their attorneys.

**(II)**     **Infringement of conversion rights of ADS holders**

214. Between September 2019 and August 2020, the Petitioners attempted to convert a limited number of their Fang ADS into Class A Ordinary Shares.  The first attempt to convert the ADS collapsed in February 2020 due to the non-responsiveness of Fang management, including Vincent Mo.  In late February 2020, the Petitioners commenced the process again. By 7 May 2020, the Petitioners had taken all steps within their power to complete the conversion process and ensured that all third parties (save for Fang) had taken all necessary steps also.  In order to complete the conversion and effect the transfer of the 100 Class A Ordinary Shares to the Petitioners, Fang's share registrar required a letter of instruction from Fang.  Both the Petitioners and Fang's own share registrar chased Fang for this letter of instruction during the course of May, June and into July 2020.  The Petitioners' Cayman attorneys wrote to Fang calling on it to provide the requested letter of instruction and pointing out that pursuant to the articles of association, the directors retained no discretion as to whether they could approve or reject the transfer.  The various excuses proffered by representatives of Fang (i.e. Cui Peng (the Deputy General Manager of Fang's Capital Markets Department) and Jessie Yang (Director of Investor Relations)) included fresh outbreaks of Covid-19 in Beijing and the necessity of complying with the, "*company's internal rules*" regarding equity related issues.  Fang purports to be an internet-based company so fresh outbreaks of Covid-19 should not have impacted on its ability to ensure that a simple letter of instruction was signed by an authorized signatory.  Moreover, the only rules which Fang was obliged to comply with were the requirements set out in its articles of association.

215. Due to the failure of Fang to comply with its own articles of association in a timely manner and provide the letter of instruction, the Petitioners commenced proceedings in the Grand Court of the Cayman Islands on 15 July 2020 seeking rectification of Fang's register of members.   The Petitioners also commenced proceedings against Fang's associated company, CIH, seeking the same relief.  The proceedings were duly served on Fang and CIH at their respective registered offices on 23 July 2020 with a return date for a hearing of the applications fixed for 7 August 2020.  Both proceedings were also notified directly to Vincent Mo and other senior management by email and accordingly the Board of Fang was made aware of the proceedings.  The deadline for entering an acknowledgment of service was Thursday, 6 August 2020.  Fang did not file an acknowledgment of service by the deadline and, at the request of the Petitioners, the Grand Court treated the return date of 7 August 2020 as the substantive hearing of the matter.  Fang did not instruct any attorneys to attend

at the hearing to represent it and the matter was heard on an uncontested basis.  Chief Justice Smellie granted the relief sought by the Petitioners against both Fang and CIH and a transcript of the hearing discloses that at the conclusion of the hearing, the Chief Justice described Fang and CIH's conduct as displaying, "*extraordinary conduct on the part of publicly-listed companies*".

216.  In the premises, the directors of Fang (including Vincent Mo) failed to act in accordance with their fiduciary duty to act in the best interests of the company, and/or were guilty of serious mismanagement:

   a.  It is inexplicable that it could take a year to effect the conversion of 100 ADS, their transfer into the Petitioners' names and the updating of Fang's register of members to reflect the Petitioners' interests;

   b.  In circumstances where Fang's directors retain no discretion as to whether they may accept or reject any instrument of transfer in the form proffered by the Petitioners, alleged need for compliance with vague references to, "*internal rules*" should not be and is not a pre-requisite to fulfilling a straightforward administrative task by its board of directors, namely the provision of a simple letter of instruction.  The Petitioners' right to have their respective interests entered on Fang's register of members was undeniable;

   c.  By failing to cause Fang to effect the conversion in a timely manner, Fang's directors (including Vincent Mo) caused it to incur an entirely unnecessary adverse costs liability and one of its shareholders unnecessary and irrecoverable costs as a result of the rectification proceedings;

   d.  The fact that Fang did not contest the rectification proceedings indicates that its directors (including Vincent Mo) knew (correctly) that there was no basis upon which Fang could properly resist the application, but instead of conceding the point and agreeing to the rectification of the register by consent, Fang's directors (including Vincent Mo) chose to ignore the rectification proceedings before the Grand Court entirely and let the hearing go uncontested; and

   e.  No properly managed company (particularly a publicly-listed company) ought to or would engage in such conduct.

