UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re Application of

EVENSTAR MASTER FUND SPC for and on
behalf of EVENSTAR MASTER SUB-FUND I
SEGREGATED PORFTFOLIO and EVENSTAR
SPECIAL SITUATIONS LIMITED

For an Order to Take Discovery Pursuant to 28 U.S.C.
§ 1782 for Use in a Foreign Proceeding

-----------------------------------------------------------------X

**OPINION & ORDER**

20 Misc. 00418 (CS)(JCM)

Before the Court is a motion by Applicants Evenstar Master Fund SPC and Evenstar

Special Situations Limited (collectively, "Applicants" or "Evenstar") to compel non-parties

Research Center on Natural Conservation Inc. ("RCNC"), New York Military Academy

("NYMA") and Wall Street Global Training Center ("WSGTC") (collectively, "Respondents" or

the "Nonprofits") to produce documents and appear for depositions in accordance with a series

of subpoenas (the "Documentary Subpoenas" and the "Deposition Subpoenas," and collectively,

the "Subpoenas"). (Docket No. 27; *see also* Docket Nos. 11-13; 28-30; 39-41).  Respondents

oppose that motion, and also move to quash the Subpoenas to the extent they seek deposition

testimony. (Docket Nos. 33-37; 43).  For the reasons that follow, Applicants' motion to compel

is granted in part and denied in part, and Respondents' motion to quash is denied.

## I.      BACKGROUND

Applicants served Respondents with the Subpoenas in December 2020 in accordance

with the Honorable Cathy Seibel's November 30, 2020 order authorizing Applicants to take

discovery from Respondents pursuant to 28 U.S.C. § 1782, for use in an action in the Grand

Court of the Cayman Islands (the "Grand Court"), *Evenstar Master Sub-Fund I Segregated*

*Portfolio et al. v. Mo et al.*, Cause No. FSD 278 of 2020(ASCJ) (the "Cayman Litigation").

- 1 -

(Docket Nos. 8, 11-13, 29-1–29-3).  In the Cayman Litigation, Applicants allege that Vincent Mo ("Mo"), an officer of Respondents, engaged in patterns of self-dealing and fiduciary duty violations by misappropriating the assets of Fang Holdings Limited[1] ("Fang") for Mo and/or his family's benefit. (*See generally* Docket No. 3-2; *see also* Docket No. 3 ¶¶ 3, 5-7).  The Cayman Litigation seeks the winding-up of Fang on just and equitable grounds, as well as the interim appointment of provisional liquidators with respect to some of Fang's real property assets in China.[2] (*See* Docket No. 3-2; *see also* Docket Nos. 3 ¶¶ 6-7, 11-24; 28 ¶¶ 4-5, 15; 40 ¶¶ 4-12). Applicants' amended petition in the Cayman Litigation (the "Amended Petition") also alleges that certain Fang assets in China are managed and/or owned by third-party companies ultimately controlled by Mo, even though Fang has failed to disclose any transactions with them and such a corporate structure has no legitimate purpose. (*See* Docket No. 3-2 ¶¶ 142-60; *see also* Docket No. 28 ¶ 19.b).

The Amended Petition details three patterns of suspicious activities involving Mo, his family, Fang, Respondents and other entities controlled by Mo or his family, which Applicants allege evidence improper co-mingling and/or misappropriation of Fang assets and relate to the instant application. (Docket No. 3-2 ¶¶ 166-203; *see also* Docket No. 30 at 7).  These allegations are discussed in turn.

## A.    RCNC

RCNC is a New York not-for-profit corporation established in 2011 and chaired by Mo. (Docket Nos. 3-2 ¶¶ 183-84; 34 ¶ 6).  Mo's wife and daughter are also officers of RCNC.

---

[1] Mo is also the controlling shareholder and CEO of Fang, which is a Caymanian company headquartered in the People's Republic of China ("China"). (Docket No. 3-2 ¶¶ 4, 8, 11, 14).  Applicants also hold a minority stake in this company. (*Id.* ¶ 14).

[2] As noted *infra*, however, Applicants recently withdrew their application for provisional liquidators pursuant to an interim arrangement with Fang and Mo. (*See infra* Section III.A).

(Docket Nos. 3-2 ¶¶ 183-84; 34 ¶ 6).  Applicants allege that Mo may have used RCNC to usurp Fang assets through a series of multi-million dollar purchases of real estate in the Hudson River Valley between 2011 and 2017 via unknown sources of capital. (Docket Nos. 3-2 ¶¶ 183-203; 30 at 7).  According to the Amended Petition, these purchases are suspicious because RCNC was newly-created in 2011, is not a functioning business, and seems to operate the purchased properties in ways contrary to its charitable purposes of environmental protection and education. (Docket No. 3-2 ¶¶ 185, 187-88, 195).  Moreover, RCNC's management of the properties indicates some level of involvement with Fang. (*Id.* ¶¶ 185, 189-91).

For example, one such property, a mansion called Arden House in Harriman, New York, was (a) reported as affiliated with Fang when it was purchased for $6.5 million in 2011; (b) administered by a Fang employee using a Fang email address and Fang website resources; (c) used by Tsinghua University, Mo's alma mater, for a fintech seminar; and (d) listed as Mo's daughter's July 2021 wedding venue on her wedding website. (*Id.* ¶¶ 185, 188-91).  The second property, New York Military Academy ("NYMA"), is a not-for-profit corporation that runs an international boarding school. (Docket Nos. 3-2 ¶ 192; 34 ¶ 13).  It was acquired by RCNC in 2015 for $15.83 million at a bankruptcy auction. (Docket No. 3-2 ¶¶ 192-93).  The third property, Briarcliffe College ("Briarcliffe"), is a vacant campus and former girls' school that RCNC purchased for $17.35 million in 2017. (*Id.* ¶¶ 193, 195).  RCNC sold it in 2021 for an unknown sum. (Docket Nos. 28-6; 30 at 7 n.3; 34 ¶ 8.c).  RCNC's filings to the Internal Revenue Service ("IRS") indicate that in 2017 and 2018, RCNC received over $50 million in loans and mortgages from Mo and/or Mo's other private companies, including Next Decade Investments Limited ("Next Decade") and numerous "Upsky" companies, which constitute a hotel business

in the United States and China run by Mo. (Docket No. 3-2 ¶¶ 196-97; *see also id.* ¶¶ 34, 37, 104-05).

In turn, the Amended Petition alleges that both Next Decade and the Upsky group of companies engaged in other unusual transactions involving Fang assets, all to Fang's detriment. (*See generally* Docket No. 3-2 ¶¶ 65-102, 130-60).  These include an options deal in December 2019 and June 2020 between Fang, Next Decade and Media Partner Technology Limited ("Media Partner"), another Mo company,[3] in which Mo caused Fang to purchase overpriced shares from companies under his control. (Docket No. 3-2 ¶¶ 37, 46, 65-102; *see also* Docket No. 30 at 6-7). This resulted in an over $38 million profit at Fang's expense that was booked by Fang as Mo's "compensation expenses."  (Docket No. 3-2  ¶¶ 46, 65-102; *see also* Docket No. 30 at 6-7).  Applicants also allege several instances where various Upsky companies improperly held themselves out as the affiliates of Fang assets, and used Fang to intermingle Mo and Fang's hotel businesses without adequate disclosure or payment for Fang's resources. (*See, e.g.*, Docket No. 3-2 at ¶¶ 34, 104-05, 108-10, 130-41, 160, 200-03, 208; *see also* Docket No. 30 at 7). Applicants further note the Upsky website states Upsky's intention to "[e]stablish a new round of success in the Arden House tradition." (Docket No. 3-2 ¶ 201).

According to Applicants, all of this evidence suggests that Mo drove a series of indirect transactions between Fang, RCNC and other companies Mo controls that resulted in the misuse of Fang assets, thus requiring investigation of RCNC's sources of capital, and the destination of Briarcliffe's sale proceeds. (Docket No. 3-2 ¶¶ 195, 202-03; *see also* Docket Nos. 28 at ¶ 11.f; 30 at 8, 15).