E        **COMPLAINTS: MISLEADING INVESTORS AND/OR FAILING TO COMPLY WITH APPLICABLE DISCLOSURE OBLIGATIONS**

217.   Fang has repeatedly failed to make full and proper disclosure to the market as required by Form 20-F concerning matters relating to its business and affairs.  The Petitioners rely on the facts and matters set out further below, pending further investigation:

   a.   Failures to disclose material allegations regarding business practices;

   b.   Misleading statements and non-disclosures relating to Fang's properties in the PRC;

   c.   Failure to disclose material facts in relation to the transfer of 42 of Fang's subsidiaries; and

   d.   Misleading statements and non-disclosures relating to Fang's properties in the US.

218.   The Petitioners contend that the sheer number and materiality of the non-disclosures and misleading statements demonstrate that Fang's management (including Vincent Mo) is not taking its obligations seriously and that there is an urgent need for an independent investigation into Fang's business and affairs and the management of its business and affairs.

**(I)        Failure to disclose allegations regarding business practices**

219.   In September 2015, 1,000 Fang employees were dismissed by way of text message sent by Fang's, "*Supervision and Anti-Corruption Investigation Office*".  The employees in question, brokerage agents, were dismissed on the basis that they had allegedly faked transaction contracts in respect of residential real estate listings.  Chinese media reports indicated that the brokerage agents were allegedly involved in "*swiping*", i.e. the generation of fake transactions in order to manipulate a commercial online platform which rewards users based on transaction volume.

220.   In response to the Chinese media coverage, Fang stated that the dismissals had been made in accordance with its internal code of conduct and that terminations for similar reasons had occurred before.[91]

221.   Chinese media outlet, Sina Finance, reported (at the time) that the dismissed workers claimed that swiping had occurred with the knowledge of Fang's management and that management had acquiesced in this practice.  The dismissals led to mass protests by former employees at Fang's Beijing and Shanghai offices.[92]  Media reports at the time stated that police officers were present at these protests such was their significance.[93]

222.   In its various filings with the SEC, Fang has failed to make any public disclosure regarding the mass dismissal of approximately one thousand employees for allegedly fraudulent conduct (the ***"Swiping Incident"***).  Similarly, no public disclosure was made regarding the allegations of former employees that such fraud was condoned by Fang's management or the mass protests which followed the dismissals.  In fact, in Fang's SEC Form 20-F (Annual

---

[91] http://finance.sina.com.cn/chanjing/gsnews/20151016/173823498020.shtml
[92] https://finance.sina.com.cn/chanjing/gsnews/20151014/095423470201.shtml
[93] https://geoinvesting.com/chinese-media-reports-allege-fake-contract-trouble-brewing-at-soufun/

Report) filed for 2015, its management described its relationship with its employees as follows:

*"We believe we maintain a good working relationship with our employees and we have not experienced any significant labor disputes…"[94]*

223. Fang's assertion regarding the absence of labour disputes[95] was not correct having regard to the matters pleaded above. Further, by failing to make any public disclosure regarding the mass dismissals for alleged fraud, Fang failed to comply with the SEC's instructions to Item 6.D of Form 20-F, which requires the company to accurately disclose, "*the number of employees at the end of the period or the average for the period for each of the past three financial years (and changes in such numbers, if material)*" and, "*any significant change in the number of employees, and information regarding the relationship between management and labor unions*". Additionally, Fang's failure to disclose the fraud allegations and labour disputes violates its disclosure obligations under Item 8.A(7) of Form 20-F, requiring the company to, "[*p*]*rovide information on any legal or arbitration proceedings, including those . . . involving any third party, which may have, or have had in the recent past, significant effects on the company's financial position or profitability. This includes governmental proceedings pending or known to be contemplated*".

**(II)  Misleading Statements/non-disclosures regarding the IDG Alternative Transaction**

224. Paragraphs 47-58 above are repeated.

225. In the premises:

    a. By failing to disclose a related party transaction, namely the 2018 Note Repurchase, in its SEC Form 20-F for the fiscal year ended 31 December 2018, Fang breached its obligations under item 7(B) of Form 20-F, requiring disclosure of certain related party transactions (as further described in paragraph 58 above);

    b. By failing to make proper disclosure of the true purpose of the 2019 Note Repurchase (i.e. to enable related parties to discharge their own liabilities) Fang breached its obligations under Item 7(B) of Form 20-F (as further described in paragraph 58 above).