---

[3] The shares in Media Partner and Next Decade are held in irrevocable discretionary trusts — the MC Trust and KM & KM Trust, respectively — of which Mo is protector. (Docket No. 3-2 ¶ 37; *see also* Docket No. 34 ¶¶ 24-25).

**B.    NYMA**

As explained, NYMA is a not-for-profit corporation acquired by RCNC in 2015 for

$15.83 million, which runs an international boarding school. (Docket Nos. 3-2 ¶¶ 192-93; 34 ¶

13).  Mo and his wife are both members of NYMA's board of trustees. (Docket No. 3-2 ¶ 194).

NYMA's public disclosures also reference a 2017 loan between RCNC and Upsky for over $3

million. (*Id.* ¶ 198).  Applicants allege that NYMA's ties with Mo and the Upsky group warrants

further inquiry into NYMA's direct and indirect transactions with Fang to identify any

misappropriation or commingling of Fang assets by NYMA and/or Mo. (*Id.* ¶¶ 200, 202-03;

Docket No. 30 at 14-15).

**C.    WSGTC**

WSGTC[4] is a New York not-for-profit corporation that was formed by Mo in 2011.

(Docket Nos. 3-2 ¶ 169; 34 ¶ 19).  According to Applicants, an unnamed Fang subsidiary

acquired a building in 2011 at 72 Wall Street in Manhattan, New York for approximately $60.7

million. (Docket No. 3-2 ¶ 166).  Shortly thereafter, this building was acquired by Best Work

Holdings (New York) LLC ("Best Work"), a company 100% owned by Fang. (*Id.*).  From 2010

through 2013, Fang's public filings to the Securities and Exchange Commission ("SEC")

asserted that the property would be used as a "global training center" for Fang employees, and

that WSGTC had provided "training services" to Fang in 2011. (*Id.* ¶¶ 167, 170-72).  Upon

further inquiry by the SEC, Fang stated that the 2011 training was held "primarily" at 72 Wall

Street, and produced an English translation of a contract with WSGTC. (*Id.* ¶ 170).  Fang also

disclosed $2.4 million in fee payments to WSGTC between 2011 and 2013. (*Id.* ¶ 173).

---

[4] The Wall Street Global Training Center is abbreviated as "WSGT" in the Amended Petition, but "WSGTC" in
Applicants' papers. (*Compare* Docket No. 3-2 ¶ 168, *with* Docket No. 30 at 7).  For ease of reference, the Court will
use "WSGTC."

However, Applicants allege that concurrent public filings and other documents demonstrate that Mo operates 72 Wall Street as a hotel, and the "training services" were never provided. (*Id.* ¶¶ 174-80; *see also* Docket No. 30 at 16).  For example, a 2011 disclosure by Shun Cheong/IDG Energy – a company majority-owned by Mo – links 72 Wall Street to a hotel project by Beijing Pukai Shiji Investment Consultancy Company, another company controlled by Mo. (Docket No. 3-2 ¶ 174).  New York City Department of Buildings ("NYC DOB") records from October 2016 indicate that 72 Wall Street was in the process of being converted to a hotel by Mojo Stumer Associates, an architecture firm, whose website describes the project as "72 Wall Street Hotel." (*Id.* ¶ 178).

When these discrepancies were exposed publicly in 2013, Fang issued press releases dialing back its previous assertions regarding 72 Wall Street's educational purpose, characterizing the building as a "temporary" office space under renovation, with a "long term" purpose of housing Fang's "internal global training programs collectively called [Fang] Business School." (*Id.* ¶¶ 175-76).  However, no such business school exists. (*Id.* ¶ 178).  An Upsky website notes that it "purchased an office building in New York" in 2011, which Applicants claim refers to 72 Wall Street, even though the building's true purpose is to serve as a hotel. (*Id.* ¶ 179).  In October 2018, Best Work entered into a mortgage with Far Eastern International Bank ("Far Eastern") to secure a $60 million "Facility Agreement" between Fang and Far Eastern, under which 72 Wall Street is designated as collateral. (*Id.* ¶ 182).  Applicants allege that the purpose of this loan is to finance the refurbishment of the building as a hotel; that Fang failed to appropriately disclose this purpose to Fang's investors; and that the acquisition and refurbishment of 72 Wall Street were intended to benefit Mo's hotel business rather than Fang. (*Id.* ¶¶ 180-82).

**D.     The Subpoenas**

The Subpoenas seek documents reflecting the following categories of information:

(1) The source(s) of funding and any agreements associated with RCNC's three real estate purchases, and these entities' ongoing source(s) of funding, (Docket Nos. 29-1 at 15-18, Request Nos. 1-7, 10; 29-2 at 15-16, Request Nos. 1-4, 7);

(2)  Any negotiations, transactions, agreements or arrangements between Respondents and/or the Mo family or companies under its control (described as "Mo Entities") such as Upsky and Next Decade, (Docket Nos. 29-1 at 16-18, Request Nos. 4-7, 10; 29-2 at 15-16, Request Nos. 2-4, 8; 29-3 at 16-17, Request Nos. 1-4, 8);

(3) Any financial or business dealings, or any agreements or transfers, between Respondents and Fang or any Fang affiliate, (Docket Nos. 29-1 at 17-18, Request Nos. 7-10; 29-2 at 16, Request Nos. 4-7; 29-3 at 16-17, Request Nos. 1-4, 8);

(4) The officers, board members and employees of each Respondent, as well as payments to members of these boards who are in the Mo family, (Docket Nos. 29-1 at 18, Request No. 11; 29-2 at 16, Request No. 8; 29-3 at 17, Request No. 9);

(5) With respect to WSGTC, any contract, agreement or non-binding financial arrangement involving WSGTC and Best Work, (Docket No. 29-3 at 16, Request Nos. 1-2); and

(6) Also with respect to WSGTC, the establishment or conduct of a business or training school at 72 Wall Street and any similar projects, as well as a real estate study mentioned on WSGTC's list of Program Service Accomplishments in its IRS form 990 for 2017 and 2018, (Docket No. 29-3 at 16-17, Request Nos. 5-7).

(*See also* Docket No. 30 at 8-9).

With respect to deposition testimony, the Subpoenas seek similar information in addition to topics not mentioned in the document requests. (*Compare* Docket Nos. 29-1 at 15-18, 29-2 at 15-16, 29-3 at 16-17, *with* Docket Nos. 29-1 at 22, 29-2 at 20, 29-3 at 21; *see also* Docket No. 37 at 26-27).  The Subpoenas to RCNC and NYMA call for deposition testimony regarding:

(1) "Any and all transactions between or involving" RCNC or NYMA and "any of the following": (a) Mo; (b) any companies owned or controlled by Mo or his family; (c) any affiliate of Upsky Enterprises Limited, including Upsky International Holding, Upsky Lighthouse Hotel LLC, Upsky Long Island Hotel LLC and/or Upsky Long Island Hotel Management; (d) Next Decade, Media Partner Technology, Deanhale Limited, Ateefa Limited, Karistone Limited, Open Land Holdings Limited, The KM & KM Trust and/or The MC Trust; and/or (e) WSGTC;

(2) "Any and all transactions between or involving" RCNC or NYMA and: (a) Fang; and/or (b) any director, officer, parent, subsidiary, affiliate, agent or representative of Fang;

(3) With respect to RCNC, the source(s) of funds for its purchases of Arden House, NYMA and Briarcliffe, and with respect to NYMA, the source(s) of funds for the purchase of NYMA and Briarcliffe by RCNC;

(4) "Any and all loans or financial transactions between or involving" RCNC and NYMA;

(5) With respect to RCNC, the "extent and nature of [its] business, education and charitable activities . . . from October 2011 to [the] present;"

(6) With respect to NYMA, "[a]ll mortgages over property held (directly or indirectly) by RCNC (at any time) or NYMA (from 2015 onwards);" and

(7) With respect to NYMA, "any and all loans" described in its IRS Form 990s from Mo, or entities controlled by him, including, but not limited to "any 'Upsky' entity," and "any 'trustee' or 'former trustees'" of NYMA.

(*See* Docket Nos. 29-1 at 22; 29-2 at 20).