**(III)  Misleading statements/non-disclosures regarding PRC properties**

***Sanya Hotel***

226. Paragraphs 111-129 above are repeated.

227. In the premises by falsely claiming that the Sanya Hotel is a local office (and that it was purchased with the aim of being a local office) and failing to disclose income derived from

---

[94] See SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2015, page 129 (same) (filed May 17 2016).

the properties, Fang has breached its disclosure obligations under Item 4.D of Form 20-F (as summarized in paragraphs 128-129 above) and has misled investors.

*Youtx*

228.   Paragraphs 130-133 are repeated.

229.   In the premises:

    a.   By failing to disclose a related party transaction between Youtx (Fang's branch) and Upsky Enterprises or an entity within the Upsky Group, Fang breached its obligations under Item 7(B) of Form 20-F, requiring disclosure of certain related party transactions (as further described in paragraph 133 above);

    b.   Further, by failing to disclose the assets or related income arising from Upsky's use of the Youtx brand and/or its assets, Fang failed to comply with its disclosure obligations under Item 3(A), Item 4.D and Item 8 and item 17 of SEC Form 20-F, namely Item 3 required Fang to disclose "*key information*", including financial data which, "*shall include, at a minimum, net sales or operating revenues; income (loss) from operations; income (loss) from continuing operations; net income (loss); net income (loss) from operations per share; income (loss) from continuing operations per share; total assets; net assets . . .* ".

*Shanghai Baoan Hotel*

230.   Paragraphs 134-141 above are repeated.

231.   In the premises:

    a.   If the Shanghai Baoan Hotel is owned by Upsky, by failing to make proper disclosure of this related party transaction, Fang breached its obligations under Item 7(B) of Form 20-F, requiring disclosure of certain related party transactions, including disclosure of any transaction since the beginning of the registrant's last fiscal year between the registrant and any 5% shareholder where the amount involved exceeds $120,000 and the 5% shareholder has a direct or indirect material interest in the transaction;

    b.   If the Shanghai Baoan Hotel is being occupied by Upsky, such undisclosed use of the premises likely violates the Company's SEC disclosure obligations under Item 4.D of Form 20-F.   Item 4.D requires the company to accurately disclose information regarding its properties including, "*information regarding any material tangible fixed assets, . . . including a description of the size and uses of the property; productive capacity and extent of utilization of the company's facilities*".

*Beijing Baoyi*

232.   Paragraphs 142-159 above are repeated.

233.   In the premises:

a.  Fang's failure to disclose a related party transaction (any contracts between Fang and the registered owners owned/controlled by Vincent Mo, including any consolidated controlled entities) violates its obligations under Item 7(B) of Form 20-F and SFAS 57, requiring disclosure of certain related party transactions, including disclosure of any transaction since the beginning of the registrant's last fiscal year between the registrant and any 5% shareholder where the amount involved exceeds $120,000 and the 5% shareholder has a direct or indirect material interest in the transaction;

b.  In addition, Fang's failure to disclose the related party transaction with Beijing Baoyi (the management arrangement between Fang and Baoyi Co which is owned or controlled by Vincent Mo) violates its obligations under Item 7(B) of Form 20-F, requiring disclosure of certain related party transactions, including disclosure of any transaction since the beginning of the registrant's last fiscal year between the registrant and any 5% shareholder where the amount involved exceeds $120,000 and the 5% shareholder has a direct or indirect material interest in the transaction;

c.  Further, by failing to disclose that a hotel operated in its headquarters building that is managed by a subsidiary of a company owned by Vincent Mo, Fang violated its disclosure obligations under Item 4.B and 4.D of SEC Form 20-F.  Item 4.B. requires the Company to provide an accurate, *"description of the nature of the company's operations and its principal activities, stating the main categories of products sold and/or services performed for each of the last three financial years"* and, "*[a] description of the principal markets in which the company competes, including a breakdown of total revenues by category of activity and geographic market for each of the last three financial years*".  Item 4.D. requires the company to accurately disclose information regarding its properties including, *"information regarding any material tangible fixed assets, . . . including a description of the size and uses of the property; productive capacity and extent of utilization of the company's facilities".*

**(IV)      Failure to disclose details regarding 42 subsidiaries transferred**

234.  Paragraphs 161-165 above are repeated.

235.  Insofar as it has failed to disclose the names of the 42 subsidiaries and significant information regarding these transactions, Fang appears to have breached its disclosure obligations as prescribed by the SEC in Item 4.A.4 for the Form 20-F Annual Report, requiring a company to disclose, "*[t]he important events in the development of the company's business, e.g. information concerning the nature and results of any material reclassification, merger or consolidation of the company or any of its significant subsidiaries; acquisitions or dispositions of material assets other than in the ordinary course of business; any material changes in the mode of conducting the business; material changes in the types of products produced or services rendered; name changes; or the nature and results of any bankruptcy, receivership or similar proceedings with respect to the company or significant subsidiaries*".