Likewise, the Subpoena to WSGTC calls for deposition testimony regarding:

(1) The purchase and use of 72 Wall Street, including any training conducted at 72 Wall Street;

(2) The SouFun Management School;

(3) Any refurnishing conducted at 72 Wall Street and its purpose;

(4) WSGTC's formation, the purpose of such formation, and the persons involved with WSGTC's management since such formation;

(5) All transactions between WSGTC and the owners of 72 Wall Street, as well as payments made in connection therewith;

(6) All transactions, including contracts, between WSGTC and Fang or any of its affiliates, including Best Work, and payments made in connection therewith;

(7) An October 27, 2016 application to NY DOB proposing "alteration type I for the conversion of an existing 18 story commercial building into a hotel with accessory offices and retail spaces;"

(8) A mortgage entered into on October 2, 2018 with Far Eastern, secured against 72 Wall Street, as well as the mortgage's "surrounding transactions" and any loans associated with it;

(9) The use and destination of any monies lent to Best Work and/or secured by mortgages or other collateral furnished by Best Work;

(10)   "All" transactions involving Best Work and "any of the following": (a) Mo; (b) any companies owned or controlled by Mo or his family; (c) any affiliate of Upsky Enterprises Limited, including Upsky International Holding, Upsky Long Island Hotel LLC and/or Upsky Long Island Hotel Management LLC; and/or (d) Next Decade, Media Partner Technology, Deanhale Limited, Ateefa Limited, Karistone Limited, Open Land Holdings Limited, The KM & KM Trust and/or The MC Trust.

(*See* Docket No. 29-3 at 21).

## E.   Respondents' Refusal to Comply with the Subpoenas

Respondents served responses and objections to the Documentary Subpoenas on January 29, 2021, declining to respond to the document requests as drafted, but inviting Applicants to meet and confer to narrow or otherwise modify the requests therein. (Docket Nos. 29-4–29-6, 36 ¶ 6).  The parties met and conferred numerous times between February and April 2021, and adjourned the Subpoenas' return dates for the pendency of those discussions. (*See* Docket Nos. 29-8; 30 at 9-10; 36 ¶¶ 8-9).

During the meet-and-confers, Respondents' counsel expressed that the Subpoenas were "overbroad," refusing to produce discovery regarding "transactions unrelated to Fang" – but agreed to produce information regarding transactions with Fang or "Fang-related entities." (*See* Docket No. 21 at 3; 36 ¶ 9.b, d; *see also* Docket Nos. 30 at 10).  To that end, Applicants

provided Respondents a list of known "Fang-related entities," which Respondents used to conduct searches for any responsive transactions involving those entities and RCNC, NYMA or WSGTC. (Docket No. 21 at 3; *see also* Docket Nos. 30 at 10 n.6, 13; 36 at ¶ 9.b).  However, the search yielded no such transactions, except for (1) trainings at WSTGC in 2011 through 2013; and (2) a training held at NYMA for Fang employees in August 2016, both of which were disclosed on Fang's SEC filings. (Docket Nos. 21 at 3; 36 ¶ 9.b; *see supra* Section I.C).  The only non-public document found was a contract between NYMA and Fang related to the 2016 training. (Docket No. 21 at 3).  However, Respondents ultimately refused to produce this document absent directions from the Grand Court regarding discovery. (Docket Nos. 21 at 3; 30 at 10; 36 ¶ 9.e).

Respondents also agreed to search for the Chinese-language version of a contract between Fang and WSGTC regarding WSGTC's training services,[5] (Docket No. 36 ¶ 9.d), but advised that the search did not yield any results, (Docket No. 30 at 10).  Accordingly, no documents have been produced and no depositions have been held to date. (*See* Docket Nos. 15 at 3; 30 at 10; 36 ¶ 9).

## II.   LEGAL STANDARD

28 U.S.C. § 1782 permits "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." 28 U.S.C. § 1782(a).  Thus, "[a] district court has authority to grant a § 1782 application [for discovery] where '(1) the person from whom discovery is sought resides (or is found) in the district of the district court to

---

[5] According to Applicants, WSGTC publicly disclosed the English-language version of the contract upon request by the SEC. (*See* Docket No. 30 at 16 n.9).  The exhibits Applicants cite in support of this assertion do not support it, (*see* Docket Nos. 29-7, 29-8), but the Court sees no reason to question it.

which the application is made[;] (2) the discovery is for use in a foreign proceeding before a

foreign [or international] tribunal[;] and (3) the application is made by a foreign or international

tribunal or any interested person.'" *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015) (quoting

*Brandi–Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012)).

Once these statutory requirements are met, the district court may grant § 1782 discovery

"in its discretion." *Id.* (citing *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 83–84

(2d Cir. 2004)). Such "discretion . . . is not boundless," but rather, "must [be] exercise[d] . . . in

light of the twin aims of the statute: 'providing efficient means of assistance to participants in

international litigation in our federal courts and encouraging foreign countries by example to

provide similar means of assistance to our courts . . . .'" *Schmitz*, 376 F.3d at 84 (quoting *In re

Application of Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997)).

In *Intel Corporation v. Advanced Micro Devices, Inc.*, the Supreme Court articulated four

additional "factors that bear consideration in ruling on a § 1782(a) request," including (1)

whether "the person from whom discovery is sought is a participant in the foreign proceeding,"

in which case "the need for § 1782(a) aid generally is not as apparent;" (2) "the nature of the

foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the

foreign government or the court or agency abroad to U.S. federal-court judicial assistance;" (3)

"whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering

restrictions or other policies of a foreign country or the United States;" and (4) whether the

request is "unduly intrusive or burdensome." 542 U.S. 241, 264–65 (2004); *see also Mees*, 793

F. 3d at 298. The Second Circuit has instructed that "[t]he *Intel* factors are not to be applied

mechanically," and "a district court should also take into account any other pertinent issues

arising from the facts of the particular dispute." *Kiobel by Samkalden v. Cravath, Swaine &*

*Moore LLP*, 895 F.3d 238, 245 (2d Cir. 2018), *cert. denied sub nom. Kiobel ex rel. Samkalden v. Cravath, Swaine & Moore LLP*, 139 S. Ct. 852 (2019).

The availability of § 1782 discovery is also subject to the Federal Rules of Civil Procedure. *See* 28 U.S.C. § 1782(a).  Moreover, "a district court evaluating a § 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome [under the fourth *Intel* factor] by applying the familiar standards of Rule 26 of the Federal Rules of Civil Procedure." *Mees*, 793 F.3d at 302.  Under Federal Rule of Civil Procedure 26(b) ("Rule 26(b)"), which also applies to subpoenas served upon nonparties, *see Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 139 (S.D.N.Y. 2017), "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[,]" Fed. R. Civ. P. 26(b).  Relevance is "construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on' any party's claim or defense." *Doe v. Sarah Lawrence Coll.*, 19 Civ. 10028 (PMH)(JCM), 2021 WL 197132, at *3 (S.D.N.Y. Jan. 20, 2021) (quoting *State Farm Mut. Auto. Ins. Co. v. Fayda*, 14 Civ. 9792 (WHP) (JCF), 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015), *aff'd*, 2016 WL 4530890 (S.D.N.Y. Mar. 24, 2016)).  Rule 45 of the Federal Rules of Civil Procedure ("Rule 45") provides that a court may issue an order compelling production or inspection of materials requested in a subpoena "where compliance is required," or quash or modify a subpoena that "requires disclosure of privileged or other protected matter, if no exception or waiver applies[,] . . . or subjects a person to undue burden." Fed. R. Civ. P. 45(d)(2)(B)(i), (3)(A)(iii)-(iv); *see also* Fed. R. Civ. P. 34(c).