**(V)      Misleading statements/non-disclosures regarding United States properties**

*72 Wall Street*

236.   Paragraphs 166-182 above are repeated.

237.   In the premises:

a.   In failing to disclose the true purpose of acquiring 72 Wall Street and in failing to accurately disclose the nature of operations conducted from and the "refurnishment" work conducted at 72 Wall Street, Fang has breached the reporting standards laid down by the SEC regarding corporate assets.  Specifically, in its instructions for Item 4.D of the SEC Form 20-F (governing annual disclosures concerning, "*Property, plants and equipment*"), the SEC requires a company to accurately disclose, "*information regarding any material tangible fixed assets, . . . including a description of the size and uses of the property; productive capacity and extent of utilization of the company's facilities*".  Further, Item 4.D requires a company to disclose information, *"[w]ith regard to any material plans to construct, expand or improve facilities, describe the nature of and reason for the plan, an estimate of the amount of expenditures including the amount of expenditures already paid, a description of the method of financing the activity, the estimated dates of start and completion of the activity, and the increase of production capacity anticipated after completion".*  As should be apparent, the annual reports filed by Fang Holdings have not met this requirement and have in instead made inaccurate and misleading disclosures; and

b.   Fang has further issued press statements (and has filed such statements with the SEC) containing misleading information, in that they falsely claimed that the property was to be used as a training centre.

*San Jose Property*

238.   In Fang's SEC Form 20-F Annual Report for the year 2017, it disclosed that it had, "*purchased a total net rentable area of 264,964 square feet in an office building in San Francisco.  Our San Francisco office is primarily used as our technology and research center in the US"*.[96] This statement was repeated in its SEC Form 20-F Annual Reports for 2018[97] and 2019.[98]

239.   The property in question is not actually located in the city of San Francisco, but is located in the nearby city of San Jose.  An online article from September 2017 discloses that Best Fang Holding LLC ("**Best Fang"**), a subsidiary of Fang, purchased a technology campus known as the '*Campus on First*' comprising a three-storey research and development building

---

[96] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2017, page 48 (filed 15 May 2018).
[97] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2018, page 65 (filed 14 May 2019).
[98] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 46 (filed 27 May 2020).

(119,780 square feet) adjacent to a six-storey office building (145,184 square feet) (totalling 264,964 square feet).  The purchase price was approximately US$58 million.

240.  Prior to Best Fang's acquisition of the San Jose property in September 2017, contemporaneous reports in the media indicated that it had been vacant for over a year at least.[99]  The Petitioners have not found any evidence that the '*Campus on First*' has been occupied by any tenants/members of Fang staff on a regular basis since its acquisition in 2017 and the property is currently available for lease in its entirety.  Fang's "San Francisco" office is therefore not its technology and research centre in the US and the fact that the property is available for lease in its entirety undermines the claims which Fang's management have made regarding the purported use of the '*Campus on First*' in its last three SEC Form 20F filings.

241.  Moreover, Fang's directors have caused it to expend approximately US$58 million for no discernible purpose.  The *'Campus on First'* is not in use by Fang nor is it yielding any rental income to cover the cost of maintenance, insurance, tax and other outlay which it ought to be incurring in the meantime.

242.  In the premises:

   a.  By including inaccurate information in its SEC Form 20F annual filings as to the true use of the San Jose Property and inaccurately representing that the property was located in San Francisco, Fang has failed to comply with SEC reporting requirements, as specified in Item 4.D. of SEC Form 20-F (as described at paragraph 238 above) in that Fang Holdings has failed to supply accurate information about its, "*material tangible fixed assets, including leased properties . . . including a description of the size and uses of the property; productive capacity and extent of utilization of the company's facilities"*;

   b.  Vincent Mo has breached his fiduciary duties to act *bona fide* in the best interests of Fang.

**F      FUNDAMENTAL CHANGE IN FANG'S BUSINESS AND INVESTMENT STATUS**

**Fang's ADS lose 98.9% of their value since March 2014**

243.  Fang's ADS price in its early years following listing hovered in the range of between US$100 to US$200 with prices in excess of US$800 during 2014.  As at 11 November 2020, the market price of Fang's ADS was US$10.35 per ADS.