In the context of a motion to compel discovery, the discovering party "has the burden of demonstrating that the information sought is relevant to the subject matter of the pending

action." *United States v. Int'l Bus. Machines Corp.*, 66 F.R.D. 215, 218 (S.D.N.Y. 1974); *see also Citizens Union*, 269 F. Supp. 3d at 139.  "Once relevance has been shown, it is up to the responding party to justify curtailing discovery." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of N.Y.*, 284 F.R.D. 132, 135 (S.D.N.Y. 2012) (quoting *Trilegiant Corp. v. Sitel Corp.*, 275 F.R.D. 428, 431 (S.D.N.Y. 2011)).  Likewise, a party moving to quash a subpoena "carr[ies] the burden of proving that a subpoena imposes an undue burden on a witness." *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 262 F.R.D. 293, 299 (S.D.N.Y. 2009).  Whereas "inconvenience alone will not justify an order to quash a subpoena that seeks potentially relevant testimony . . . [a] subpoena that 'pursues material with little apparent or likely relevance to the subject matter,' . . .  is likely to be quashed as unreasonable even where the burden of compliance would not be onerous." *Kirschner v. Klemons*, No. 99 Civ. 4828(RCC), 2005 WL 1214330, at *2 (S.D.N.Y. May 19, 2005) (quoting *Concord Boat Corp. v. Brunswick Corp.*, 169 F.R.D. 44, 50 (S.D.N.Y. 1996)).

Both motions to compel and "motions to quash a subpoena are . . . 'entrusted to the sound discretion of the district court.'" *In re Fitch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003) (quoting *United States v. Sanders*, 211 F.3d 711, 720 (2d Cir. 2000)); *see also Mason Tenders Dist. Council of Greater N.Y. v. Phase Constr. Servs., Inc.*, 318 F.R.D. 28, 36 (S.D.N.Y. 2016).  However, "to the extent a district court finds that a [§ 1782] discovery request is overbroad, before denying the application it should ordinarily consider whether that defect could be cured through a [more] limited grant of discovery." *Mees*, 793 F.3d at 302.

## III.   DISCUSSION

The parties dispute whether the Subpoenas violate the statutory "for use" requirement under § 1782, as well as the first and fourth *Intel* factors. (*Compare* Docket Nos. 30 at 13-21; 39

at 7-19, *with* Docket Nos. 37 at 17; 43 at 3-10).  Accordingly, the Court focuses its analysis on these three issues.

## A.      The "For Use" Requirement Under § 1782

Respondents argue that the discovery sought is not "for use" in the Cayman Litigation within the meaning of § 1782 because it is irrelevant to those proceedings. (Docket No. 37 at 17, 21-26 & n.8).  The Court disagrees.

To satisfy the "for use" requirement under § 1782, an applicant must demonstrate that the discovery it seeks is "something that will be employed with some advantage or serve some use in [a foreign] proceeding." *Mees*, 793 F.3d at 298.  This inquiry focuses on the applicant's "practical ability to inject the requested information into [the] foreign proceeding." *In re Accent Delight Int'l Ltd.,* 869 F.3d 121, 132 (2d Cir. 2017); *see also In re Noguer*, 18-MC-498 (JMF), 2019 WL 1034190, at *3 (S.D.N.Y. Mar. 5, 2019).  The intended "use" of such discovery need not be imminent, but rather, must be "within reasonable contemplation at the time" of the § 1782 petition. *Mees,* 793 F.3d at 301; *see also Intel*, 542 U.S. at 258–59; *In re Schlich for Ord. to Take Discovery Pursuant to 28 U.S.C. §1782*, No. 16-MC-319 (VSB), 2017 WL 4155405, at *5–7 (S.D.N.Y. Sept. 18, 2017).  Nor must the discovery be necessary to prevail in the foreign proceeding; the "for use" requirement is satisfied, for example, if the requested evidence would "tend[] to prove" one or more underlying claim before the foreign tribunal. *See In re Accent Delight*, 869 F.3d at 133.

Because the statute does not "condone speculative forays" into foreign law, *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1099 (2d Cir. 1995) [hereinafter "*Euromepa I*"], the "for use" requirement also does not require an applicant to show that the requested materials ultimately would be relevant or discoverable in the foreign proceeding. *See Intel*, 542 U.S. at

26263; *Brandi-Dohrn*, 673 F.3d at 82.  Indeed, "the ultimate admissibility of the evidence is

determined by the foreign tribunal," *Brandi-Dohrn*, 673 F.3d at 82, and the statute does not

direct district courts to "engage in comparative analysis to determine whether analogous

proceedings exist here." *Intel*, 542 U.S. at 263.  On the other hand, "the requirements of § 1782

are not satisfied by the requesting party reciting some minimal relation to [the] pending foreign

proceeding." *In re Asia Mar. Pac. Ltd.*, 253 F. Supp. 3d 701, 706 (S.D.N.Y. 2015); *see also

Certain Funds*, 798 F.3d at 120 (finding that "[t]he relevance of the information sought . . . is not

sufficient in and of itself to authorize the district court to order discovery").  Thus, the Second

Circuit has explained that an inquiry into "[t]he relevance of the information sought may be

necessary" to the "for use" analysis, "insofar as it is difficult to conceive how information that is

plainly irrelevant to the foreign proceeding could be said to be 'for use' in that proceeding." *See

Certain Funds*, 798 F.3d at 120 n.7.  However, even "[w]here relevance is in doubt" in a § 1782

case, "the district court should be permissive." *In re Application Pursuant to 28 U.S.C. Section

1782 of Christen Sveas*, 249 F.R.D. 96, 107 (S.D.N.Y. 2008)) (noting that "court[s] should be

wary of denying discovery on relevance grounds" when "called upon only to resolve a discovery

issue that arises from underlying litigation in foreign jurisdictions"); *see also In re China

Petrochemical Dev. Corp.*, No. 3:17-cv-02138 (SRU), 2018 WL 1320665, at *4 (D. Conn. Mar.

14, 2018).

Here, the requested materials are plainly "for use" in the pending Cayman Litigation. *See

28 U.S.C. § 1782.  That proceeding seeks Fang's winding up on the grounds that Mo breached

his fiduciary duty by commingling Fang assets with those of his other companies, and causing

Fang to enter into several transactions to benefit Mo and/or his family rather than Fang. (*See

Docket No. 3-2 ¶¶ 188, 266-74).  The procedural rules in winding up proceedings permit the

Grand Court to hold an evidentiary hearing and issue "directions" regarding the taking of evidence, document discovery and oral discovery. (*See* Docket Nos. 3 ¶ 27; 35 ¶¶ 5-19).  To date, the Cayman Litigation has not involved any discovery, and has focused on a "preliminary liquidation application" to address the alleged mismanagement of certain real property assets in China. (*See* Docket Nos. 35 ¶¶ 10-18; 40 at ¶¶ 4-12).  However, at oral argument on August 2, 2021, the parties represented that Applicants conditionally withdrew that application after the last conference before this Court.  Therefore, if the case does not settle, the Grand Court's next task is to address the rest of Applicants' allegations and requests for relief through a variety of potential devices including discovery. (*See id.*; Docket Nos. 35 ¶¶ 6-9; 40 ¶¶ 12-13, 17-27).  That is sufficient to establish that the Grand Court will "'take and hear new evidence' in at least some respect" in the underlying proceeding, and thus, there is a "discernible procedural mechanism" for introducing the evidence Applicants seek. *See In re Noguer*, 2019 WL 1034190, at *3 (quoting *Certain Funds*, 798 F.3d at 122 n.11; *Euromepa, S.A. v. R. Esmerian, Inc.*, 154 F.3d 24, 29 (2d Cir. 1998) [hereinafter "*Euromepa II*"]).

Furthermore, the requested discovery is "not plainly irrelevant" to the Cayman Litigation, as Respondents contend. *See Certain Funds*, 798 F.3d at 120 n.7; (Docket No. 37 at 21 n. 8). The Amended Petition asserts that Mo's family members, who also sit on RCNC's board, appear to have used Arden House for personal purposes. (*See* Docket No. 3-2 ¶¶ 184, 188).  It also expressly names all three nonprofits as entities with connections to other companies in the Mo corporate structure that allegedly diverted Fang assets – such as Upsky and Next Decade – and that allegedly engaged in facially irregular transactions. (*Id.* ¶¶ 65-102; 130-60).  For example, Applicants allege that both NYMA and RCNC have non-operative businesses, yet received financing from Upsky and Next Decade, which in turn intermingled Fang assets and caused Fang

to lose millions of dollars in a rigged options transaction. (*Id.* ¶¶ 196-97, 65-102, 130-60). Similarly, according to Applicants, both RCNC and WSGTC have held themselves out as related to Fang and utilized Fang assets, even though their true purpose is to benefit Mo's family or hotel operations. (*Id.* ¶¶ 174-82, 188-91). If these allegations are correct, the requested discovery could help Applicants prove the extent of Mo's alleged misconduct and provide crucial information regarding any equitable relief the Grand Court might fashion to protect Fang's assets and regulate its affairs. (*See* Docket No. 3 ¶ 15).