---

[99]   https://www.mercurynews.com/2017/09/21/asian-investors-scoop-up-empty-north-san-jose-campus-for-58-5-million/; https://www.bizjournals.com/sanjose/news/2017/09/22/chinese-company-buys-north-san-jose-office-park.html



**Proposed 'spin-off' of the internet portal business**

244.   As outlined above at paragraphs 29 to 30, Fang intends to implement a further 'spin-off' of its *"core internet advertising and listing services"*.

245.   Fang's revenues are derived primarily from the following activities, namely:

    a.   Marketing services;

    b.   Listing services;

    c.   Leads generation services;

    d.   E-commerce services; and

    e.   Value-added services.[100]

246.   Fang's management has not divulged significant details as to what comprises Fang's core internet advertising services, the subject of a further 'spin-off', but based on the description of *"marketing services"* set out in its SEC Form 20-F (Annual Report) for 2019, it is to be reasonably inferred that *"marketing services"* and *"core internet advertising"* services are the same or substantially the same.  In its SEC Form 20-F (Annual Report) for 2019, Fang describes its market services in the following terms, namely:

> "...***Marketing is one of our most important businesses.*** *Our revenues generated from marketing services were US$149.3 million, US$98.4 million and US$94.6 million in 2017, 2018 and 2019, respectively, representing 37.8%, 41% and 43.1% of our revenues, respectively.  **Our marketing services are delivered through our website www.fang.com and our mobile apps, which can be downloaded for both iOS- and Android-based operating systems, and include traditional Internet advertisements***

---

[100] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 38 (filed 27 May 2020).

*such as banners, links, logos and floating signs, as well as featured promotions, which are specially-tailored packages of traditional online advertising tools.*

*…*

*We also combine **traditional online advertising tools with new marketing strategies** to create featured promotion packages for our customers.  **Using the inherent flexibility of website advertising, we create customized marketing and promotional packages** with additional features at the request of our customers to meet the different needs of various customers operating in diverse geographic markets in China…"[101]* (Emphasis added).

247.   Fang's financial statements reveal that 43.1% of its revenue was derived from marketing services in 2019 with 28.9% of Fang's revenue derived from listing services.[102]  Assuming that "*core internet advertising*" is simply another description for Fang's marketing services, the proposed further 'spin-off' will result in the divestiture of business lines which generated at least 72% of Fang's revenue in 2019.  On any analysis, the loss of those two business lines, in full or in part, would impact significantly on Fang's business.  Further, as the remaining business lines referred to in paragraph 245 above are likely to be ancillary to the main marketing business, it is likely that the loss of revenue would be considerably more than 72%.

248.   The leads generation services generated revenue in 2018 and 2019 representing 8.9% and 19.7% of Fang's total revenues.[103]  However, as outlined in its Form 20-F for 2019, it involves providing "*leads generation services to real estate developers, real estate brokers and, to a lesser extent, suppliers of home furnishing and improvement-related products and services by connecting **our customers** with scattered demand for real estate and home furnishing and improvement-related services."[104]*  (Emphasis added).  Following any proposed further 'spin-off' any such customers would be the customers of the 'spun-off' entity with its core internet portal attracting traffic, not Fang's customers.

249.   Financial services generated a mere 4.3% of revenues in 2019 (US$9.6 million) with e-commerce services representing only 1.3% of revenue in 2019 (US$2.8 million).[105]

---

[101] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 39 (filed 27 May 2020).

[102] [102] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 60 (filed 27 May 2020).

[103] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 60 (filed 27 May 2020).

[104] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 63 (filed 27 May 2020).

[105] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 60 (filed 27 May 2020).

250. Value added services generated 2.7% of revenue in 2019 (US$5.89 million) but revenue generated from this business line includes data and analytics services, a discontinued operation following the CIH 'spin-off'.

251. Accordingly, the proposed further 'spin-off' is likely to result in the cessation of the vast majority of Fang's operational income.

**Potential classification as passive foreign investment company**

252. Fang has recently adjusted its position on whether it would constitute a, "*passive foreign investment company*" for purposes of United States tax laws.