Respondents contend that the discovery sought is irrelevant because it seeks information regarding transactions (1) with entities unrelated to Fang, or (2) that took place before Applicants invested in Fang in 2014. (Docket No. 37 at 22-26). These arguments are meritless. First, Respondents' argument that NYMA is not related to Fang is belied by the fact that during the meet-and-confer process, Respondents' counsel identified a payment from Fang to NYMA for a training provided to Fang employees in 2016. (Docket Nos. 30 at 10; 36 ¶ 9.e; 37 at 22). Because there is evidence that NYMA implicated itself in at least one transaction with Fang, Applicants are entitled to explore the transaction's terms, the nature of these entities' relationship, and whether any other transactions that occurred between these entities diverted Fang assets.

Second, transactions between any of the three nonprofits and entities acting for or related to Fang – though not wholly-owned Fang subsidiaries – are highly relevant to Mo's alleged misconduct in the Cayman Litigation. In the Amended Petition, Applicants assert that Mo has surreptitiously diverted Fang assets by registering those assets as managed and/or owned by private third-party companies of which he is a majority owner. (Docket Nos. 3-2 ¶¶ 142-59; 28 ¶ 19.b). Because Mo allegedly transferred these Fang assets outside of the Fang corporate

structure without adequate disclosure to shareholders, it is insufficient to rely on Respondents'

transactions with Fang itself, Fang's own public disclosures, or Applicants' knowledge to

identify other potential repositories of Fang assets. (*See* Docket Nos. 30 at 17; 37 at 18).  Nor can

the Court confidently conclude that Respondents possess no relevant documents based on Mo's

assertions that neither RCNC nor NYMA have "received any transfer of any 'property or rights'

from Fang," and that RCNC has not received "any loan or payment from Fang or any Fang

subsidiary." (Docket No. 34 ¶¶ 10, 16).  Even if Mo's representations are true, they do not

foreclose the possibility that these nonprofits acquired Fang assets by transacting with entities

acting for Fang or that are affiliated with the Mo corporate empire, but that are not wholly-

owned Fang subsidiaries. (Docket No. 34 at ¶¶ 10, 16).  Although the Subpoenas do not clearly

define the word "affiliate," given Applicants' allegations regarding Mo's method of hiding assets

and stated goal of tracing any Fang assets transferred through the three Respondents, any

documents in Respondents' possession reflecting these types of transactions – as well as Rule

30(b)(6) testimony on that topic – is sufficiently relevant for the Court's limited purposes here.[6]

*See Certain Funds*, 798 F.3d at 120 n.7; *see, e.g.*, *In re Vale S.A.*, 2021 WL 311236, at *45;

---

[6] Respondents also argue that the Deposition Subpoenas are overbroad because they cover certain matters not encapsulated by the Documentary Subpoenas, none of which are relevant to the Cayman Litigation. (Docket Nos. 37 at 26; 43 at 6).  Specifically, the Deposition Subpoenas seek testimony regarding any transactions involving each Respondent and Deanhale Limited, Ateefa Limited, Karistone Limited, Open Land Holdings Limited, the KM & KM Trust and/or the MC Trust, yet these entities are not named in any document requests. (Docket Nos. 29-1–29-3). However, at oral argument, Applicants explained that the Documentary Subpoenas cover these same transactions because all of these entities are defined as "Mo Entities" in these Subpoenas' definitions sections. (*See* Docket Nos. 29-1 at 8; 29-2 at 8; 29-3 at 9; *supra* Section I.D).  Moreover, per various Fang SEC filings and the Amended Petition, Deanhale Limited, Ateefa Limited and Karistone Limited are wholly owned by Mo; Open Land Holdings Limited is another Mo company that owns equity in Fang; and the KM and MC Trusts hold shares of Next Decade and Media Partner, respectively. (*See* Docket No. 3-2 ¶¶ 37, 48, 57.d, 59).  In light of these latter relationships with Next Decade and Media Partner – the same companies involved in the 2019 and 2020 options transaction – as well as Mo's alleged pattern of using his companies to hide Fang assets, transactions with these additional entities are also relevant to the Cayman Litigation. *See In re Vale S.A.*, 20-mc-199 (JGK) (OTW), 2021 WL 311236, at *4–5 (S.D.N.Y. Jan. 29, 2021); *supra* Section I.A.

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 438 (S.D.N.Y. 2011).

Finally, it is of no moment that Applicants did not invest in Fang until three years after a number of transactions involving WSGTC and RCNC named in the document requests. (Docket No. 37 at 22-23, 25-26).  The thrust of the Cayman Litigation is that Mo's misuse of Fang assets and other misconduct began well-before Applicants' involvement. (*See generally* Docket Nos. 3 ¶¶ 20-22; 3-2 ¶¶ 103-203, 268.e).  The Amended Petition highlights specific transactions at RCNC's inception in 2011 involving suspiciously large influxes of capital from unknown sources. (Docket No. 3-2 ¶¶ 183-96).  It further asserts that after WSGTC was formed that same year, WSGTC began charging Fang for trainings at 92 Wall Street that never occurred. (*Id.* ¶¶ 166-81).  Consequently, given the permissive standard for relevance and the caution to avoid resolving foreign legal issues, *see Euromepa I*, 51 F.3d at 1099; *In re Application Pursuant to 28 U.S.C. Section 1782 of Christen Sveas*, 249 F.R.D. at 107, the requested information regarding these entities' formation, Mo's connections with them, and their early financial transactions sufficiently bears on Applicants' claims for purposes of this § 1782 proceeding. *See Doe*, 2021 WL 197132, at *3; *see also In re Ambercroft Trading Ltd.*, No. 18-mc-80074-KAW, 2018 WL 4773187, at *9 (N.D. Cal. Oct. 3, 2018).

For all of these reasons, the requested discovery satisfies the "for use" requirement under § 1782 and is sufficiently relevant to the Cayman Litigation under Rule 26(b).

**B.     The First *Intel* Factor: Whether the Person From Whom Discovery Is Sought Is a Participant in the Foreign Proceeding**

Respondents argue that the Subpoenas violate the first *Intel* factor because they ultimately require disclosure from Mo, a party to the Cayman Litigation who has possession and control of any relevant documents. (Docket Nos. 37 at 17-20; 43 at 3-5).  Thus, Respondents

reason, the requested discovery is subject to the Grand Court's jurisdiction. (Docket Nos. 37 at 17-20; 43 at 3-5).  They further assert that the Subpoenas run afoul of Rule 45 in that the requested non-party discovery is equally available from Mo, a party to the underlying proceeding. (Docket No. 37 at 17-18).  These points are well-taken, but after much consideration, the Court finds them unpersuasive.

Under the first *Intel* factor, "when the person from whom discovery is sought is a participant in the foreign proceeding . . . the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a non participant." *Intel*, 542 U.S. at 264.  This is because "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Id.*; *see also In re Tiberius Grp. AG*, 19-mc-467 (VSB), 2020 WL 1140784, at *6 (S.D.N.Y. Mar. 6, 2020).  The Second Circuit found that this factor also weighs against § 1782 discovery when "for all intents and purposes petitioners are seeking discovery from . . . their opponent in the [foreign] litigation," even though the subpoenaed party is not technically a participant in those proceedings. *See Schmitz*, 376 F.3d at 85; *see also Kiobel*, 895 F.3d at 245.