253. Under United States tax laws, a distinction is made between ordinary foreign operating companies, on the one hand, and, "*passive foreign investment companies*," or "*PFICs*" on the other.  The underlying rationale behind these rules is that United States taxpayers should not be allowed to "park" their capital into foreign enterprises, and obtain all of the tax advantages that flow from that (e.g. deferral of taxation on capital gains and absence of U.S. tax residence for the foreign enterprise), when the enterprise itself is not functioning as an ordinary operating business.  Thus, as described by the IRS, a company will be treated as a PFIC according to two tests:

    a. The income test -  75% or more of the corporation's gross income for its tax year is passive income; and

    b. The asset test -  At least 50% of the average percentage of assets held by the foreign corporation during the tax year are assets that produce passive income or that are held for the production of passive income.[106]

254. For these purposes, the term "*passive income*" is linked to the definition of, "*foreign personal holding company income*" as defined by the U.S. Tax Code and includes, for example, income from dividends, interest or gains arising from the sale or exchange of property.

255. In its SEC Form 20-F (Annual Report) for fiscal year 2010, Fang repeatedly stated that:

> "*We operate an active real estate Internet portal in China.  Based on the market price of our ADSs, the value of our assets, and the composition of our income and assets, we do not believe we were a PFIC for the [applicable] taxable year ended December 31, 2010.*"[107]

---

[106] IRS, "*Instructions for Form 8621*" available at
https://www.irs.gov/instructions/i8621#idm140366309348544.
[107] SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2010, page 28 (filed 10 June 2011).

256. Materially identical statements appeared in Fang's SEC Form 20-F (Annual Report) for 2011 and 2012.[108]

257. For the SEC Form 20-F (Annual Report) for 2014, this language was expanded to read:

> *"We operate an active real estate Internet portal in China. Based on the market price of our ADSs, the value of our assets, and the composition of our income and assets, we do not believe we were a PFIC for the taxable year ended December 31, 2013 and we do not believe that we are likely to become one in our current taxable year **or any future tax years**."*[109]

258. Materially identical statements (including a statement that Fang did not believe it would become a PFIC in, "*any future tax years*") appeared in Fang's SEC Form 20-F (Annual Report) for 2015, 2016 and 2017.[110]

259. For its Form 20-F (Annual Report) for 2018, Fang reverted to a statement that, "*we do not believe we were a PFIC for the taxable year ended December 31, 2018*", without expressing any view about future tax years.[111]

260. Each of Fang's above-referenced Form 20-F filings since 2010 has informed ADS holders that there can be no assurance that the Company would retain its non-PFIC status, and each such filing has warned that there is a risk that the company might become a PFIC in the future.

261. In its SEC Form 20-F (Annual Report) for 2019, however, Fang stated, for the first time, that:

> *"We operate an active real estate Internet portal in China.  Based on the market price of our ADSs, the value of our assets, and the composition of our income and assets, **we may have been a PFIC for the taxable year ended December 31, 2019**.  The determination of whether a non-U.S. corporation is a PFIC is made on an annual basis after the close of each tax year….One consequential factor affecting the outcome of annual PFIC determination in current and future tax years will be our market capitalization…"* (Emphasis added).[112]

262. As noted above, IRS guidance indicates that a company can qualify as a PFIC if more than 50% of its assets produce "*passive income*".  Thus, in some situations, external economic

---

[108] SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2010, page 28 (filed 10 June 2011); SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2011, page 27 (filed 26 April 2012)

[109] SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2013, page 44 (filed 30 April 2014).

[110] SouFun Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2015, page 35 (filed May 17 2016); Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2016, page 36 (filed 12 May 2017); Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2017, page 37 (filed 15 May 2018).

[111] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2018, page 48 (filed 14 May 2019).

[112] Fang Holdings SEC Form 20-F, Annual Report for the Fiscal Year Ended 31 December 2019, page 37 (filed 27 May 2020).

events may alter a company's asset values and ratios, and thus cause a company to be reclassified as a PFIC even if its business model does not significantly change.

263. In the present case, however, external economic events alone cannot be the likely cause of this state of affairs. As pleaded in the preceding paragraphs, Fang's current management has caused or procured it to invest heavily in real property that, in many instances, appears to be disguised hotel investments made partly or wholly for the benefit of Vincent Mo's private companies. It is thus likely that this pattern of conscious investment in assets that produce (in the terminology of U.S. revenue law) "*passive income*" is responsible for the potential reclassification of the company as a PFIC.