For example, in *Kiobel by Samkalden v. Cravath, Swaine & Moore LLP*, the Second Circuit held that § 1782 discovery was unwarranted where the applicant requested documents from a U.S.-based law firm that had been acquired in a previous litigation. *See* 895 F.3d at 245. The previous litigation involved the same applicant and the applicant's current adversary, whom the firm represented. *See id.*  The firm had produced the documents in question pursuant to a confidentiality order, which required the other litigants – including the applicant – to destroy or return the documents at the conclusion of the case. *See id.* at 241.  In light of these facts, the Second Circuit concluded that the adversary was the "real party from whom" the applicant

sought the subject documents. *See id.* at 245.  The court declined to grant the request because doing so would encourage "Section 1782 [to] become a workaround to gain discovery" and "undermine confidence in confidentiality orders." *See id.* at 247; *see also Schmitz*, 376 F.3d at 84–85 (affirming denial of § 1782 application for discovery from counsel to German corporation in furtherance of foreign litigation, where documents were in counsel's possession due to lawsuit against German corporation in the United States).

That said, courts within this Circuit have also found that § 1782 discovery is not necessarily inappropriate under the first *Intel* factor simply because it is sought from a U.S.-based party that is affiliated with the applicant's foreign adversary. *See, e.g.*, *In re Application of CBRE Glob. Invs. (NL) B.V.*, 20-MC-315 (VEC), 2021 WL 2894721, at *10 (S.D.N.Y. July 9, 2021); *In re Kidd*, No. 3:20-cv-00800 (KAD), 2020 WL 5594122, at *5 (D. Conn. Sept. 18, 2020); *In re Top Matrix Holdings Ltd.*, No. 18 Misc. 465 (ER), 2020 WL 248716, at *5 (S.D.N.Y. Jan. 16, 2020).  This is because entities who are "participants" in foreign proceedings are "separate legal entities from their subsidiaries and affiliates for the purpose of Section 1782 motions." *See In re Top Matrix Holdings Ltd.*, 2020 WL 248716, at *5 (citing *In re del Valle Ruiz*, 939 F.3d 520, 523 (2d Cir. 2019)).  As one court put it, the first *Intel* factor does not militate against § 1782 discovery under *Kiobel* even where the applicant's foreign adversary possesses the requested information, if the requested information "is not information that an affiliate or subsidiary would have *solely* by virtue of its relationship to the real party to the foreign proceedings and is pertinent only to the party to the foreign proceeding[s]." *See In re Application of CBRE Glob. Invs. (NL) B.V.*, 2021 WL 2894721, at *10 (emphasis in original).

Here, Respondents are not named parties in the Cayman Litigation, nor does the record indicate that they are otherwise "participants" in that proceeding. (Docket No. 37 at 17-18); *see*

*also Intel*, 542 U.S. at 265.  However, Mo – Applicants' opponent in the Cayman Litigation – is affiliated with all three Respondents, because he is a director and President of RCNC; Secretary and Treasurer of NYMA's board of trustees; and a director and President of WSGTC. (Docket No. 34 ¶¶ 6, 14, 19).  Mo also asserts that any responsive documents are "maintained in China under [his] control." (*Id.* ¶¶ 11, 17, 22).  Although Applicants dispute whether Mo indeed has legal control over these documents, (Docket No. 39 at 14), the question before the Court is whether, even assuming Mo has such possession or control over the documents requested, Mo is the "real" target of the Subpoenas in that Respondents have the documents "solely" because of their relationship with Mo, and the documents are "pertinent only" to him. *See In re Application of CBRE Glob. Invs. (NL) B.V.*, 2021 WL 2894721, at *9–10 (quoting *Kiobel*, 895 F.3d at 245) (internal quotation marks omitted).

The Court finds that unlike in *Kiobel*, Respondents are the "real part[ies]" from whom the subject discovery is sought – not Mo – and the first *Intel* factor supports the requested discovery. *See Kiobel*, 895 F.3d at 245; *see also In re Application of CBRE Glob. Invs. (NL) B.V.*, 2021 WL 2894721, at *10.  Mo and each Respondent are not one in the same simply because of Mo's executive positions, and as New York not-for-profit corporations, Respondents are not within the Grand Court's jurisdiction.[7] *See In re Top Matrix Holdings Ltd.*, 2020 WL 248716, at *5.

Furthermore, although the Subpoenas do seek information concerning Mo, his family and Fang, Applicants' foreign adversary, the Subpoenas also request information regarding

---

[7] Although *Lazaridis v. Int'l Ctr. for Missing & Exploited Child., Inc.*, 760 F. Supp. 2d 109, 114 (D.D.C. 2011), *aff'd sub nom. In re Application for an Ord. Pursuant to 28 U.S.C. § 1782*, 473 F. App'x 2 (D.C. Cir. 2012), and certain other district courts have reached contrary results, Respondents' reliance on these decisions is misplaced. (Docket Nos. 37 at 17-18 n.3, 20 n.6; 43 at 4).  First, as a district court decision from the District of Columbia, *Lazaridis* is not binding on this Court.  Second, *Lazaridis* is distinguishable from the facts here because in that case, the U.S.-based respondents' counsel was consistently present at hearings in the foreign proceedings, and thus, actively "participa[ted]" in that litigation. *See id.* at 114 n.3; *see also Intel*, 542 U.S. at 264.  Third, all of these cases contradict recent Second Circuit precedent analyzing corporate "affiliates" as legally separate entities for § 1782 purposes. *Cf. In re del Valle Ruiz*, 939 F.3d at 534; *see also In re Top Matrix Holdings Ltd.*, 2020 WL 248716, at *5.

transactions solely "pertinent" to Respondents and other entities that are legally separate from Mo. *See In re Application of CBRE Glob. Invs. (NL) B.V.*, 2021 WL 2894721, at \*10; *see also In re Kidd*, 2020 WL 5594122, at \*5. For example, the Subpoenas call for disclosure of documents regarding: (a) RCNC's purchases of Arden House, NYMA and Briarcliffe; (b) loans or payments from Upsky entities; (c) WSGTC's establishment of a training school at 192 Wall Street; (d) a real estate study listed on WSGTC's IRS Form 990 for 2017 and 2018; and (e) "all" officers, directors, trustees, and employees of each of the Respondents. (*See generally* Docket Nos. 29-1–29-3). Therefore, the Subpoenas are tailored to request information regarding Respondents' *own* business activities within this District. *See In re Kidd*, 2020 WL 5594122, at \*5. The fact that Mo also possesses this information stems from his affiliation with Respondents, not the other way around. *See In re Application of CBRE Glob. Invs. (NL) B.V.*, 2021 WL 2894721, at \*10. These factors render this action distinguishable from the circumstances in *Kiobel* and similar cases, where the § 1782 applicants strategically attempted to leverage attorney-client relationships as a "work around" to obtain documents solely pertaining to the applicants' foreign adversaries. *See Kiobel*, 895 F.3d at 245; *see also id.*

Although Mo claims that the relevant documents are housed in China, (Docket No. 34 ¶¶ 11, 17, 22), the Court is dubious that there are *no* relevant documents at Respondents' properties in this State. In any event, it is not prohibited from compelling discovery of information that is located abroad. *See In re del Valle Ruiz*, 939 F.3d at 533. The Second Circuit recently held that "a district court is not categorically barred from allowing discovery under § 1782 of evidence located abroad," as long as the court "consider[s] the location of documents and other evidence when deciding whether to exercise its discretion to authorize such discovery." *See id.* Thus, the mere fact that the requested "information is located" abroad "is not relevant, and by extension,

that [the] information" is in the possession of both a § 1782 applicant's adversary and its U.S.-based affiliate "is [also] not relevant." *See In re Top Matrix Holdings Ltd.*, 2020 WL 248716, at *5.