264. In the premises, it is averred, that that Fang's substratum (the substantive commercial purpose for which it was incorporated and with which objective its business was pursued and the reason for which those who invested capital made their investments) has been undermined by the manner in which Fang's management have conducted its business – it has moved from a business generating active income to one where its income and revenue are derived (or deemed to be derived) from passive investments. If Fang's management continues with its proposed second 'spin-off', thereby divesting Fang of its core internet portal business which generates non-passive income, the likelihood that Fang will be deemed a PFIC increases markedly and, on any analysis, in that scenario Fang will have lost its substratum completely and it will be impossible, alternatively, it will be practically impossible for the Company to pursue its business.

265. The reclassification to PFIC status also is potentially deleterious to shareholders. One consequence of a PFIC reclassification is that if Fang experiences any capital gains, these could be taxable in the hands of its U.S. shareholders (and hence U.S. ADS holders) as ordinary income. This will not only be disadvantageous to many U.S. shareholders and U.S. ADS holders but may also, potentially, have a negative impact on the share and ADS price and is contrary to the basis upon which U.S. investors made their investments.

## G.   GROUNDS FOR RELIEF

## (I)   Oppression of and prejudice to minority shareholders and mismanagement/misconduct – past and ongoing conduct

266. By reason of the matters aforesaid, Vincent Mo and the directors appointed at his direction have conducted and continue to conduct Fang's business in such a way as is unfairly prejudicial and oppressive to the rights and interests of the Petitioners, other shareholders and other investors, which rights and interests have been disregarded and undermined such that appropriate relief cannot be obtained without the Court's intervention.

267. In addition, Vincent Mo and the directors appointed at his direction have engaged in significant mismanagement/misconduct in respect of the affairs of the Company by way of action and/or omission such that the Petitioners and other members and investors have lost all confidence in the ability of Vincent Mo and the other members of the board of directors to manage the Company's affairs in accordance with: (i) their fiduciary and common law duties; (ii) applicable regulatory and statutory requirements; and (iii) accepted standards

and norms as regards corporate governance, transparency, investor and shareholder protection and commercial behaviour generally.

268.  In particular, the Petitioners rely upon the following matters as rehearsed above, namely:

    a.  The IDG Alternative Transaction, as pleaded in paragraphs 47-58 above;

    b.  The Safari Transaction as pleaded in paragraphs 59-64 above;

    c.  The CIH Option Transaction as pleaded in paragraphs 65-82 above;

    d.  Market manipulation as pleaded in paragraphs 83-102 above;

    e.  The pursuit of the business of the Company and use and transfer of its assets for the benefit of Vincent Mo and/or his personal and/or business interests as pleaded in paragraphs 103-208 above;

    f.  The infringement of the rights of shareholders and other investors by reason of:

        a.  The dilution of the value of shareholders' interests and the interests of other investors as pleaded in paragraphs 209-213; and

        b.  The compromise of the rights of conversion of holders of ADS and their putative rights as shareholders as pleaded in paragraphs 214-216;

    g.  Persistent non-compliance with statutory and regulatory disclosure requirements and the consequent provision of misleading information to shareholders, investors and the market as pleaded in paragraphs 217-242; and

    h.  Impairment of the Company's investment status and fundamental change in the company's business as pleaded in paragraphs 243-265 above.

269.  Conduct of the type referred to is likely to persist unless and until Vincent Mo and the other members of the board of directors resign or are removed

270.  While it would be open to the Petitioners to join with other disinterested investors and requisition an extraordinary general meeting for the purpose of removing Vincent Mo as a director of Fang, this step would face significant obstacles in that:

    a.  In order to requisition an extraordinary general meeting, a member or members must hold, at a minimum, 20% of the paid-up voting share capital of the Company (see Article 58(3) of the Articles).  In terms of ADS, the Petitioners hold approximately 17.13% in Fang.  However, in order to requisition any general meeting, the Petitioners would need to identify further supporting investors, the Petitioners and any supporting investor would need to convert their ADS into Class A Ordinary Shares.  In

circumstances where the last attempt to do so took over a year to complete and only occurred on service of a Court Order compelling Fang to register the Petitioners' interests, requisitioning a general meeting is neither a viable nor practical option for the Petitioners in the short term or at all;

   b.   Even if a general meeting could be convened for the purpose of removing Vincent Mo as director, the dual-class voting structure is such that Vincent Mo controls approximately 71% of the voting power in Fang and therefore has the power to block any effort to remove him, which power it is averred he will rely upon.

271.   In the premises, an investigation into the business and affairs of the Company and the conduct of those responsible for the management of its business and affairs is imperative and is only possible with the intervention of a duly appointed independent insolvency practitioner as liquidator.