Respondents' contention that the Subpoenas should be quashed because Rule 45 prevents third-party discovery "where the subpoenaed information can be obtained directly from a party" similarly fails. (Docket No. 37 at 18).  Although that may be true in some domestic proceedings without any § 1782 component, the Second Circuit has "rejected the requirement that an applicant must first seek discovery abroad before bringing a § 1782 petition." *In re Catalyst Managerial Servs., DMCC*, 680 F. App'x 37, 41 (2d Cir. 2017) (summary order) (citing *Application of Malev Hungarian Airlines*, 964 F.2d 97, 100 (2d Cir. 1992)).  Indeed, the plain language of § 1782 does not support such a reading. *See* 28 U.S.C. § 1782; *Application of Malev Hungarian Airlines*, 964 F.2d at 100; *see also Mees*, 793 F.3d at 303.  In the context of international litigation, barring § 1782 discovery for these reasons "would [also] undermine the policy of improving procedures for assistance to foreign and international tribunals by imposing . . . additional burden[s]" contrary to the "twin aims" of the statute. *See Application of Malev Hungarian Airlines*, 964 F.2d at 100.  Thus, Respondents' Rule 45 argument fails to appreciate the policy and comity concerns courts must weigh in deciding § 1782 petitions, and the cases they cite are distinguishable. (Docket No. 37 at 17-18 & n.4).

For all of these reasons, the first *Intel* factor militates in favor of granting the requested discovery.

## C.    The Fourth *Intel* Factor: Whether the Request is Unduly Intrusive or Burdensome

Respondents further argue that the Subpoenas violate both the fourth *Intel* factor and the Federal Rules of Civil Procedure because they are overbroad and unduly burdensome. (Docket

- 24 -

Nos. 37 at 21-27; 43 at 5-10).  In support of this contention, they assert that (1) the requested

discovery is irrelevant and overbroad for the same reasons set forth above; and (2) the

Deposition Subpoenas would require Mo, the only corporate representative with sufficient

knowledge to testify regarding the topics identified, to provide duplicative testimony as a fact

witness and Rule 30(b)(6) deponent. (Docket Nos. 37 at 26; 43 at 4-5).  The Court rejects

Respondents' arguments as they pertain to the both sets of discovery requests.

The fourth *Intel* factor asks whether the applicant's request is "unduly intrusive or

burdensome." *Intel*, 542 U.S. at 265.  The determination whether a subpoena creates an undue

burden "depends upon 'such factors as relevance, the need of the party for the documents, the

breadth of the document request, the time period covered by it, the particularity with which the

documents are described and the burden imposed.'" *In re Vale S.A.*, 2021 WL 311236, at *3

(quoting *Concord Boat*, 169 F.R.D. at 49).  When a party moves to quash a subpoena, it "bears a

heavy burden of proof." *Kirshner v. Klemons*, No. 99 Civ. 4828 (RCC), 2005 WL 1214330, at *2

(S.D.N.Y. May 19, 2005) (quoting *Irons v. Karceski*, 74 F.3d 1262, 1264 (D.C. Cir. 1995)).  To

prevail, the movant cannot "merely assert that compliance with the subpoena would be

burdensome without setting forth the manner and extent of the burden and the probable negative

consequences of insisting on compliance." *Id.*  "[I]nconvenience alone" is inadequate

justification to quash an otherwise valid subpoena. *See id.*  Furthermore, "[g]eneral and

conclusory objections as to relevance, overbreadth[] or burden are insufficient to exclude

discovery of requested information." *In re Vale S.A.*, 2021 WL 311236, at *3 (quoting *Lindsey v.

Butler*, No. 11-cv-9102, 2017 WL 4157362, at *3 (S.D.N.Y. Sept. 18, 2017)).

### 1.       Documentary Subpoenas

The Court has already determined that the Documentary Subpoenas seek sufficiently relevant evidence under the first *Intel* factor. (*See supra* Section III.A & n.6).  However, Respondents do not explain, in non-conclusory terms, why searching for and producing information in response to Applicants' document requests would be particularly difficult. *See In re Vale S.A.*, 2021 WL 311236, at *3–5.  Therefore, Respondents have not carried their burden. *See Kirshner*, 2005 WL 1214330, at *2.  This is especially so in light of the fact that many § 1782 applications "undoubtedly" require production of numerous documents and many hours of work. *See In re Vale S.A.*, 2021 WL 311236, at *4.

Furthermore, a review of the Documentary Subpoenas reveals that they are sufficiently tailored in time and subject matter to seek information relevant to Applicants' allegations regarding Respondents' suspect activities involving Mo, Mo companies, Fang affiliates or agents, and Mo's family. (*See generally* Docket Nos. 29-1–29-3).  Although the Subpoenas seek documents from the time of RCNC and WSGTC's incorporation to the present, representing a ten-year timeframe, the actual scope of discovery for WSGTC is much narrower because according to Mo, it has not carried on any business since 2013. (Docket Nos. 29-1; 29-3; 34 ¶¶ 6, 19, 21).  Moreover, although NYMA was incorporated over a century ago, (Docket No. 4-8), the Documentary Subpoena to NYMA covers the period from July 1, 2015 through the present, which corresponds with RCNC's purchase of NYMA in the same year, (Docket Nos. 29-2 at 14; 34 ¶ 14).  In light of the seriousness of Applicants' allegations and stated basis for believing that Mo has used his companies to misuse Fang assets – and may have also used Respondents to do so – the scope of the document requests is appropriate.

However, the Court notes that many of Applicants' requests to RCNC and NYMA may cause duplicative productions because RCNC purchased NYMA's real property and other assets in 2015. (*See* Docket No. 34 ¶¶ 8.a, 14). The parties are therefore directed to meet and confer to narrow the Documentary Subpoenas to those entities in order to minimize duplicative productions.

In addition, although Applicants complain that WSGTC is unable to locate the Chinese-language version of its contract with Fang, (Docket No. 30 at 16), it appears that WSGTC's counsel has made good-faith efforts to do so, (Docket No. 36 ¶ 9.d). The Court therefore declines to order WSGTC to continue searching for this document. However, since the contract is encapsulated by Document Request No. 4, WSGTC is reminded of its continuing obligation to produce it under Rule 26(e)(2) should it resurface at a later time. *See* Fed. R. Civ. P. 26(e)(2); (Docket No. 29-3 at 16, Request No. 4).

### 2.      Deposition Subpoenas

The Court also disagrees that the requested Rule 30(b)(6) depositions would be unduly burdensome. (*See* Docket Nos. 37 at 26-27; 43 at 45). As explained, the additional Mo entities referenced in the Deposition Subpoenas are relevant to Applicants' claims, and therefore, the Deposition Subpoenas are not overbroad. (*See supra* Sections III.A & n.6; III.C.1). Moreover, Respondents cannot avoid their obligation to produce any Rule 30(b)(6) witnesses simply because it would be inconvenient for Mo to sit for multiple depositions or segregate his knowledge as it pertains to his status an individual and a corporate representative. (Docket Nos. 37 at 26; 43 at 4-5).

"There is a discernable preference in the case law of this Circuit to allow a litigant the opportunity to bind a corporate entity through Rule 30(b)(6) testimony." *Rubie's Costume Co.,*

*Inc. v. Kangaroo Mfg., Inc.*, CV 16-6517 (SJF) (AKT), 2018 WL 4558405, at *3 (E.D.N.Y. Sept.

21, 2018).  Rule 30(b)(6) requires that "when a party seeking to depose a corporation announces

the subject matter of the proposed deposition, the corporation . . . produce someone familiar with

that subject." *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 268 (2d Cir. 1999).  The rule

imposes an "affirmative duty" on the corporate deponent "to make available 'such number of

persons as will' be able 'to give complete, knowledgeable and binding answers' on its behalf."

*Id.* (quoting *Securities & Exchange Comm'n v. Morelli*, 143 F.R.D. 42, 45 (S.D.N.Y. 1992)).

However, there is no requirement that a Rule 30(b)(6) witness have personal knowledge of the

noticed topics. *See Jam Indus. USA, LLC v. Gibson Brands, Inc.*, No. 19 MC 508-LTS, 2020 WL

4003280, at *4 (S.D.N.Y. July 15, 2020).  Instead, the rule requires testimony regarding

information "known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6).  When

the designated witness(es) lack relevant personal knowledge, "the corporation is obligated to

prepare them so that they may give knowledgeable answers." *Agniel v. Cent. Park Boathouse

LLC*, No. 12 CIV. 7227 NRB, 2015 WL 463971, at *2 (S.D.N.Y. Jan. 26, 2015) (quoting

*Spanski Enters., Inc. v. Telewizja Polska*, S.A., 07 Civ. 930, 2009 WL 3270794, at *3 (S.D.N.Y.