272.   Further, following such investigation a liquidator either in his or her own name or in the name of the Company would be at liberty to commence such proceedings as they might consider appropriate as against Vincent Mo and/or other members of the board of directors and/or as against other third-parties (whether connected or affiliated to Vincent Mo or otherwise).

**(II)   No available alternative remedy**

273.   Further in the premises pleaded above, it is averred that the only suitable remedy available to the Petitioners and other shareholders is the making of a winding up order by the Grand Court.

**H.   CONCLUSION**

274.   In the premises, it is just and equitable for the Company to be wound up.


**YOUR PETITIONERS THEREFORE HUMBLY PRAY THAT:**

(1)   The Company be wound up in accordance with section 92(e) Companies Law (2020 Revision).

(2)   Simon Conway, Peter Greaves and Yat Kit Jong be appointed as joint official liquidators of the Company with power to act jointly and severally (the *"Official Liquidators"*).

(3)   The registered office of the Company be moved to PwC Cayman Islands, 18 Forum Lane, Camana Bay, Grand Cayman.

(4)   The Official Liquidators be authorized to act jointly and severally in their capacity as liquidators of the Company.

(5)   The Official Liquidators shall not be required to give security for their appointment.

(6)     The Official Liquidators be authorized to exercise within and outside the Cayman Islands any of the powers conferred on them by the Court pursuant to Section 110(2) and Part II of the Third Schedule of the Companies Law without further sanction or intervention of the Court.

(7)     The Official Liquidators be authorized to take any such action as may be necessary or desirable in connection with the liquidation of the Company and the winding-up of its affairs and to prevent the dissipation of the assets of the Company and its subsidiaries in any jurisdiction.

(8)     The Official Liquidators be authorized to take any such action as may be necessary or desirable to obtain recognition of the Official Liquidators and/or their appointment in any other relevant jurisdiction and to make applications to the courts of such purpose.

(9)     The Official Liquidators have the power to appoint agents in the Cayman Islands, the United States, the PRC and elsewhere to do any business contemplated by this order which they are unable to do themselves or which can more conveniently be done by an agent.

(10)    The Official Liquidators be authorized to take control of such of the direct and/or indirect subsidiaries of the Company (the *"Subsidiaries"*) and/or control and vote the Company's interest in any joint ventures, investments, associated companies, businesses or other entities in which the Company holds an interest (or such shares of Company) (the *"Associated Companies"* and collectively with the Company and the Subsidiaries  the "*Group"*) in each case wherever located, as the Official Liquidators shall think fit; to call or cause to be called such meetings of such Subsidiaries and/or Associated Companies and/or to sign such resolutions (in accordance with the provisions of any relevant constitutional or related documentation of such companies) and take such other steps including applications to appropriate courts and/or regulators, as the Official Liquidators shall consider necessary to appoint or remove or terminate the engagement or authority of, directors, legal representatives, officers, agents, attorneys and/or managers to, by or from such Subsidiaries and/or Associated Companies, and in each case take such steps as are necessary to cause the registered agents (or other equivalent corporate administrators) of such Subsidiaries or Associated Companies to give effect to the changes to the boards of directors, legal representatives, officers and/or managers of such companies or entities, including (without limitation) effecting changes to the company registers of such Subsidiaries or Associated Companies as may be deemed appropriate by the Official Liquidators; and/or to take such other action in relation to all such Subsidiaries or Associated Companies as the Official Liquidators shall think fit for the purpose of protecting the Assets and managing the affairs of the Company (which, for the avoidance of doubt, shall include the assets and affairs of the Subsidiaries and Associated Companies).

(11)    The Official Liquidators be at liberty to appoint counsel, attorneys, and/or any other professional advisors and agents, whether in the Cayman Islands or elsewhere as they may consider necessary to advise and assist them in the performance of their duties and on such terms as they may think fit and to remunerate them out of the assets of the Company.

(12)    The remuneration and expense of the Official Liquidators shall be paid out of the assets of the Company.

(13)     The Official Liquidators be at liberty to apply generally to the Court to make such orders for regulating the future conduct of the affairs of the Company as the Court shall deem fit.

(14)     Such further or other relief be granted as the Court deems appropriate.

(15)     The petitioners' costs of and incidental to the Petition shall be paid forthwith out of the assets of the Company on the indemnity basis.


And your Petitioners will ever pray etc.


Dated the ~~12th~~ 16TH day of November 2020


_____

Forbes Hare


NOTE: This petition is intended to be served on the First Respondent and the Second Respondent.