Oct.13, 2009)).  Because of this obligation, and because it is rare for one employee to have

personal knowledge of everything known to a corporation, it is not unusual for a Rule 30(b)(6)

deposition to involve extensive preparation and multiple witnesses. *Cf. Wultz v. Bank of China

Ltd.*, 298 F.R.D. 91, 99 (S.D.N.Y. 2014) [hereinafter "*Wultz II*"]; *In re Weatherford Int'l Sec.

Litig.*, No. 11 CIV. 1646 LAK JCF, 2013 WL 4505259, at *3 (S.D.N.Y. Aug. 23, 2013); Fed. R.

Civ. P. 30 advisory committee's note to 1993 amendment.

  In addition, the Rule 30(b)(6) deponent is the party who holds the right to select the

specific person(s) who will testify on its behalf; neither the court nor the noticing party can

choose the corporate designee. *See McIntyre v. BF Capital Holding, LLC*, No. 3:14cv33 (RNC), 2016 WL 5219445, at *1 (D. Conn. Sept. 20, 2016); *Wultz II*, 298 F.R.D. at 99.  That said, the court "can compel [a corporate deponent] to select a designee and educate her in accordance with its duty under Rule 30(b)(6)." *See Wultz II*, 298 F.R.D. at 99.  Where a nonparty corporation is subpoenaed for a Rule 30(b)(6) deposition pursuant Rule 45, however, these requirements must be balanced with Rule 45(d)'s "mandate that . . . [a subpoena be] quashed[ed]" if it "subjects a person to 'undue burden.'" *See Wultz v. Bank of China Ltd.*, 293 F.R.D. 677, 680 (S.D.N.Y. 2013) [hereinafter "*Wultz I*"]; *see also Koch v. Pechota*, No. 10 Civ. 9152, 2013 WL 3892827, at *1 (S.D.N.Y. July 25, 2013) ("[T]he status of a witness as a non-party to the underlying litigation entitles [the witness] to consideration regarding expense and inconvenience.") (quoting *Night Hawk Ltd. v. Briarpatch Ltd., L.P.*, No. 03 Civ.1382 (RWS), 2003 WL 23018833, at *8 (S.D.N.Y. Dec. 23, 2003)) (internal quotation marks omitted); Fed. R. Civ. P. 45(d)(3)(A)(iv).

Whereas the Court understands Respondents' concerns regarding the practical difficulties in preparing Mo to testify on their behalf, Respondents fail to appreciate that they do not need to designate Mo as their representative at all. *See Jam Indus. USA, LLC*, 2020 WL 4003280, at *4; *Wultz II*, 298 F.R.D. at 99.  Rather, Respondents must designate one or more witnesses who can testify to matters within *Respondents'* knowledge or that are reasonably available to *Respondents*, based on either personal knowledge or adequate preparation. *See Rubie's Costume Co, Inc.*, 2018 WL 4558405, at *3; *see also Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Royal Bank of Scotland Grp. PLC*, No. 3:11CV1383(AWT), 2015 WL 13634404, at *3–5 (D. Conn. Aug. 20, 2015).  Mo is not the only director or trustee of the three Respondents, (*see* Docket Nos. 4-7 at 3; 4-8 at 2; 4-10 at 3; 34 ¶¶ 6, 14, 19), and in light of Applicants' need for the

information requested,[8] Respondents have presented no convincing explanation why it would be *unduly* burdensome to designate and prepare another one of those individuals, if Respondents so choose. *Cf. Wultz II*, 298 F.R.D. at 98–99 (finding that Israeli bank whose most knowledgeable employees were in Israel was required to designate Rule 30(b)(6) witness to testify on behalf of New York branch, as a New York employee "c[ould] easily be educated by a person in Israel by telephone, email or videoconference and relevant documents c[ould] easily be transmitted on a single flash drive or CD-ROM"); (*see* Docket Nos. 37 at 26-27; 43 at 3-10).

Furthermore, if Respondents wish to make a strategic decision to exercise their right to designate Mo as their representative,[9] that does not foreclose Applicants' right to extract deposition testimony binding Respondents. *See* Fed. R. Civ. P. 30(b)(6).  First, without unduly delving into the intricacies of Caymanian law, *Euromepa I*, 51 F.3d at 1099, it is not clear that the Grand Court would permit fact depositions in those proceedings at all, nor has discovery in the Cayman Litigation begun. (*See* Docket Nos. 3 ¶ 27 n.14; 3-16; 35 ¶ 19; 40 ¶ 34).  Therefore, Respondents' complaints that Mo will be required to provide duplicative testimony are premature.  Second, even if Mo is eventually deposed as a fact witness in the Cayman Litigation, courts within this Circuit permit Rule 30(b)(6) depositions even when the anticipated testimony

---

[8] The subject depositions are especially crucial in light of the fact that Respondents' recordkeeping appears to be scant and they have been unable to locate key documents. (*See supra* Section I.E).

[9] The Court rejects Respondents' assertion that proceeding with the Rule 30(b)(6) depositions with Mo as their designee will be "unfair" or "raise the prospect of inconsistent rulings" from this and the Grand Court without the Grand Court's supervision. (*E.g.*, Docket No. 43 at 4-5).  To the extent Respondents argue that the requested discovery is an "attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country" under the third *Intel* factor, *see Intel*, 542 U.S. at 264–65, Respondents have not pointed to any proof-gathering restrictions that would contradict this Court's rulings under Caymanian law. *See In re Application of Hill*, No. M19-117(RJH), 05-CV-999996, 2007 WL 1226141, at *3 (S.D.N.Y. Apr. 23, 2007).  Furthermore, if a foreign court "opposes United States assistance, that court may simply choose to exclude the discovered material from evidence." *In re Gemeinshcaftspraxis Dr. Med. Schottdorf*, No. Civ. M19-88 (BSJ), 2006 WL 3844464, *6-7 (S.D.N.Y. Dec. 29, 2006).  Moreover, where, as here, the applicant appears to be pursuing § 1782 discovery with a good faith basis to believe it will be able to use the discovery in the foreign proceeding, the applicant's "attempt to short-circuit the [foreign] discovery process by obtaining documents directly in this proceeding" does not negatively implicate the third *Intel* factor. *See In re Application of Hill*, 2007 WL 1226141, at *3.

would "essentially duplicate information which has already been stated in an individual deposition." *See Dongguk Univ. v. Yale Univ.*, 270 F.R.D. 70, 74 (D. Conn. 2010); *see also Rubie's Costume Co, Inc.*, 2018 WL 4558405, at *3.  This is because, whereas an individual person may testify as a fact witness, her testimony on the same subject matter pursuant to Rule 30(b)(6) binds the corporation. *See Rubie's Costume Co, Inc.*, 2018 WL 4558405, at *3.

Additionally, the Court must evaluate the Rule 30(b)(6) Subpoenas in light of § 1782's "twin aims" of promoting efficient assistance to international litigations, as well as encouraging foreign courts to do the same. *See Schmitz*, 376 F.3d at 84.  Because the Federal Rules of Civil Procedure explicitly provide for the right to bind a corporation through deposition testimony, Fed. R. Civ. P. 30(b)(6), and the record indicates that Caymanian courts may receive deposition transcripts as evidence, (Docket No. 3 ¶ 27), the Court will not deny Applicants their right to depose Respondents as a means of prosecuting the Cayman Litigation.  Respondents must decide whether their resources are best served designating Mo as their representative despite the concerns they cite, or taking the time to prepare any one of the other directors, trustees or employees of their organizations.

Therefore, the fourth *Intel* factor also weighs in favor of granting the requested discovery.

## IV.   CONCLUSION

For the foregoing reasons, Applicants' motion to compel is GRANTED in part and DENIED in part, and Respondents' motion to quash is DENIED.

The Clerk is respectfully requested to terminate the pending motions (Docket Nos. 27; 33).

Dated: August 27, 2021
        White Plains, New York

**SO ORDERED:**

JUDITH C. McCARTHY
United States Magistrate Judge
